LEWIS & LLEWELLYN LLP
Paul T. Llewellyn (Bar No. 216887)
pllewellyn@lewisllewellyn.com
Nicolas V. Saenz (Bar No. 284087)
nsaenz@lewisllewellyn.com
Tobias Snyder (Bar No. 289095)
tsnyder@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

Attorneys for Plaintiff
TOP AGENT NETWORK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP AGENT NETWORK, INC.<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, CALIFORNIA ASSOCIATION OF REALTORS, INC., SAN FRANCISCO ASSOCIATION OF REALTORS,<br><br>Defendants. | CASE NO.<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>**(1) VIOLATION OF SHERMAN ANTITRUST ACT SECTION 1**<br><br>**(2) VIOLATION OF SHERMAN ANTITRUST ACT SECTION 2**<br><br>**(3) VIOLATION OF CLAYTON ACT SECTION 3**<br><br>**(4) VIOLATION OF CARTWRIGHT ACT**<br><br>**(5) UNFAIR COMPETITION UNDER BUSINESS AND PROFESSIONS CODE SECTION 17200**<br><br>**(6) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This action is necessary to stop the National Association of Realtors ("NAR") and its affiliates from conspiring to shut down competition, disrupt the relationship between real estate agents and their clients, require agents to violate California law, and take away a family's freedom to choose how to market their home for sale.  NAR's most recent unlawful attempt at abusing its market dominance should be enjoined.

2.      The NAR is the largest trade association in the United States.  The NAR and its local affiliates throughout the country, such as the California Association of Realtors, Inc. ("CAR") and San Francisco Association of Realtors ("SFAR"), make money, in part, by charging real estate agents to use their multiple listing service ("MLS").  An MLS is a listing service containing a database of homes for sale in any given geographic region.  For example, the SFAR controls the San Francisco-based MLS, the "SFARMLS."  When a home is "listed" on the SFARMLS, tens of thousands of agents gain access to details about the home for sale and about the home seller.  For agents to access the MLS, first they must pay membership dues or a fee and agree to be bound by NAR's rules.

3.      As a practical matter, to practice their profession, the overwhelming majority of real estate agents currently must use the NAR-affiliated MLS in the area in which they operate.  This market control ensures that NAR and its affiliated associations are guaranteed substantial membership dues and fees— around $200 million annually—from agents needing access to the MLS.

4.      Beyond these fees, the NAR has a second, less obvious motivation to make sure the MLS-system continues to grow in power.  At its basic level, the NAR is just an association of competing real estate agents who have joined together to cooperate on some issues.  But a small number of the agents are responsible for the overwhelming majority of all home sales.  Many of these experienced agents have established their own networks and created methods outside of the MLS to service their clients.  They are therefore less reliant on the MLS as a percentage of their overall business than less experienced or lower producing agents.  Many of these top performers frequently conduct "Off-MLS" sales and gather market research by using alternative networks.

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

5.      These alternative networks pose a problem for NAR.  If a home for sale is never "listed" on the MLS, and instead is marketed "Off-MLS" through alternative means, most NAR members have a reduced chance of being involved in the transaction, and therefore are less likely to make a commission.  Absent the ability to make a commission from using the MLS, NAR's members have less incentive to pay NAR to access it.  Off-MLS sales, then, threaten NAR's revenue stream, its market dominance, and its entire reason for existing.  And the number of Off-MLS sales has grown significantly in recent years.  NAR, its affiliates, and many of its individual agent-members, therefore have a huge incentive to stamp out these alternative networks to ensure homes for sale *must* be listed on the MLS.

6.      Plaintiff Top Agent Network, Inc. ("TAN") is a prime example of a competitor providing an alternative to NAR-controlled MLS.  TAN's membership is limited to the top ten-percent of agents in select regions throughout the country.  TAN, in effect, is a private MLS with standards.  Its platform allows high-producing agents to exchange market data and information on a more selective, controlled basis.  It also allows a home seller to avoid the exposure, and associated risks and hassles, that come along with listing on the MLS: for example, disclosing her personal information to thousands of people and having strangers trounce through the house for showings.  TAN also provides behind-the-scenes "matchmaking" services, connecting a seller's agent and buyer's agent who have communicated symmetrical needs to TAN.  Once TAN matches them, the seller and buyer agents can then have private one-one-one conversations off the TAN platform regarding their respective clients' needs.  Put simply, agents pay TAN membership dues to get access to *information not available on the MLS*.

7.      Unable to compete with TAN through free and fair innovation, NAR has sought to eliminate TAN through anticompetitive regulation.  Realizing the threat TAN poses, the NAR recently promulgated a rule, which each of its affiliates and members must follow, intended to undercut TAN's entire business model.  The rule provides, in effect, that any property an agent discusses on TAN or similar platforms must be listed on the MLS within one business day thereafter.  As NAR knows, if information shared on TAN must be placed on the MLS, agents have much less reason to ever use TAN in the first place.

2

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS + LLEWELLYN LLP

8. Furthermore, some NAR local affiliates, including SFAR, have used the rule to take aim not only at private marketing of properties on TAN's platform, but also TAN's matchmaking service. SFAR has taken the position that properties discussed in private one-on-one meetings between agents must be listed on the MLS within one-business day—meaning the utility of agents using TAN to facilitate these one-on-one conversations is significantly diminished. Agents who violate NAR's rule are subject to penalties—SFAR has already specifically threatened to fine its members $5,000 for the first violation, and such fines double and triple for subsequent violations.

9. The NAR has attempted to justify the rule by claiming it somehow is in the best interest of home sellers and buyers, for example by purportedly making housing more accessible. But the rule itself undermines these claims: big brokerage firms like Compass can still market properties internally among its thousands of agents without ever having to list that property on the MLS. The difference, of course, is that, unlike TAN, the large brokerage companies do not compete against the NAR for membership fees, and they require their agents to be NAR members. NAR's rule, in other words, is a transparent attempt at protecting its turf, not helping consumers.

10. The truth is the rule drives out competition, ensuring the NAR's continued market dominance. It forces agents to (1) violate the California Consumer Privacy Act by listing clients' protected, personal information on the MLS for thousands of people to find, forcing sellers to choose either to risk their privacy or not to have their home marketed in any way, and (2) breach their fiduciary duty to clients by listing properties on the MLS even when that is against the seller's best interest or wishes. It forces home sellers to participate in a fundamentally anticompetitive MLS-system. The rule also causes irreparable harm to TAN's business and reputation—members have already canceled subscriptions and communicated fear of reprisal from NAR for using TAN's services. NAR's conduct amounts to violations of federal and state antitrust statutes, a violation of California's unfair competition law, and intentional interference with TAN's contractual relations with its members.

## THE PARTIES

11. Plaintiff TAN is a California corporation with its principal place of business in San Francisco, California.

3

12.     Defendant NAR is a nongovernmental trade association organized under the laws of Illinois with its principal place of business in Chicago, Illinois.  The NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state.  It has approximately 200,000 members in California, derives revenue from California, and holds meetings in California.  For example, in November 2019, the annual NAR conference took place in California.  It also directs its California-based members to follow rules it promulgates.

13.     Defendant CAR is an association of licensed real estate brokers and real estate agents throughout the state of California.  CAR is affiliated with, and chartered by, the NAR.

14.     Defendant SFAR is the official association of licensed real estate brokers and real estate agents in San Francisco.  SFAR is affiliated with, and chartered by, the NAR.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

16.     This Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also proper in this District pursuant to 15 U.S.C. § 22 because all Defendants are found in this District and transact business herein.

18.     The Court has personal jurisdiction over CAR and SFAR because they are residents of California and their wrongful conduct occurred in this state.  As described in more detail herein, the Court has personal jurisdiction over NAR both because of its substantial contacts with California, its specific contacts with the state give rise to this action, and pursuant to 15 U.S.C. § 22 because of its nationwide sufficient minimum contacts.

## INTERSTATE COMMERCE

19.     The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

LEWIS + LLEWELLYN LLP

**FACTUAL BACKGROUND**

**I.    THE NAR AND MULTIPLE LISTING SERVICES.**

20.    Founded in 1908, the NAR is a North American trade association for professionals in the residential and commercial real estate industries.  It is America's largest trade association, representing approximately 1.4 million members including real estate brokers, salespeople, property managers, appraisers, counselors and others engaged in the real estate industry.

21.    The majority of real estate agents in the United States are members of the NAR. Indeed, a popularly applied term for real estate agents, "realtors," is a licensed trademark owned by the NAR for use by its professional membership.  On information and belief, NAR has approximately 200,000 members in California and, through its membership dues and fees described below, collects substantial revenues and fees from its members located in this District.

22.    In addition to its own realtor membership, NAR acts as an umbrella organization for a chartered network of competing realtor associations, including 54 at the state-level, and over 1200 local associations.  Thus, the NAR and the state and local associations are effectively vehicles for competing brokers to share their clients' listings and to cooperate in other ways, both at a local, statewide and national level.  Indeed, as the NAR itself concedes on its website, its "local REALTOR® associations may now be viewed as competitors" and that "[b]y definition associations consist of groups of competitors gathered together to promote their common business interests."

23.    The NAR has promulgated rules and codes of conduct for its realtor-members and chartered organizations, and chartered affiliates are generally required to adopt the NAR's rules and recommended bylaws and to enforce the NAR promulgated rules upon real estate agents comprising the state and local associations.  Indeed, the NAR requires its member associations to incorporate mandatory provisions verbatim into their bylaws.  Member associations and MLSs must also adopt new or amended NAR policies.

24.    In California, the statewide realtor association is the CAR.  Founded in 1905 and headquartered in Los Angeles, the CAR is one of the largest state trade organizations in the United States, with more than 185,000 members.  The association, and each of its members, is required to follow NAR rules, as described above.

LEWIS +
LLEWELLYN LLP

25.     One such local realtor association is the SFAR, the central real estate association in San Francisco.  Over 4,000 real estate agents are members of the SFAR.  This association, and each of its members, is required to follow NAR rules, as described above.

26.     NAR's members are typically enrolled in NAR's national, state and local organizations in tandem.  For example, a Bay Area real estate agent who seeks to join the SFAR, a local NAR affiliate, must also become a member of the CAR and the NAR, paying dues to, and agreeing to abide by, the membership rules of the local, state, and national organizations.

## II.     OFF-MLS VERSUS ON-MLS HOME SALES.

27.     One of the most important benefits of membership in the NAR and its affiliates is access to a Multiple Listing Service ("MLS").  An MLS is a subscription-based database of properties listed for sale in a particular geographical region.  In sum, each local MLS is a platform for agents to share information regarding residential properties for sale.  Most of the roughly 640 MLSs in the United States are controlled by a local NAR affiliate.

28.      Through its chartering of the local affiliates, the NAR is able to establish standard rules and codes of conduct for the MLSs and participating realtors that its local affiliates must adopt and enforce.  For example, SFAR operates and controls the San Francisco MLS ("SFARMLS").  The SFARMLS is effectively a database of properties marketed for sale in San Francisco.  Because the SFAR is affiliated with the NAR, any real estate agent that uses the SFARMLS must first agree to abide by the NAR's rules.

29.     More than 80% of residential homes put up for sale are listed on an MLS.  In the vast majority of locations across the country, including San Francisco, an NAR-affiliated MLS dominates the market for listed homes and is the primary gateway for residential real estate sales.  In these locations, a real estate agent must use the local MLSs to meaningfully practice his or her profession.  For instance, the SFARMLS controlled by the SFAR is the only San Francisco-specific MLS available to agents.  So, for a real estate agent to work in San Francisco, as a practical matter, he or she must pay the SFAR for the right to access the SFARMLS and also agree to be bound to the NAR's rules.

30.     In general, access to NAR-affiliated MLSs is restricted to NAR members.  The sole

6

LEWIS +
LLEWELLYN LLP

exceptions are those MLSs located in California, Alabama, Florida and Georgia, as a result of decisions in California state court and the Eleventh Circuit Court of Appeals, which found that such membership restrictions violate state and federal antitrust laws.  Even in these jurisdictions, however, before gaining access to the NAR-affiliated MLSs, non-member participants must first agree to follow and be bound by the NAR-affiliated rules, and any such additional rules the NAR-affiliated association promulgated, and also pay the required fees (which can be higher than membership fees).  For example, an agent cannot access the SFARMLS without first paying a fee and agreeing to be bound by NAR and SFAR's rules.

31.     Individuals who use an NAR-affiliated MLS to market their homes generally follow a standardized timeline of staging or repairs, listing on an MLS, open houses, scheduled viewings, dissemination of property disclosures, collection of bids, acceptance, the escrow process (usually including inspections, appraisals and securing financing), and ultimately closing and conveyance. Importantly, because the vast majority of agents have access to their local MLS databases, once a seller's property is placed on that database, specific information regarding that home is widely available to, in the case of SFARMLS, for example, thousands of people.

32.     There are a variety of reasons a home-seller might choose to forego this process and wish to pursue an alternative to using the NAR-affiliated MLS.  For example, the seller may also want to avoid exposing herself to the potential adverse health effects of having large numbers of unknown potential buyers parade through her home; the seller may wish to avoid publicly disclosing that the property is for sale, the details of the ultimate sale, or both, especially if the seller is a high-profile individual; the seller may want to test the waters, and retain the option to pull the home off the market without the stigma and downward price pressure that attaches to a de-listed property; the counterparties may already know one another; the seller may prefer to forego the typical expense of repairing and/or staging their home for potential buyers, and want to sell the home as-is; or the seller may want the sale to move faster or slower than the standard closing process.  As a columnist phrased it in a recent article regarding the NAR rule change discussed below, "[e]ven for the non-famous, selling your home can be a disruptive circus.  Listing off-market [*i.e.*, off MLS] can reduce the number of lion tamers and jugglers, separate the browsers

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

from the buyers and perhaps remove some stress for sellers who, studies have shown, are often already undergoing periods of life stress (divorce, relocation, death of a parent)."[1]

33.     Beyond these reasons, a potential home seller may want to avoid NAR-affiliated MLSs to avoid disclosing private details about themselves and their family.  The information that is posted on these MLSs is quite sensitive.  In fact, the CAR recently opined that agents who post on an MLS are likely revealing information that is "personal" pursuant to the recently enacted California Consumer Privacy Act ("CCPA").  CAR also advised potential home sellers: "[e]ven after a sale is complete, the MLS distributes sales information to the real estate community.  Brokers, agents, and MLSs may also share your personal information with others who post the personal information on websites or elsewhere, or otherwise use it.  Thus, there are various service providers and companies in a real estate transaction who may be engaged in using or sharing your personal information."  Accordingly, home sellers seeking to protect their personal information may understandably not want to list their property on the MLS.

34.     While there are myriad reasons why a home seller may decide to forgo the MLS, there are also reasons why a potential buyer would rather purchase a home "Off-MLS."  For example, a buyer may wish to avoid battling against dozens of others for a for-sale home listed on the MLS; a buyer may also want to maintain her privacy regarding the fact that she is in the market for a home.

35.     In sum, the MLS is the dominant—but not only—platform that facilitates residential home transactions in San Francisco and across the United States.  Many times, sellers and buyers decide it is advantageous to utilize the local MLS.  Other times, however, an alternative makes sense.  And in recent years, more and more home sellers are opting to use "Off-MLS" avenues.  On information and belief, in San Francisco, for example, Off-MLS sales increased 68% between 2010 and 2018.  As explained below, TAN provides an "Off-MLS" alternative choice for home sellers and buyers.

/ / /

---

[1] Larry Rosen, "Will the ban on real estate 'pocket listings' help or hurt?"  *San Francisco Examiner*, December 3, 2019.

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

## III.    TOP AGENT NETWORK.

36.    Founded in 2010, TAN is a private, member-only community open to the most active and successful real estate agents in a given geographic location.  TAN has nearly 10,000 members across 31 chapters across the country, including in the San Francisco Bay Area.  TAN's members are collectively involved in $165 billion in home sales each year—or around 11% of all homes sold in the United States.

37.    To gain admittance to TAN, an agent must show that they were within the top ten percent of closed home sale volume within their chapter area in the preceding 24 months.  In other words, membership in the TAN community is entirely performance-based.  In general, the top ten percent of agents in a given area are responsible for around 90% of closed home sales.

38.    Like an NAR-affiliated MLS, TAN provides the agents in its network with a platform to share market information and data.  TAN members also use the service to share information about properties for which they are acting as sellers' agents, including properties the seller does or does not intend to list on an MLS.  In effect, as NAR's counsel recognized in pre-litigation correspondence, the service TAN offers is effectively a more ***private MLS*** providing a competing platform for home sellers and buyers looking for an alternative to the widely accessible NAR-affiliated MLS.

39.    Recently, TAN also introduced a new "match-making" service for its members.  In effect, beyond serving as a platform for exchanging information, TAN also facilitates one-on-one private conversations between a buyer's agent and seller's agent with symmetrical needs.  For example, a TAN member can inform TAN that she represents a homeowner in San Francisco looking to sell in a general price range.  TAN will then "match" that prospective seller with an interested potential buyer-member who communicated similar criteria to TAN.  The prospective buyer and seller agents can then move off the TAN platform and begin communicating privately over email, phone or at a coffee shop regarding the specifics of their respective clients' goals.  This recent service has been very successful, but, as explained below, is threatened by CAR and SFAR's interpretation and enforcement of NAR's newly promulgated, anti-competitive rule.

40.    For those properties that sellers do not want listed on an MLS, TAN represents a

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

crucial platform for its members to locate and arrange off-MLS sales.  As mentioned above, home sellers and buyers may wish to pursue such off-MLS sales for a variety of reasons, including maintaining privacy and confidentiality.  Another major reason that TAN members and their homeowners use TAN is to gather critical market research about the potential home for sale by utilizing the collective experience of other top agents (across all brokerages) to answer questions regarding pricing, demand, condition, marketability, etc.  In sum, access to information regarding off-MLS properties is one of the primary benefits TAN advertises to its membership, and one of the most important features to TAN's member agents.

41.     TAN's income derives from membership fees.  Top agents may purchase monthly, quarterly, or annual memberships.  Further, as with many associational organizations, TAN's value for its members derives in large part from network effects—the larger the share of top agents in TAN's membership, the greater the value of TAN membership to other top agents, as it allows for access to a greater volume of market intelligence and more opportunities to pursue off-market sales.

## IV.     RELEVANT MARKET AND NAR'S MARKET POWER.

### A.     Professional Real Estate Associations.

42.     One relevant market here is for professional affiliation in organizations targeted at real estate agents.  Competitors in this market seek fees from real estate agents in exchange for providing services that facilitate residential home sales.  TAN, NAR, and NAR-affiliates, like CAR and SFAR, are engaged in this market.

43.     Any professional association competes for customers within the finite pool of members of that profession.  TAN and NAR both derive substantial income from dues/fees paid by their membership/participants.  NAR and TAN compete to receive the limited dollars that real estate agents have budgeted for to spend in exchange for the similar services TAN and NAR provide.

44.     In 2019, the NAR charged members an annual fee of $150 and a $35 "Consumer Advertising Campaign Special Assessment."  These dues accounted for roughly three quarters of NAR's revenue, which totals around $200 million per year.  In California alone, based on these figures, NAR makes over $35 million in fees.  And given NAR's large membership in its associations in the Bay Area, a substantial portion of this amount is derived from agents and

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

associations in this Judicial District.

45.     Dues payments are typically routed through NAR's local affiliates, such as SFAR, where NAR members have concurrent memberships.  The MLSs controlled by NAR's local affiliates also generally charge NAR members a monthly fee for access, typically around $25 to $50 per month, and also charge non-members who want to participate in the relevant MLS a separate fee, which can be higher than the membership dues.

46.     Similarly, TAN derives its income primarily from membership dues, with annual membership generally costing $475 per year.

47.     The market for professional affiliation for real estate agents exists (1) nationwide, and (2) in each of the regions within which TAN operates, including San Francisco.  Real estate is, by nature, a localized product.  Each real estate market has its own immobile inventory of available real estate, and real estate professionals gain experience specific to the local markets in which they operate.  For this reason, both NAR and TAN primarily interface with their membership through local chapters or affiliates, allowing members to associate and share property information with professionals operating within the same geographic area.

48.     TAN currently operates chapters in the following regions (some of which regions are subdivided into multiple chapters): Scottsdale, Arizona; Alameda County, California; Contra Costa County, California; Marin County, California; Monterey, California; San Fernando Valley, California; San Francisco, California; San Jose, California; San Mateo County, California; Santa Barbara, California; Santa Clara, California; Sonoma and Napa Counties, California; Los Angeles, California; Washington, D.C.; Oahu, Hawaii; Chicago, Illinois; Boston, Massachusetts; Cape Cod, Massachusetts; Howard County, Maryland; Portland, Oregon; Austin, Texas; Fairfax County, Virginia; and Loudoun County, Virginia.  Other than the Boston area, and Marin, Napa and Sonoma Counties, an NAR-affiliated MLS operates in all of these locations.

49.     As of 2019, NAR claimed to have 1,383,010 members, of which "68% percent . . . are licensed as sales agents, 20% hold broker licenses, and 14% hold broker associate licenses."  There are estimated to be roughly two million licensed real estate agents in the United States, a substantial portion of whom are not currently active.  NAR's national market totals at least half of

11

LEWIS +
LLEWELLYN
LLP

all licensed real estate agents in the United States, and on information and belief NAR members constitute a substantially higher percentage of currently active real estate agents.

50.     Nearly every region in which TAN operates is also served by one or more of NAR's local affiliates and is also within the territory of a NAR state-level affiliate.  On information and belief, in each region where TAN operates, at least a majority of real estate agents in that region are NAR members.  On information and belief, NAR's membership share is even higher among the top-level real estate agents who qualify for TAN membership, as access to MLSs—most of which are affiliated with NAR—is almost always required to achieve the sales volume necessary to qualify for TAN.  The overwhelming majority of TAN members are also members of NAR and its applicable local affiliate.  For example, in San Francisco, nearly 100% of TAN's members are also members of SFAR.

51.     NAR and its affiliates' significant penetration of the market for real estate professional associations, coupled with NAR's control over NAR-affiliated MLSs, allows NAR to exert substantial influence over real estate agents, the real estate market in general, and specifically the market for professional memberships and participation among real estate agents.  The primary means through which NAR asserts this control is by promulgating operating rules for NAR-associated MLSs, as well as codes of conduct for NAR members affiliated MLS participants.  Given MLSs centrality to the real estate industry, few agents can afford to forgo participating in, and thereby paying fees to, their local NAR-affiliated MLS.  For example, because of NAR-affiliated MLS's market dominance, as a practical matter, agents must access and monitor these MLS databases to effectively represent their clients.  Put another way, in most markets, one cannot be a successful real estate agent without participating in the local MLS.  Furthermore, many local real estate brokerage companies, as a result of pressure from the NAR, require all of their associated real estate agents to be members of the local MLS association, thereby leaving most real estate agents no choice but to join an NAR affiliate.

52.     There are significant barriers to entry for any new real estate professional association. As NAR acknowledges, professional associations depend on network effects to provide value to their members; in other words, the fewer members currently enrolled in a professional association,

LEWIS +
LLEWELLYN
LLP

the less that association can offer to new members.  Any new entrant must have the capital and staying power to survive the initial period in which its membership is low and the value the association can offer is at its minimum.

> **B.**     **Residential Real Estate Listing Services.**

53.     Another, related relevant market here, beyond membership dues in a professional association, is the competition to provide access to the valuable information regarding specific residential properties in a particular region on a centralized platform.  Both TAN and NAR affiliates such as SFAR, through their local MLSs, compete to provide fundamentally the same product in locales across the country—a platform that facilitates agents obtaining information needed to consummate a real estate deal.

54.     As with professional association membership, NAR holds a dominant position in this market.  Roughly 80-90% of residential real estate put up for sale in the United States is listed on an MLS.  The vast majority of these MLSs are affiliated with and ultimately controlled by the NAR.  On information and belief, most homes sold in the United States are listed on an NAR-affiliated MLS.  On information and belief, most homes sold in each of the regions in which TAN operates are listed on an NAR-affiliated MLS.

55.     In general, the market for residential real estate listing services is local in nature—buyers generally seek property in a specific city, neighborhood or region, and sellers within that specific area will seek to target those buyers.  However, while the MLSs in these markets are organized as regional entities, NAR is able to exercise control over NAR-affiliated MLSs on a nationwide basis through its charter and membership agreements.  This includes the NAR-affiliated MLSs present in every market in which TAN operates (with the exception of the Boston area, and Marin, Napa and Sonoma counties).

56.     Through its affiliation and membership agreements, the NAR maintains dominant power over the market for residential real estate listing services and exercises that power by promulgating rules for NAR members and affiliates, including for the operation of NAR-affiliated MLSs.  As noted, the SFAR has over 4,000 agents needing access to the SFARMLS.  Those agents all must follow NAR/SFAR's rules.

LEWIS +
LLEWELLYN
LLP

57.     As with professional associations, real estate listing services face barriers to entry as a result of network effects.  A property listing service depends on having sufficient volume and/quality of seller-side listings and buyer-side engagement to justify membership costs.  As stated, NAR-affiliated MLSs generally charge monthly membership fees of around $25 to $50 per month.

58.     While TAN does not operate solely as a residential listing service, one of the benefits of TAN membership is the ability to share residential properties among other TAN members for the purpose of initiating off-MLS sales and to gather market intelligence (pricing, condition, marketability, etc.) to prepare the house for the MLS in advance of any attempt to make a sale.  This is part of the networking value that top agents bring their clients.  This benefit is advertised by TAN to potential members and is included with TAN membership.  Accordingly, TAN effectively operates as a residential real estate listing service in competition with NAR and its affiliated MLSs.

59.     NAR has a strong commercial incentive, beyond competing for membership dues, in ensuring it dominates the market for providing access to valuable home-sale information.  Fundamentally, the NAR is merely an association of real estate agents who make their money on commissions buying and selling homes.  The more home listings NAR can force onto its affiliated MLSs, the better chance NAR-affiliated agents have of working on those deals and earning a commission.

60.     The problem for the NAR, though, as explained above, is that for a variety of reasons people may not want to post their home on an MLS.  If a seller already has an agent and feels comfortable proceeding "off MLS" by exploring alternative options for finding a buyer, like by using TAN, for example, the NAR-affiliated agents who do not meet TAN's high standards will need to expend extra effort to know about that property.  And, if smaller "private MLSs" like TAN's proliferated, which is likely given home sellers increasing use of Off-MLS alternatives, NAR and its affiliated MLSs would no longer be a necessary tool for all agents to pay for; their market dominance would be threatened.  In fact, many agents have expressed a strong desire for more alternatives to the MLS's one-size-fits-all approach.  To protect against this threat, as explained below, the NAR instituted a new rule intended to force its member-agents to abandon TAN and similarly situated businesses.

LEWIS +
LLEWELLYN
LLP

1  **V.      NAR TARGETS TAN WITH A NEW ANTICOMPETITIVE RULE.**

2          61.      As mentioned above, the NAR maintains strict rules and guidelines for its

3  membership and chartered affiliates, including for the various regional MLSs under these affiliates'

4  control.  Specifically, among other things, the NAR publishes an annual Handbook on Multiple

5  Listing Policies (the "Handbook"), which the NAR states is "intended to guide members

6  associations of REALTORS® in the operation of multiple listing services consistent with the

7  policies established by the National Association's Board of Directors."  The Handbook includes

8  model provisions for MLS bylaws and other rules and regulations established by the NAR for the

9  operation of associated MLSs.

10          62.      Each policy item in the Handbook is denoted by a "compliance classification

11  category": "Informational," "Optional," "Recommended," and "Mandatory."  The Handbook states

12  that "[a]doption [of 'Mandatory' policies] is necessary to ensure compliance with mandatory

13  policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and coverage

14  under the National Association's master professional liability insurance policy."  The Handbook

15  further states that "[a]ssociation and association-owned MLSs must conform their governing

16  documents to the mandatory MLS policies established by the National Association's Board of

17  Directors to ensure continued status as member boards and to ensure coverage under the master

18  professional liability insurance program."

19          63.      On September 20, 2019, the NAR's MLS Technology and Emergency Issues

20  Advisory Board issued an opinion recommending that the following mandatory policy, which it

21  referred to as "MLS Statement 8.0" or the "MLS Cooperation Proposal," be incorporated into the

22  Handbook:

23              Within 24 hours of marketing a property to the public, the listing broker must submit
                the listing to the MLS for cooperation with other MLS participants. Public marketing
24              includes, but is not limited to, flyers displayed in windows, yard signs, digital
                marketing on public facing websites, brokerage website displays (including IDX and
25              VOW), digital communications marketing (email blasts), ***multi-brokerage listing
                sharing networks***, and applications available to the general public.
26

27  (Emphasis added).

28          64.      The NAR provided a short "FAQ" with the September 20, 2019 opinion.  The FAQ

15

LEWIS +
LLEWELLYN
LLP

1    stated that "office exclusives"—where agents within a single brokerage office share listings among

2    themselves—would not be considered "public" and would not covered by the rule.  However, the

3    FAQ specifically stated that the rule would cover listings "advertised to a select group of brokers

4    outside the listing broker's office" and would constitute "public advertising or display" under the

5    policy.  In other words, NAR's inclusion of  "multi-brokerage listing sharing networks" in its

6    definition of "public marketing" was aimed squarely at TAN's business model because the rule was

7    intended to make it difficult, if not impossible, for agents to arrange off-MLS deals or simply share

8    property information with each other when determining whether, or when, to post the listing on the

9    MLS—despite the sellers requests to do so.  At the same time, it bolstered the centrality of MLS

10   listings to the residential real estate market

11          65.     Defining broker communications on TAN as "public marketing" is nonsensical and

12   simply makes the NAR's anticompetitive motives plain.  Unlike the other activities that NAR

13   defines as "public marketing," TAN's "multi-brokerage listing sharing network" is entirely private

14   with only a select group of agents who can join—it is not "public facing" or "available to the public"

15   by any stretch of the imagination.  NAR's own counsel admitted that TAN is effectively a "private

16   MLS."  In fact, including multi-brokerage listing sharing networks like TAN as part of the policy

17   violates NAR's own antitrust compliance rules set forth in the Handbook.  For example, the

18   Handbook provides that "Boards and associations of Realtors® and their multiple listing services

19   shall not enact or enforce any rule which restricts, limits, or interferes with participants in their

20   relations with each other, in their broker/client relationships" and "shall not . . . [p]rohibit or

21   discourage cooperation between participants and brokers that do not participate in the MLS."

22   Handbook at p. 7.  Yet NAR's policy directly interferes with participants' business relationship,

23   requiring them to place properties on the MLS regardless of whether any participant to the

24   transaction wants to do so.  The policy therefore discourages cooperation among participants on

25   TAN and similar services, and instead requires participants to widely share properties on a

26   competing platform.

27          66.     Likely anticipating the antitrust scrutiny the rule would bring given NAR's

28   stranglehold on the residential real estate market, NAR claims the policy is "pro-competitive and

16

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

pro-consumer."  But NAR is not a governmental entity, does not speak for consumers, and represents no public interest.  Like TAN, it is simply a platform for sharing information regarding residential properties for sale—albeit one with a dominating market presence—whose main income is derived from membership fees paid by agents who subscribe.  Indeed, the NAR is acutely aware of its potential antitrust liability, and the organization's website maintains a page detailing past antitrust challenges to its restrictive MLS policies—and arguing for their legality.[2]

67.     Attempting to give NAR the benefit of the doubt, on November 5, 2019, TAN's counsel sent a letter to NAR requesting confirmation whether NAR interpreted the proposed policy as applying to "private communications between and among TAN agent-members."  The letter also expressed concern regarding the Policy, and in particular the impact the policy would have on agents' freedom to represent their clients, their fiduciary duty to those clients, and the privilege given to large brokerages by the "office exclusive" carve-out.

68.     Counsel for NAR responded by letter dated November 7, 2019, confirming NAR's position that, "if a communication among TAN members involved an offer to sell or otherwise to market a particular property, the property would have to be listed on the MLS within 24 hours after the communication was made."  The letter continued by asserting that, if any TAN members exchanged communications about a property for sale, "the TAN community is basically operating a private MLS that is confined to TAN members and that is keeping listings from all other MLS participants," claiming that this "reduces the . . . network effects of the MLS."

69.     In a November 26, 2019 email to another real estate organization that had expressed concern about the policy, counsel for NAR repeated NAR's concern that allowing off-MLS sales through outside fora would "devalue the MLS."

70.     The NAR ultimately adopted the rule in November as the "MLS Clear Cooperation Policy," (the "Policy") and it was incorporated into NAR's 2020 governing "Handbook."  It became effective on January 1, 2020, and each NAR-affiliated MLS was required to implement the Policy by May 1, 2020.  MLS participants who do not comply with the Policy face punishment, including

---

[2] "Non-Member Access to REALTOR® Association Multiple Listing Services," available at https://www.nar.realtor/legal/non-member-access-to-realtor-association-multiple-listing-services.

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

1    monetary fines.

2         71.    On information and belief, a central motivation of NAR for including "multi-

3    brokerage listing sharing networks" in the Policy was to destroy the ability of smaller, exclusive

4    companies such as TAN to compete with NAR-affiliated MLSs.  Indeed, on information and belief,

5    during its internal debates regarding the Policy, NAR specifically discussed eliminating TAN.

6    **VI.    CAR AND SFAR'S ADOPTION AND IMPLEMENTATION OF NAR'S POLICY.**

7         72.    As an NAR-affiliated association, SFAR was required to implement the Policy by

8    May 1, 2020.  In March 2020, SFAR and its affiliated MLS, SFARMLS, provided details on its

9    implementation of the rule.  SFAR provided that any agent found to have violated the Policy—*i.e.*

10   not submitting a property that was "publicly marketed" to SFARMLS within one business day—

11   would be fined $5,000 for the first offense, and the "fines double and triple for subsequent offences

12   just like any other violation of the Rules & Regulations."  On information and belief, after the third

13   purported violation, which would attract a fine of $15,000, an agent is banned from using the MLS.

14        73.    Beyond this, SFAR has adopted an extreme interpretation of the Policy that injects

15   SFAR directly into private business dealings of individual agents and puts TAN's entire business

16   model at risk.  As noted above, TAN recently developed a new "matchmaking" service to

17   supplement its traditional private MLS platform.  This matchmaking service simply connects a

18   seller's agent and a buyer's agent who seemingly were a good fit for a potential real estate deal.

19   Once that connection is made, TAN's service ends; the prospective buyer and seller's respective

20   agents move to private, one-on-one conversations regarding the property in question.  In other

21   words, no "marketing" of any property—public or otherwise—occurred on a "multi-brokerage

22   listing sharing network."  Based on the plain language of NAR's Policy, TAN understood this

23   private one-on-one broker communication would under no circumstances qualify as "public

24   marketing" and thus at least a portion of its business would be able to continue despite NAR's

25   draconian Policy.  TAN also communicated its position on webinars that were widely available.

26        74.    Following TAN's webinars, SFAR, apparently realizing that TAN's new service

27   would allow it to continue to flourish, recently interpreted the Policy to prohibit one-on-one private

28   communications among brokers unless they placed the property they discussed on the SFARMLS

18

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

within one business day.  In numerous webinars and documents, SFAR explicitly stated that no matter what TAN says or how it functions, if an agent uses TAN's services in connection with a property, the agent must place the property on the MLS within one business day.  To be clear, if an agent has coffee with another agent and mentions a property for sale, SFAR's (and potentially CAR and NAR's) position is that within one-business day the agent must list that property on the MLS.  Put simply, if a property must be placed on the MLS within a day of private conversations, the value of TAN's private matchmaking service diminishes significantly because all agents can simply find the same information by searching the MLS—even if the seller has no interest is marketing her property this way.

75.     CAR has similarly adopted an extreme interpretation of the Policy.  For example, in a presentation about the new rule given on April 27, 2020, the CAR identified the "public" as "anyone outside the broker(s) and agent(s) licensed within a single listing brokerage and their clients."

76.     Furthermore, other NAR-affiliates have initiated similar rules based on NAR's Policy.  For example, "Bright MLS," the NAR-affiliate based in the Washington D.C. area, has also explicitly prohibited private one-on-one conversations among brokers unless the property at issue is placed on the MLS within one business day.  Moreover, following TAN's webinars and SFAR's interpretation, two other Bay Area MLSs—Bridge MLS and MLS Listings—have now adopted the same prohibition on one-to-one agent communication.  In fact, a Bridge MLS representative recently told a TAN member that Bridge MLS had been in contact with NAR regarding TAN's matchmaking service, and that the service is not in compliance with the Policy.  Other NAR-affiliated MLS's are likely to follow if this extreme restraint on trade is permitted.

## VII.   THE ANTI-COMPETITIVE IMPACT OF NAR'S POLICY.

77.     NAR's Policy has and will continue to negatively impact competition in the market for professional affiliations for real estate agents.  The Policy has and will also damage competition in the related markets for residential real estate listings and sales, as well as TAN's economic relationship with its members.

78.     The Policy has the effect of acting as an exclusive dealing and/or group boycotting arrangement, severely damaging the value of professional associations and real estate listing

19

services that compete with NAR.  The Policy, in a pernicious backdoor way, cuts off TAN's supply of valuable property listing information by coercing the relevant market players—experienced agents—to stop using TAN.  This is NAR's tool to stamp out any competitive threat before its market dominance dwindles away.

79.     Given NAR's overwhelming market share among real estate agents, any competing professional association or real estate listing service—now and in the future—must contend with the majority of its potential members/customers being subject to NAR rules and regulations.  Given the accompanying centrality of MLSs to the real estate industry, no competing professional association or listing service can reasonably expect that it will be able to induce potential members to terminate their membership with NAR and/or participation rights with NAR-affiliated MLSs.

80.     By adopting the Policy, NAR has severely damaged TAN and other businesses providing an alternative to NAR-affiliated MLSs, as NAR has harmed their ability to act as a competing listing service.  In TAN's case, the Policy has crippled TAN's ability to bring value to potential members by providing centralized off-MLS forum through which valuable information regarding available properties can be shared.

81.      TAN's members pay dues to TAN in part because it provides a forum through which real estate agents could offer or solicit off-MLS sales.  However, there is no value to initiating negotiation on an off-MLS sale if the property must be listed within one business day on an NAR-affiliated MLS.  Because the value of agents' using TAN comes from obtaining information that would not otherwise be available, requiring such information to be posted on the MLS largely defeats the purpose of TAN's business model.  The Policy, if allowed to stand, would also prevent TAN from moving into additional markets seeking to attract new top performing agents to its platform.

82.     Many TAN members have already made the decision to cancel their membership if they cannot freely use TAN to initiate off-MLS communications, much less sales.  Dozens of TAN members, when canceling their memberships, have explicitly referenced the consequences stemming from their violation of NAR's policy.  For example, one TAN member posted, "Will likely NOT be renewing TAN membership since the new clear cooperation policy of MLS basically makes TAN

20

LEWIS + LLEWELLYN LLP

obsolete."  Many of these members also noted specific concern with SFAR's threats of aggressive enforcement of fines stemming from private one-on-one conversations facilitated by TAN's matchmaking service.  Other MLSs across the country, such as Bright MLS in Washington D.C., have adopted similarly extreme versions of the Policy.  If this Policy is allowed to stand, many other local MLSs may join in an attempt to drain TAN of its members nationwide.

83.     NAR has admitted openly that it adopted the Policy to boost the value of NAR-affiliated MLSs, and to reduce the use of property listing services that compete with NAR-affiliated MLSs.  While NAR has not admitted publicly that it adopted the Policy for the purpose of reducing membership in professional associations that compete with NAR, it is and was fully aware that adoption of the proposal would have this effect, and on information and belief it intentionally adopted the proposal at least in part to create this effect.  Furthermore, on information and belief, NAR specifically designed the Policy to target TAN and discussed this goal during its internal deliberations before formally adopting the Policy.

84.     Moreover, by adopting the Policy, NAR has damaged competition within the market for residential real estate, which is naturally connected to the market for residential real estate listing services.  NAR has explicitly stated that it adopted the proposal "as a way to address the growing use of off-MLS listings,"[3] and has justified the proposal by stating that it will increase home prices.

85.     As discussed above, home sellers and buyers often choose off-MLS sales for the increased efficiency and lower costs they offer in relation to on-MLS sales.  Accordingly, NAR's adoption of the MLS Policy will have the effect of precluding many home sellers and buyers from pursuing the sales avenue of their choosing, to the benefit of NAR and its members and affiliates.

86.     Furthermore, NAR's Policy and CAR and SFAR's adoption of the same results in at least two other anti-competitive harms.  First, it drives home sellers wanting to avoid the MLS to large brokerage firms, such as Compass, who are exempted from the rule.  Indeed, Compass recently touted its "Private Exclusives" service, boasting "Listing your home as a private exclusive allows

/ / /

---

[3]     *See* "NAR Passes MLS Proposal to Strengthen Cooperation," REALTOR® Magazine, available at https://magazine.realtor/daily-news/2019/11/11/nar-passes-mls-proposal-to-strengthen-cooperation.

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

1  you to control what information is shared about you and your home while still getting exposure to

2  over 15,000 top agents."

3        87.    Second, the Policy forces home sellers onto the MLS system which effectively limits

4  a home seller's ability to negotiate the commission amount.  NAR has promulgated a rule that, in

5  effect requires all seller's agents to make blanket, unilateral and effectively non-negotiable offers of

6  buyer-agent commission amount when listing a property on an MLS.  In effect, because of NAR's

7  rule (adopted by its affiliates), the seller pays the buyer's agent a set commission based on the price

8  of the home.  Without NAR's rule, the seller would have the ability to negotiate in a free and open

9  market.  NAR's "commission rule" has been the subject of litigation in other jurisdictions.  *See*

10  *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 912 (W.D. Mo. 2019) (denying NAR's motion

11  to dismiss Sherman Act claims).

12        88.    Beyond this, NAR's Policy—and CAR and SFAR's adoption, interpretation, and

13  enforcement of it—has a particular impact on real estate markets in California.  First, California

14  recently passed the Consumer Privacy Act ("CCPA"), which generally prohibits certain businesses

15  from disclosing a consumer's "personal information" without his or her consent.  As the CAR has

16  acknowledged, "a real estate broker is likely to submit personal information to a Multiple Listing

17  Service ("MLS") in order to help find a buyer for a seller's property," and also that some brokers

18  will be subject to the CCPA.  Now with NAR's Policy, a seller's agent associated with a covered

19  brokerage firm **must** submit such personal information to the MLS within one business day or be

20  fined and/or banned from using the MLS.  Second, California real estate agents owe a fiduciary duty

21  to their clients.  As noted, some clients do not want their property listed on the MLS, and in some

22  cases placing the property on the MLS is simply not in the client's best interest.  Or, in other cases,

23  it is in the client's best interest for an agent to utilize an Off-MLS platform like TAN to obtain

24  market intelligence about a property before putting it on the MLS.  But the Policy leaves only one

25  day in which to do this, which is insufficient.  Put simply because of the NAR Policy and CAR and

26  SFAR's adoptions of the same, agents are faced with the prospect of violating the Policy and being

27  fined on the one hand, or violating their duty to act in their clients best interest, on the other hand.

28  This unlawful policy, in other words, not only harms competition and disrupts TAN's contractual

LEWIS +
LLEWELLYN
LLP

relationship with its members—it requires agents to violate the law.

**FIRST CLAIM FOR RELIEF:**

**VIOLATION OF SHERMAN ANTITRUST ACT, 15 U.S.C. § 1**

**UNLAWFUL COMBINATION IN RESTRAINT OF TRADE**

**(Against all Defendants)**

89.    TAN realleges and incorporates paragraphs 1 through 88 by reference.

90.    NAR's Policy constitutes a Group Boycott by NAR's associated members against TAN, and thus the NAR's actions are a per se antitrust violation.  The MLS Clear Cooperation Policy constitutes a Group Boycott because it effectively cuts off TAN's access to the supply and customers in the relevant market needed to compete with NAR-affiliated MLSs—*i.e.* information regarding properties being marketed and/or sold Off-MLS, and the agents paying membership dues for this information—by undermining the entire purpose for TAN's services.  Furthermore, as described above, the NAR has a dominant market position, and the Policy is not justified by overall efficiency or competitive policy reasons.

91.    Moreover, NAR's Policy is also invalid under a rule of reason antitrust analysis.  First, NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this Policy among its membership, regional affiliates and NAR-related MLSs, constitutes a contract, combination, or conspiracy by and between NAR's members and its affiliate associations that unreasonably restrains competition within the market for professional affiliation for real estate agents throughout the United States, and within each regional market in which TAN operates, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As the NAR itself concedes, its individual members and affiliated associations are competitors in the market without a unity of economic interest.  The associations comprising the NAR are therefore legally capable of agreeing and conspiring to unlawfully restrain competition.

92.    Second, as described above, NAR added reference to the "multi-brokerage listing sharing networks" in the Policy to target TAN and businesses similarly situation, competitors with NAR-affiliated MLSs, for the purposes of undermining TAN's business in the relevant market, thereby intending to harm or restrain trade.  Third, NAR's Policy has actually injured competition

23

LEWIS +
LLEWELLYN
LLP

by already causing damage to TAN's business—namely, TAN's members have cancelled memberships specifically out of fear of running afoul of NAR's Policy, with the prospect of many more cancelling in the near future given enforcement of the Policy began on May 1, 2020.  TAN has also suffered untold reputational harm, with members openly questioning whether they can continue to use TAN's services or risk being fined.  The Policy also forces consumers onto the MLS where they will be faced with restricted means for negotiating commissions, and also bolsters large brokerage firm's ability to monopolize Off-MLS marketing and sales given they, unlike TAN and similarly situated businesses, are exempt from the Policy.  NAR's Policy also reduces brokers' independent decision-making regarding how to compete among themselves.

93.     The aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

94.     This contract, combination, or conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

95.     TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues.

96.     Separately, the CAR's adoption of the Policy, and SFAR's adoption and enforcement of the NAR's Policy in San Francisco, is a violation of section 1 of the Sherman Act.

**SECOND CLAIM FOR RELIEF:**

**VIOLATION OF SHERMAN ANTITRUST ACT, 15 U.S.C. § 2**

**UNLAWFUL MONOPOLIZATION**

**(Against all Defendants)**

97.     TAN realleges and incorporates paragraphs 1 through 96 by reference.

98.     NAR possesses monopoly power in the market for professional associations among real estate professionals and the market for residential real estate listing services.

99.     NAR's conduct constitutes the intentional and unlawful maintenance of that

24

LEWIS +
LLEWELLYN
LLP

monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.    For the purpose of maintaining its monopoly power, NAR adopted the MLS Clear Cooperation Policy, which rule it forced on its members and affiliates, including regional NAR-affiliates and NAR-affiliated MLSs.

101.    NAR does not have a legitimate business purpose for its anticompetitive behavior, and any alleged benefits to competition or consumers is pretextual and designed to justify a policy intended to maintain NAR's monopoly over real estate professional associations and real estate listing services.

102.    Adoption of the MLS Clear Cooperation Policy had the intended purpose and actual effect of preventing or discouraging real estate professionals from joining professional associations that compete with NAR; of preventing or discouraging real estate professionals from competing real estate listing services, or pursuing off-market homes sales on behalf of their clients; and of artificially inflating the value of NAR membership and membership in NAR-affiliated MLSs.

103.    NAR's unlawful attempts to suppress competition, including through the CAR and SFAR, have harmed competition in the markets for real estate professional associations, real estate listing services, and residential home sales.  TAN has and will continue to suffer actual injury as a result of the anticompetitive effect of NAR's unlawful acts, primarily through the loss of TAN members and membership dues.

**THIRD CLAIM FOR RELIEF:**

**VIOLATION OF THE CLAYTON ACT, 15 U.S.C. § 14**

**UNLAWFUL EXCLUSIVE DEALING ARRANGEMENT**

**(Against all Defendants)**

104.    TAN realleges and incorporates paragraphs 1 through 103 by reference.

105.    NAR maintains monopoly power over the market for residential real estate listing services.

106.    NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this proposal among its membership, regional affiliates and NAR-related MLSs, including through the CAR and SFAR,

1    constitutes an unlawful exclusive dealing arrangement in violation of Section 3 of the Clayton Act,

2    15 U.S.C. § 14.

3          107.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real

4    estate listing services.

5          108.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to

6    prevent and/or discourage real estate agents from using residential real estate listing services that

7    compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have

8    anticompetitive effects in the markets for real estate professional association and residential real

9    estate listing services, and the related market for residential real estate, by reducing competition on

10   price and quality, raising barriers to entry, and restricting consumer choice.

11         109.    NAR's actions are not reasonably necessary to accomplish any procompetitive

12   objective, or, alternatively, and its procompetitive justifications are pretextual.

13         110.    TAN has and will suffer actual injury as a result of the anticompetitive effects of

14   NAR's actions, primarily through the loss of TAN members and membership dues.

15                      **FOURTH CLAIM FOR RELIEF:**

16   **VIOLATION OF THE CARTWRIGHT ACT, BUS. & PROF. CODE § 16700**

17                         **EXCLUSIVE DEALING**

18                        **(Against all Defendants)**

19         111.    TAN realleges and incorporates paragraphs 1 through 110 by reference.

20         112.    NAR maintains monopoly power over the market for residential real estate listing

21   services.

22         113.    NAR's adoption of the MLS Clear Cooperation Policy, in combination with the

23   charters and agreements allowing NAR to promulgate and enforce this proposal among its

24   membership, regional affiliates and NAR-related MLSs, including through the CAR and SFAR,

25   constitutes an unlawful exclusive dealing arrangement in violation of the Cartwright Act, Bus. &

26   Prof. Code § 16720(e)(1).

27         114.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real

28   estate listing services.

LEWIS +
LLEWELLYN
LLP

115.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

116.    NAR's actions are not reasonably necessary to accomplish any procompetitive objective, or, alternatively, and its procompetitive justifications are pretextual.

117.    TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues.

## FIFTH CLAIM FOR RELIEF:

## VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200

### (Against all Defendants)

118.    TAN realleges and incorporates paragraphs 1 through 117 by reference.

119.    Section 17200 of the California Business and Professions Code prohibits any unfair or unlawful business practice.

120.    Defendants have engaged in acts of unfair competition within the meaning of Section 17200 by engaging in unlawful and unfair conduct.

121.    Defendants engaged in unlawful conduct by committing the acts described herein in violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and the Cartwright Act.

122.    Defendants have further engaged in unlawful conduct by requiring agents to disseminate their clients' private information on MLSs without client consent in violation of California's Consumer Privacy Act.  Defendants have further engaged in unlawful conduct by requiring real estate agents to violate their fiduciary duty to their clients by placing their homes on the NAR-affiliated MLS when it is not in the clients' best interest.

123.    Defendants have engaged in unfair conduct by adopting the MLS Clear Cooperation Policy, for the purpose of using their market power to prevent entities such as TAN from recruiting

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

dues-paying members and from participating in the market for real estate listing services, thereby violating the policy and spirit underlying the federal and state antitrust laws.

124.    Defendants' unfair and unlawful acts have harmed competition in California by preventing and/or discouraging real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  Defendants' unlawful acts have had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

125.    TAN has and will suffer actual injury and economic loss as a result of the Defendants' unfair and unlawful actions, primarily through the loss of TAN members and membership dues.

## SIXTH CLAIM FOR RELIEF:

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

#### (Against all Defendants)

126.    TAN realleges and incorporates paragraphs 1 through 125 by reference.

127.    Numerous membership contracts existed between TAN, on the one hand, and TAN's members on the other, through which TAN exchanged membership benefits in its network for membership dues.  Many of TAN's membership contracts were made with real estate agents who were also members of NAR, CAR and SFAR.

128.    Defendants were aware that TAN had entered into membership contracts with real estate agents, including NAR members, and was aware that these members often shared off-market real estate listings through TAN for the purpose of engaging in off-market transactions.

129.    NAR, CAR and SFAR's adoption of the MLS Clear Cooperation Policy made performance of these contract more difficult by preventing or hindering their membership from sharing off-market real estate listings, preventing TAN from serving as a forum for off-market sales and thereby reducing the value of the membership benefits TAN could offer to members.  This interference has caused and will continue to cause TAN members to terminate their membership.

130.    NAR deliberately adopted the MLS Clear Cooperation Policy for the admitted

purpose of hindering NAR members from engaging in off-market transactions facilitated by TAN. NAR intended for adoption of the MLS Clear Cooperation Policy to denude the value of TAN membership. NAR either intended to induce TAN members to cancel their TAN membership, or knew that such terminations were substantially likely (if not certain) to occur.

131.   TAN has and will suffer actual injury as a result of the NAR's interference, primarily through the loss of TAN members and membership dues.

## PRAYER FOR RELIEF

WHEREFORE, TAN prays for judgment against NAR as follows:

1. For treble damages, including lost profits, according to proof, together with prejudgment and postjudgment interest thereon;

2. For costs of this suit, including attorneys' fees and costs, pursuant to 15 U.S.C. § 26 and to the maximum extent permitted by law.

3. For an award of punitive damages;

4. For restitution;

5. For an order directing termination of the anticompetitive conduct, including but not limited to rescission of the MLS Clear Cooperation Policy;

6. For a preliminary and permanent injunction barring enforcement of the MLS Clear Cooperation Policy; and

7. For such other and further relief as the Court deems just and proper.


Dated:  May 11, 2020                              LEWIS & LLEWELLYN LLP


By:   /s/  Paul T. Llewellyn
Paul T. Llewellyn
Attorneys for Plaintiff
TOP AGENT NETWORK, INC.

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff hereby demand a jury trial for all claims for relief so triable.

3

4    Dated:  May 11, 2020                         LEWIS & LLEWELLYN LLP

5

6                                        By:  _/s/  Paul T. Llewellyn_
                                          Paul T. Llewellyn
7                                         Attorneys for Plaintiff
                                          TOP AGENT NETWORK, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF TAN'S COMPLAINT AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP