LEWIS & LLEWELLYN LLP
Paul T. Llewellyn (Bar No. 216887)
pllewellyn@lewisllewellyn.com
Nicolas V. Saenz (Bar No. 284087)
nsaenz@lewisllewellyn.com
Tobias Snyder (Bar No. 289095)
tsnyder@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:     (415) 800-0590
Facsimile:     (415) 390-2127

Attorneys for Plaintiff
TOP AGENT NETWORK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP AGENT NETWORK, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS; CALIFORNIA ASSOCIATION OF REALTORS, INC.; SAN FRANCISCO ASSOCIATION OF REALTORS,<br><br>Defendants. | CASE NO. 4:20-CV-03198 DMR<br><br>**PLAINTIFF TOP AGENT NETWORK, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Date:<br>Time:<br>Judge:  Hon. Donna M. Ryu<br><br>Complaint Filed: May 11, 2020 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.   ISSUE PRESENTED ............................................................................................. 4

III.  RELEVANT BACKGROUND ............................................................................... 4

    A.   The NAR Controls Most MLSs, A Necessary Tool For Real Estate Agents ........... 4

    B.   The Growth of "Off-MLS" Sales. ............................................................................ 6

    C.   TAN Offers An Alternative To NAR's Dominant MLS-System ............................... 7

        1.   TAN's business model. ................................................................................ 7

        2.   TAN competes in the market NAR dominates. ............................................. 9

    D.   NAR Promulgates a New Anticompetitive Rule to Destroy Competition. ............... 10

        1.   NAR enacts the Policy, which its affiliates had to enforce starting May 1 .. 10

        2.   NAR's anticompetitive motivation for enacting the Policy. ........................... 10

    E.   CAR and SFAR's Extreme Interpretation of the Policy. ......................................... 12

    F.   The Anticompetitive & Unjust Impact Of NAR's Policy. ........................................ 13

IV.   LEGAL ARGUMENT ........................................................................................... 15

    A.   TAN Is Likely To Succeed On Each Of Its Claims. ................................................ 15

        1.   TAN is likely to succeed on its Sherman Act Section 1 claim ..................... 15

            a.   NAR's Policy is a *per se* illegal group boycott. ............................... 16

            b.   The Policy fails under "Rule of Reason" analysis. ........................... 18

        2.   TAN's Section 2 Claim Under the Sherman Act is Likely to Succeed ........ 19

        3.   TAN Is Likely To Succeed On Its Cartwright Act Claims. ....................... 20

        4.   TAN Is Likely To Succeed On Its Unfair Competition Claims. ................ 20

        5.   TAN Is Likely To Succeed On Its Intentional Interference Claims. .......... 21

    B.   TAN Will Suffer Irreparable Harm Absent Injunctive Relief. ................................. 22

    C.   The Balance of Equities Strongly Favors TAN. ...................................................... 24

V.    INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST .................... 24

VI.   A BOND IS UNNECESSASARY. ........................................................................ 25

VII.  CONCLUSION ..................................................................................................... 25

i

LEWIS +
LLEWELLYN
LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*
    836 F.3d 1171 (9th Cir. 2016) ..................................................................................... 15

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ..................................................................................... 15

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*
    750 F.2d 1470 (9th Cir. 1985) ..................................................................................... 22

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*
    182 F.3d 1096 (9th Cir. 1999) ............................................................................... 16, 17

*Byars v. SCME Mortgage Bankers, Inc.*
    109 Cal. App.4th 1134 (2003) ..................................................................................... 20

*Doran v. Salem Inn, Inc.*
    422 U.S. 922 (1975) .................................................................................................... 22

*Drinkwine v. Federated Publication, Inc.*
    780 F.2d 735 (9th Cir.1985) ........................................................................................ 20

*Durell v. Sharp Healthcare*
    183 Cal. App. 4th 1350 (2010) .................................................................................... 21

*Earth Island Inst. v. Carlton*
    626 F.3d 462 (9th Cir. 2010) ....................................................................................... 24

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*
    No. CV-19-01228-PHX-SMB, 2020 WL 122877 (D. Ariz. Jan. 10, 2020) ................. 20

*Ernest W. Hahn, Inc. v. Codding*
    615 F.2d 830 (9th Cir. 1980) ....................................................................................... 16

*Fid. Brokerage Servs. LLC v. McNamara*
    2011 WL 2117546 (S.D. Cal. May 27, 2011) ............................................................. 25

*Freeman v. San Diego Ass'n of Realtors*
    322 F.3d 1133 (9th Cir. 2003) ..................................................................................... 16

*hiQ Labs, Inc. v. LinkedIn Corp.*
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ...................................................................... 22

*ICANN Transparency, Inc. v. VeriSign, Inc.*
    611 F.3d 495 (9th Cir. 2010) ....................................................................................... 20

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*
   No. 15-CV-1576-AJB-RBB, 2016 WL 4087302 (S.D. Cal. Aug. 1, 2016)........................21

*In re eBay Seller Antitrust Litig.*
   545 F. Supp. 2d 1027 (N.D. Cal. 2008).................................................................19

*In re Musical Instruments & Equip. Antitrust Litig.*
   798 F.3d 1186 (9th Cir. 2015)...........................................................................17

*Jorgensen v. Cassiday*
   320 F.3d 906 (9th Cir. 2003).............................................................................25

*Knevelbaard Dairies v. Kraft Foods, Inc.*
   232 F.3d 979 (9th Cir. 2000).............................................................................20

*Korea Kumho Petrochemical v. Flexsys Am. LP*
   No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008)....................................20

*Martins v. United States Citizenship & Immigration Servs.*
   962 F. Supp. 2d 1106 (N.D. Cal. 2013).................................................................15

*Napa Valley Publ'g Co. v. City of Calistoga*
   225 F. Supp. 2d 1176 (N.D. Cal. 2002).................................................................24

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*
   468 U.S. 85 (1984) ........................................................................................19

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*
   472 U.S. 284 (1985) ................................................................................16, 17

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*
   323 F. Supp. 2d 1037 (N.D. Cal. 2004).................................................................22

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*
   No. CIV. 12-00064 LEK, 2012 WL 381209 (D. Haw. Feb. 3, 2012)...............................24

*Realcomp II, Ltd. v. F.T.C.*
   635 F.3d 815 (6th Cir. 2011).......................................................................18, 19

*Reg'l Multiple Listing Serv. of Minnesota, Inc. v. Am. Home Realty Network, Inc.*
   960 F. Supp. 2d 958 (D. Minn. 2013) ............................................................16, 17

*Sitzer v. Nat'l Ass'n of Realtors*
   420 F. Supp. 3d 903 (W.D. Mo. 2019)..................................................7, 16, 18, 19

LEWIS +
LLEWELLYN
LLP

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001).........................................................................................23

*Tanaka v. Univ. of S. California*
252 F.3d 1059 (9th Cir. 2001).......................................................................................18

*Texaco Inc. v. Dagher*
547 U.S. 1 (2006)..........................................................................................................16

*Thompson v. Metro. Multi-List, Inc.*
934 F.2d 1566 (11th Cir. 1991)...............................................................................18, 19

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*
169 Cal. App. 4th 357 (2008)........................................................................................20

*United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*
766 F.3d 1002 (9th Cir. 2014).......................................................................................22

*United States v. Realty Multi-List, Inc.*
629 F.2d 1351 (5th Cir. 1980)..................................................................................16, 17

*United States v. Visa U.S.A., Inc.*
344 F.3d 229 (2d Cir. 2003)..........................................................................................19

*Winter v. Natural. Res. Def. Council*
555 U.S. 7 (2008)..........................................................................................................15

**Statutes**

15 U.S.C. § 26 ................................................................................................................1

Cal. Bus. & Prof. Code § 16720 ...................................................................................20

Cal. Bus. & Prof. Code § 17200 .............................................................................20, 21

Cal. Bus. & Prof. Code § 17204 ...................................................................................21

Cal. Civ. Code § 1798.105 ............................................................................................21

MPA IN SUPPORT OF TAN'S MOTION FOR TEMPORARY RESTRAINING ORDER; OSC
CASE NO. 4:20-CV-03198 DMR

LEWIS +
LLEWELLYN
LLP

## I.       INTRODUCTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Local Civil Rule 65-1, and 15 U.S.C. § 26, Plaintiff Top Agent Network, Inc. ("TAN") respectfully moves for temporary injunctive relief.  TAN and the National Association of Realtors ("NAR"), through its local affiliates, compete for membership dues from real estate agents by providing platforms for agents to exchange information regarding residential home sales.  Agents use TAN's platform to share and receive information not available on NAR's platform.  This threatens NAR's revenues and market dominance.  So, recently, NAR abused its market power by implementing a policy that forces agents to siphon off their clients' valuable property information from TAN and funnel it to NAR's competing platform—whether their clients agree or not.  Beyond removing a homeowners' choice regarding how to market her own property, as NAR knows, its new policy fundamentally undermines TAN's entire business operation:  TAN has lost, and will continue to lose, customers and goodwill as a direct result of NAR's anticompetitive policy.  Immediate injunctive relief is therefore necessary to prevent TAN from suffering irreparable harm.

NAR is the largest trade association in the United States.  NAR and its local affiliates throughout the country, such as Defendants California Association of Realtors ("CAR") and San Francisco Association of Realtors ("SFAR"),[1] make money by charging real estate agents to use their multiple listing service ("MLS").  An MLS is a listing service containing a database of homes for sale in any given geographic region.  For agents to access the MLS, first they must pay NAR membership dues and agree to be bound by NAR's rules.

As courts have found, real estate agents must have access to their local MLS to meaningfully practice their profession.  So long as agents need to access the MLSs, NAR and its affiliated associations are guaranteed to (1) make a lot of money—around $200 million annually—from agents paying membership dues and fees; and (2) retain substantial control over the 1.4 million members who must follow NAR's rules in exchange for accessing the MLS.

TAN, and businesses like it, present a growing threat to Defendants' dominance.  TAN, in

/ / /

---

[1]       NAR, CAR, and SFAR are collectively referred to herein as "Defendants."

LEWIS +
LLEWELLYN
LLP

1    effect, is a private MLS with standards.  Its platform allows its members to exchange market

2    information on a more selective, controlled basis.  It also allows a home seller to avoid the exposure,

3    and associated risks and hassles, that come with using the MLS—where tens of thousands of people

4    can access a homeowner's personal information.  TAN also provides "matchmaking" services,

5    connecting a seller's agent and buyer's agent who have symmetrical needs.  Once TAN matches the

6    agents, they can then have private one-one-one conversations off the TAN platform.  In sum, agents

7    pay TAN membership dues to get ***access to information not available on the MLS***.

8        The reason Defendants want to eliminate TAN and other competitors is simple:  they

9    threaten Defendants' revenue sources.  Defendants monetize the data on the MLS, both through

10   member dues and by selling it to third-party vendors.  If a home for sale is not immediately "listed"

11   on the MLS, most NAR members will either never have access to the property information or will

12   learn of it after other agents who use Off-MLS networks.  Most NAR-members, then, are left out,

13   wondering whether they should still pay NAR dues when they are not getting access to timely

14   information on valuable properties.  Separately, if homes are marketed Off-MLS on TAN and

15   similar platforms, Defendants have less valuable information to sell to vendors.

16       So Defendants decided to act.  But, instead of relying upon innovation, Defendants relied

17   upon blunt force regulation to stamp out Off-MLS competition.  NAR mandated that, by May 1,

18   2020, each of its local affiliates implement a policy requiring that any property an agent discusses on

19   TAN or similar platforms must be listed on the MLS within one business day thereafter.  Violations

20   subject agents to $5000, $10,000, and $15,000 fines, and agents are encouraged to report one

21   another.  CAR and SFAR have gone further, interpreting the policy to require agents who have

22   private, one-on-one conversations about a property over the phone or private email to place it on the

23   MLS within one day thereafter, which eliminates the usefulness of TAN's matchmaking service.

24   The policy, in sum, takes away TAN's central product: access to information ***not*** on the MLS.

25       Defendants' actions are unlawful for several reasons.  First, courts have held that when NAR

26   affiliates conspire to restrict the supply of real estate information a non-affiliate needs to compete, it

27   violates the Sherman Antitrust Act.  Here, Defendants accomplish this by coercing agents—who are

28   TAN's suppliers and customers—to take information off TAN's platform and give it to NAR.  This

2

LEWIS +
LLEWELLYN
LLP

ensures both that agents have no need to visit TAN in the first place, and that customers' options for home marketing are diminished, thus violating state and federal antitrust laws.

Second, the policy amounts to unfair competition under California law—it violates the spirit underlying state and federal antitrust laws, and it forces agents to choose between following state law on the one hand, and NAR's rule, on the other.  In California, agents must act in their clients' best interest and cannot release their personal information absent consent.  But NAR's rule mandates that if an agent discusses a property on TAN's platform then the property must be submitted to the MLS—for thousands to see—even if the homeowner refuses, thereby pushing agents to violate obligations to their clients to escape hefty fines.

But, not to worry, say Defendants, this rule is justified as "pro consumer" because placing a home for sale on the MLS is *always* in the seller's best interest.  That does not wash.  A "pro-consumer" rule does not take away a family's choice regarding how to sell their own home.  A "pro-consumer" rule does not force homeowners onto an MLS system where they lose the ability to meaningfully negotiate the commission they must pay.  A "pro-consumer" rule does not exempt big brokerage firms.  And a "pro-consumer" rule does not eliminate a homeowner's ability to use private platforms like TAN to test the market before deciding to move her property onto the MLS, when she is ready, at her own pace.  No, a "pro consumer" rule simply lets the consumer decide what is best for her.

Defendants' policy has nothing to do with the consumer.  It has to do with money and power.  And the way for Defendants to preserve both is to eliminate TAN and similar Off-MLS businesses.  Absent injunctive relief, Defendants may succeed.  TAN's members have already cancelled subscriptions specifically citing Defendants' rule and enforcement since May 1.  Others have voiced significant concern regarding both their ability to continue to use TAN and the business's survival.  Usage on TAN's platform and matchmaking services is down.  TAN's ability to attract new customers has plummeted.  In sum, without immediate injunctive relief, TAN's entire business is at significant risk.  Meanwhile, temporarily enjoining Defendants would cause them no harm—it would simply preserve the status quo: a system Defendants already dominated and flourished under.  The Court should temporarily restrain Defendants from enforcing the policy.

## II.    ISSUE PRESENTED

Whether the Court should issue a temporary restraining order and preliminary injunction to preserve the status quo by preventing Defendants from enforcing the Clear Cooperation Policy against TAN's member agents pending the final resolution of this lawsuit.

## III.    RELEVANT BACKGROUND

### A.    The NAR Controls Most MLSs, A Necessary Tool For Real Estate Agents.

The NAR is America's largest trade association, comprising over 1.4 million professionals engaged in the real estate industry.  Declaration of Nicolas V. Saenz ("Saenz Decl."), Exh. B.  The majority of real estate agents in the country are members of the NAR, and NAR members constitute a substantially higher percentage of currently active real estate agents.  Declaration of David Faudman ("Faudman Decl."), ¶ 3.  These competing agents have joined together to collaborate on certain issues, forming a powerful force in the real estate industry.

NAR's member-agents are also members of their local real estate associations.  Saenz Decl., Exh C.  NAR acts as an umbrella organization for these associations, effectively coordinating a chartered network of competing realtor groups, including 54 at the state level, and over 1200 local associations.  *Id.*, Exhs. C-D.  NAR promulgates rules that state and local associations under its umbrella must adopt.  *Id.,* Exh. E.

One such state-level association is CAR, which oversees the local realtor associations in California.  *Id.*, Exh. F.  SFAR is the local association in San Francisco—the dominant real estate group in the city, with over 4,000 members.  *Id.*, Exh. G.  NAR's members are typically enrolled in NAR's national, state and local organizations in tandem.  For example, a Bay Area real estate agent who joins SFAR must also become a member of CAR and NAR, paying dues to and agreeing to abide by the membership rules of the local, state, and national organizations.  *Id.*, Exh. H.

One of the most important benefits the NAR and its affiliates provide to real estate agents is access to a Multiple Listing Service ("MLS").  Faudman Decl., ¶ 4.  An MLS is a subscription-based database of properties listed for sale in a particular geographical region.  *Id.*, ¶ 2.  Roughly 90% of residential homes put up for sale are listed on an MLS.  Saenz Decl., Exh. I.  And, according to the Department of Justice, the substantial majority of real estate markets are serviced by a single

LEWIS +
LLEWELLYN
LLP

comprehensive MLS in any given location. *Id.*, Exh. J at p. 6; *see also* Faudman Decl., ¶ 4. Thus, given the centrality of a local MLS, as a practical matter, agents must use it to practice their profession. *Id.*

The majority of MLSs are controlled by the NAR. Faudman Decl., ¶ 5. The NAR's local affiliates administer the MLS and control who gets access to the database. *E.g.*, Saenz Decl., Exh. H. There are two main criteria the NAR requires for gaining access to its affiliated MLSs that are relevant here. First, an agent must either pay dues to become a member of the NAR-affiliated association or, for non-members, pay participation fees. *Id.* Second, an agent must agree to follow NAR-promulgated rules, as adopted by state and local affiliates. *Id.* For example, SFAR controls the only MLS in San Francisco, the SFARMLS. So, for a real estate agent to work in San Francisco, as a practical matter, he or she must pay SFAR to access SFARMLS and also agree to be bound to CAR and NAR rules. *Id.*; Faudman Decl., ¶ 5.

So long as agents need to access the MLS, NAR and its affiliates are guaranteed to continue making a lot of money. In 2019, for example, NAR charged members an annual fee of $150 and a $35 "Consumer Advertising Campaign Special Assessment." Saenz Decl., Exh. S. As of 2018, according to NAR, it made over $200 million through membership dues alone. *Id.*, Exh. K. at p. 9. Membership fees are typically routed through NAR's local affiliates, where NAR members have concurrent memberships. *See, e.g.*, *id.*, Exh. H. The MLSs controlled by NAR's local affiliates, including SFAR, also generally charge a separate monthly fee for MLS access, typically around $25 to $50 per month.[2] *Id.*

Beyond membership fees, the NAR has a separate reason to ensure the MLS-system continues to maintain dominance. Fundamentally, the NAR is an association of real estate agents who make their money on commissions buying and selling homes. The more home listings NAR can force onto its affiliated MLSs, the better chance NAR-affiliated agents have of working on those deals and earning a commission. Faudman Decl., ¶ 5. While more experienced, top agents often have their own networks and methods, and are less dependent on the MLSs, most agents still rely

---

[2]     Given NAR's membership in the Bay Area, it generates millions of dollars from agents and affiliates operating in this Judicial District. Saenz Decl., ¶ 21.

LEWIS +
LLEWELLYN LLP

1  heavily on the MLS system to obtain information on listing properties that most of them need to

2  obtain market data regarding comparable property sales and to earn a commission.  *Id*.  The NAR's

3  ability to continue providing this information to its membership is a central reason for why agents

4  pay fees to the NAR and its affiliates like CAR and SFAR.  *Id*.  Furthermore, NAR also makes

5  money by selling the home data agents place on the MLS to third-party vendors.  *Id*.  This is why

6  when some agents market properties through an alternative, competing network like TAN—and

7  therefore do not have to use a NAR-affiliated MLS—it threatens NAR's continued market

8  dominance and hundreds-of-millions in annual revenues.

9        **B.      The Growth of "Off-MLS" Sales.**

10       Over at least the past ten years, the number of Off-MLS sales facilitated by TAN and other

11  businesses has significantly grown.  *Id*., ¶ 6.  In San Francisco alone, from 2010 to 2018, Off-MLS

12  sales expanded by an estimated 68%, a trend that occurred throughout the country.  *Id*.[3]  As CAR

13  admits, there are many other reasons for a home seller or buyer proceed Off-MLS using TAN or a

14  similar business.  Saenz Decl., Exh. L.  Privacy is one reason.  Information regarding homes

15  marketed and sold on the MLS is often made available to tens of thousands of people through the

16  MLS-system.  Faudman Decl., ¶ 7.  This includes customer information that NAR affiliates, such as

17  CAR, have acknowledged qualify as "personal" under the California Consumer Privacy Act

18  ("CCPA").  Saenz Decl., Exh. M.

19       Indeed, CAR advises potential home sellers: "[e]ven after a sale is complete, the MLS

20  distributes sales information to the real estate community.  Brokers, agents, and MLSs may also

21  share your personal information with others who post the personal information on websites or

22  elsewhere, or otherwise use it.  Thus, there are various service providers and companies in a real

23  estate transaction who may be engaged in using or sharing your personal information."  *Id*.  Because

24  of the interconnectivity of the MLS-system, tens of thousands of people could access an individual's

25  personal information placed on SFARMLS alone.  Faudman Decl., ¶ 7.  People wishing to avoid this

26  unwanted exposure must use alternative means for marketing their home.  Health concern is another

27  ───────────
[3]      Kathleen Howley, "NAR bans 'pocket listings'" HousingWire.com, November 12, 2019,
28  available at https://www.housingwire.com/articles/nar-bans-pocket-listings/ (noting 68% increase in
Off-MLS sales in San Francisco).

reason a consumer would proceed Off-MLS.  Given the wide dissemination of information on the database, a potential home seller using the MLS can expect more people appearing at their residence for a showing, which, given the recent pandemic, is a risk many may simply be unwilling to take. *Id*.

Beyond this, the seller may want to "test the waters" and retain the option to pull the home off the market without the stigma and downward price pressure that attaches to a property that is either de-listed from, or does not sell on, the MLS.  Other potential concerns include that the counterparties may already know one another and have no need for the MLS; that the seller may prefer to forego the typical expense of repairing and/or staging their home for potential buyers, and want to sell the home as-is; or that the seller may want the sale to move faster or slower than the standard closing process associated with homes sold on the MLS.  *Id*., ¶ 9; Saenz Decl., Exh., L.  As one columnist recently put it, "[e]ven for the non-famous, selling your home can be a disruptive circus.  Listing off-market [*i.e.*, Off MLS] can reduce the number of lion tamers and jugglers, separate the browsers from the buyers and perhaps remove some stress for sellers who, studies have shown, are often already undergoing periods of life stress (divorce, relocation, death of a parent)."[4]

Furthermore, home sellers may simply want to avoid the anti-competitive MLS system.  For example, NAR's rules require the seller to pay the commission of the buyer's agent with no meaningful ability to negotiate this amount.  Faudman Decl., ¶ 10.  Indeed, a recent challenge to this NAR rule survived a motion to dismiss in ongoing litigation.  *See Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 912 (W.D. Mo. 2019).  For these reasons, among others, Off-MLS sales have grown significantly in recent years and there remains a demand for this alternative to the MLS system.  To accommodate this demand, businesses have developed to facilitate this alternative to NAR-affiliated MLS.

**C.    TAN Offers An Alternative To NAR's Dominant MLS-System.**

**1.    TAN's business model.**

Founded in 2010, TAN is a private, member-only community open to the most successful real estate agents in a given geographic location.  Faudman Decl., ¶ 11.  TAN has nearly 10,000

---

[4]    Larry Rosen, "Will the ban on real estate 'pocket listings' help or hurt?"  *San Francisco Examiner*, December 3, 2019.

LEWIS +
LLEWELLYN
LLP

members in 31 chapters across the country, including throughout California generally and the San Francisco Bay Area specifically. *Id*. TAN's member-agents are collectively involved in an estimated $165 billion in home sales each year—or around 11% of all homes sold in the United States. *Id*. To gain admittance to TAN, an agent must show that they were within the top ten percent of closed home sale volume within their chapter area in the preceding 24 months. *Id*. In general, it is estimated that the top ten percent of agents are responsible for around 90% of closed home sales in any given area. *Id*.

Like an NAR-affiliated MLS, TAN provides the agents in its network with a centralized online platform to share information regarding residential real estate. *Id*., ¶ 12. TAN members can use the platform to gain helpful market information about a home that may ultimately go on the MLS. *Id*. This "pre-MLS" exploration is often critical for homeowners and their agents to, for example, adequately price a property or determine whether to put the home up for sale. *Id*. Beyond gaining market intelligence, TAN members also use its platform to market properties for which they are acting as sellers' agents, including properties the seller may not intend to list on an MLS. *Id*. As NAR has acknowledged, TAN effectively offers a more ***private MLS*** for home sellers and buyers looking for an alternative to the widely accessible NAR-affiliated MLS. Saenz Decl., Exh. N. Furthermore, recently, TAN also introduced a new "match making" service for its members. This service facilitates one-on-one private conversations between a buyer's agent and seller's agent with symmetrical needs. Faudman Decl., ¶ 13. Once TAN matches the agents, they can communicate privately over email, phone or at a coffee shop, for example, regarding the property at issue. *Id*. In sum, agents use TAN to access information—whether it be helpful market data, a specific private home listing, or to discover a counterparty in which to transact business—that is ***not available on the MLS***. *Id*.

TAN, like the NAR, makes money from membership fees. *Id*., ¶ 14. Agents may purchase monthly, quarterly, or annual memberships. *Id*. Further, as an associational organization, TAN's value for its members derives in large part from network effects—the larger the share of top agents in TAN's membership, the greater the value of TAN membership to other top agents, as it allows for access to a greater volume of Off-MLS information in which to service their clients. *Id*.

LEWIS +
LLEWELLYN
LLP

### 2.    TAN competes in the market NAR dominates.

TAN and NAR-affiliates compete to attract real estate agents to their respective centralized property listing platforms, both of which provide access to information regarding residential properties in specific locales.  Moreover, both TAN and NAR derive substantial income from dues/fees paid by their membership/participants.

Beyond providing a similar product to real estate agents, TAN and NAR also compete in the same geographic regions.  TAN currently operates chapters in the following regions (some of which regions are subdivided into multiple chapters): Scottsdale, Arizona; Alameda County, California; Contra Costa County, California; Marin County, California; Monterey, California; San Fernando Valley, California; San Francisco, California; San Jose, California; San Mateo County, California; Santa Barbara, California; Santa Clara, California; Sonoma and Napa Counties, California; Los Angeles, California; Washington, D.C.; Oahu, Hawaii; Chicago, Illinois; Boston, Massachusetts; Cape Cod, Massachusetts; Howard County, Maryland; Portland, Oregon; Austin, Texas; Fairfax County, Virginia; and Loudoun County, Virginia.  Faudman Decl., ¶ 15.

Except for the Boston area, and Marin, Sonoma, and Napa counties, an NAR affiliate controls a dominant MLS in each of these locations—meaning agents in these areas have very little option but to agree to join the local MLS and follow NAR rules.  *Id.*, ¶ 16.  NAR's membership share is even higher among the top-level real estate agents who qualify for TAN membership, as access to MLSs—most of which are affiliated with NAR—is almost always required under current market conditions to achieve the sales volume necessary to qualify for TAN.  *Id.*  For example, in the San Francisco Bay Area, nearly all TAN members are also members of SFAR and the surrounding NAR-affiliated associations.  *Id.*

NAR's dominance over the market for agent membership—coupled with its ability to mandate that its affiliates and agents follow its rules—provide NAR with enormous power over TAN.  This is because NAR, through its mandatory rules, can control the majority of agents—who are both the consumers and the suppliers of the residential property information that TAN needs to compete.  *Id.*, ¶ 17.

/ / /

LEWIS +
LLEWELLYN
LLP

**D.     NAR Promulgates a New Anticompetitive Rule to Destroy Competition.**

**1.     NAR enacts the Policy, which its affiliates had to enforce starting May 1.**

Despite multiple players from across the real estate industry raising significant concerns, in November 2019 NAR adopted the following language as the "MLS Clear Cooperation Policy" (the "Policy") and incorporated it into its 2020 Handbook for Multiple Listings:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts**), multi-brokerage listing sharing networks**, and applications available to the general public.

(Emphasis added).

Saenz Decl., Exh. O.  The Policy became effective on January 1, 2020, and each NAR-affiliated MLS was required to implement it by May 1, 2020.  Saenz Decl., Exh. P.  MLS participants who do not comply with the Policy face punishment, including monetary fines.  *Id*.

There is only one exception to this Policy: properties marketed via "office exclusives," which is defined as listings shared between agents affiliated within a single brokerage (licensees affiliated under the same brokerage license) and their clients on a one-on-one basis.  *Id*.  In other words, an agent working at a large brokerage firm, such as Compass, can market her client's property internally to other Compass agents without ever having to list the property on the MLS.  *Id*.

In contrast, the NAR has confirmed that the Policy's reference to "multi-brokerage listing sharing networks" applies to TAN.  Saenz Decl., Exh. N.  This means that agents—who use TAN to both access and provide information unavailable on the MLS—must list on the MLS any property discussed with another TAN member within one business day.  Of course, if TAN members know that all properties discussed on TAN will soon be available on the MLS, TAN's platform becomes significantly less attractive.

**2.     NAR's anticompetitive motivation for enacting the Policy.**

Several facts indicate that NAR's inclusion of "multi-brokerage listing sharing networks" was intended to eliminate competition from TAN and similar businesses.  As an initial matter, defining broker communications on TAN as "public marketing" is nonsensical.  Unlike the other

10

LEWIS +
LLEWELLYN
LLP

1    activities that NAR defines as "public marketing," TAN's "multi-brokerage listing sharing network"

2    is entirely private with only a select group of agents who can join—it is not "public facing" or

3    "available to the public."  As NAR's counsel admitted, TAN is effectively a "private MLS."  Saenz

4    Decl., Exh N.

5           Furthermore, the Policy violates NAR's own antitrust compliance rules set forth in the

6    Handbook.  The Handbook provides that "Boards and associations of Realtors® and their multiple

7    listing services shall not enact or enforce any rule which restricts, limits, or interferes with

8    participants in their relations with each other, in their broker/client relationships"; and "shall not . . .

9    [p]rohibit or discourage cooperation between participants and brokers that do not participate in the

10   MLS."  *Id*., Exh. Q.  Yet NAR's policy directly interferes with participants' business relationship,

11   requiring them to place properties on the MLS regardless of whether any participant to the

12   transaction wants to do so.

13          Nevertheless, NAR claims its motivation is "pro consumer" because eliminating Off-MLS

14   sales allegedly ensures that agents are acting in the best interests of their clients by marketing their

15   home widely, which can only be done on the MLS.   But several facts undermine this claim.  First—

16   as noted above and as NAR acknowledges—there are legitimate reasons a home seller may want to

17   avoid the MLS.  As NAR's general counsel stated, "it is acceptable to withhold properties from the

18   MLS at the express direction of a seller."  Saenz Decl. ¶ 19.  Then why does NAR not simply

19   require agents to first obtain consent from clients as a condition for keeping their property Off-

20   MLS? This would ensure agents can explore Off-MLS options, while still acting in the consumer's

21   best interest.  Because NAR already tried that, sellers continued choosing to proceed Off-MLS, and

22   NAR's market dominance continued to be threatened.  So, NAR enacted the Policy that took away

23   the seller's choice, which is a far cry from being "pro consumer."

24          Second, NAR's purported "pro-consumer" motivation is undermined by the Policy's glaring

25   exception for "office exclusives," which allows big brokerage firms to engage in robust Off-MLS

26   sales operations, representing both buyers and sellers without ever having to list the property on the

27   MLS.  *Id*., Exh. P.  Why target TAN and not brokerage firms like Compass?  Because big brokerage

28   firms are not in the market for attracting membership dues/fees from agents.  Faudman Decl., ¶ 18.

LEWIS +
LLEWELLYN
LLP

1    They therefore are not direct competitors of NAR and do not threaten NAR's monopoly control for

2    such dues.  Moreover, big brokerage firms generally require their agents to be NAR members.  *Id*.

3    Thus, facilitating Off-MLS sales internally at Compass, in contrast to sales using TAN, does not

4    threaten either the MLS-system or NAR's revenue stream because agents engaging in them must

5    remain due-paying NAR members.

6         **E.    CAR and SFAR's Extreme Interpretation of the Policy.**

7         While NAR's Policy has been highly detrimental to TAN's business, based on the plain

8    language of the Policy, TAN understood that its successful matchmaking service, described above,

9    would be safe and provide TAN a lifeline.  Faudman Decl., ¶ 19.  This is because TAN's

10   matchmaking service simply connects a seller's agent and buyer's agent who seemingly were a good

11   fit for a potential real estate deal.  *Id*.  Once that connection is made, TAN's role ends; the

12   prospective buyer and seller's respective agents then have private, one-on-one conversations

13   regarding the property in question.  *Id*.  In other words, no "marketing" occurred on a TAN's

14   platform.

15        But, recently, CAR and its local affiliates like SFAR have taken specific aim at TAN's

16   matchmaking service by adopting a draconian, non-sensical interpretation of "public marketing."

17   CAR's interpretation is that if agents have private, one-on-one conversations regarding a property,

18   for example, at a coffee shop, over email, or on the telephone, that property must be listed on the

19   MLS within one business day thereafter.  Faudman Decl., ¶ 20.  SFAR and other local CAR/NAR

20   affiliates in California have adopted this interpretation; SFAR's MLS Director stated that "[o]nly

21   submission to the MLS . . . once you start ANY use of a 3rd party platform is in compliance, it does

22   not matter if their tools use any kind of blind-matching or otherwise."  *Id*.  CAR representatives have

23   told TAN members in webinars that CAR is in communication with NAR regarding TAN's

24   matchmaking service "not complying" with the Policy.  *Id*.

25        SFAR punishes any Policy violation with a $5,000 fine for the first offense, and the "fines

26   double and triple for subsequent offences just like any other violation of the Rules & Regulations."

27   Saenz Decl., Exh. P.  Agents can be banned from using the MLS after a third violations.  Faudman

28   Decl., ¶ 21.  Following the May 1, 2020 implementation date, SFAR has threatened to fine TAN

LEWIS +
LLEWELLYN
LLP

members and has encouraged agents to report one another. *Id.*; Saenz Decl., Exh. T. The Policy, in other words, undermines TAN's entire business model—platform communication and matchmaking services alike. *Id.*

### F.    The Anticompetitive & Unjust Impact Of NAR's Policy.

NAR's Policy, and CAR and SFAR's adoptions and enforcement of it, has caused, and will continue to cause, harmful effects across the real estate industry.

***First***, the Policy ensures no competitor to NAR-affiliated MLSs could ever challenge NAR's market dominance for agent membership. No alternative platform offering information for residential real estate can compete for membership/participation fees given the Policy requires agents to list any and all properties they discuss on the MLS within one business day. The harm TAN has already suffered, and will continue to suffer, illustrates this point.

Since the Policy's implementation, dozens of TAN members have cancelled their memberships. Faudman, Decl. *Id.*, ¶ 22. Others have explicitly referenced the consequences stemming from their violation of NAR's policy. *Id.* Many members have expressed confusion regarding whether they can legally use TAN. *Id.* Usage is down. *Id.* Thus, beyond lost memberships that have already occurred, the Policy casts a black cloud over TAN's reputation and undermines its entire business model, preventing TAN from gaining new members. *Id.* Below are four of many examples of the reaction of TAN's members to the Policy:

- "Will likely NOT be renewing TAN membership since the new clear cooperation policy of MLS basically makes TAN obsolete[.]"
- "[with] all the recent changes regarding the legality of off-market/pocket listings we are not seeing the future relevance of TAN . . ."
- "the reason for my cancellation is the recent rule instituted by Bright MLS (and passed yesterday by NAR) restricting marketing of off-market listings. Because of these actions, TAN is no longer useful to me."
- "Can I get a refund? I paid $450 in October of 2019, TAN no longer does what I paid for due to the new SFAR rules."

*Id.* at Exh. A. Beyond this, the MLS in the Washington D.C. area implemented the Policy early, in

13

1   December 2019.  Member usage of TAN has dropped by approximately 71% in this location for

2   TAN's non-matchmaking services.  *Id.*, ¶ 24.  In contrast, in the greater Boston area—one of the

3   very few places TAN operates where an NAR-affiliates MLS does not—usage increased over the

4   same time period by nearly 23%.  *Id.*  In sum, if this Policy is allowed to stand, and particularly

5   CAR/SFAR's draconian prohibition on private agent conversations, the business operations of TAN

6   and other NAR competitors will be irreparably harmed.

7           ***Second***, before NAR enacted the Policy, a home seller wanting to market/sell her property

8   Off-MLS had several options.  Through her agent, she could use TAN, or a competitor like

9   thePLS.com or the Austin Luxury Network.  Faudman Decl., ¶ 25.  But now she has one option:  the

10  big brokerage firm, because their "office exclusives" are the only exception to the Policy.  Saenz

11  Decl., Exh.  P.  In fact, these firms are already taking advantage of their newfound market control.

12  For example, Compass's CEO recently wrote, "NAR's [Policy] will limit seller choice when it

13  comes to using private home sale websites to pre-market or market their home, but seller demand for

14  privacy and flexibility isn't going anywhere. Compass is the obvious choice for sellers who want to

15  sell their homes or test the market, with the option to do so privately[.]" Faudman Decl., Exh. B.

16  This means the Policy is facilitating, not ending, Off-MLS sales; it is just gifting them to a handful

17  of big firms like Compass.

18          ***Third***, the Policy forces home sellers to engage in an MLS system that is rife with

19  anticompetitive practices.  As noted above, NAR rules—currently being challenged in other

20  jurisdictions—require a seller to, in effect, pay a non-negotiable commission of the buyer's agent.

21  The Policy leaves sellers wanting to avoid the anticompetitive MLS-system with effectively no

22  alternative beyond dealing with another monopoly, the big brokerage firms.

23          ***Fourth***, in addition to disrupting markets across the real estate industry, the Policy requires

24  agents to violate both the CCPA and their fiduciary duty to clients.  As CAR has acknowledged, "a

25  real estate broker is likely to submit personal information to a Multiple Listing Service ("MLS") in

26  order to help find a buyer for a seller's property," and that some brokers will be subject to the

27  CCPA.  Saenz Decl., Exh. M.  At the same time, however, there is no privacy-related exception to

28  the Policy.  *Id.*, Exh. P.  In fact, CAR's literature suggested that "If seller has privacy or other access

14

LEWIS +
LLEWELLYN
LLP

concerns but still wants a sign or other marketing to the public beyond an "office exclusive," ***listing agent will be required to submit the listing to the MLS to be viewable by participants and subscribers*** . . . ."  Saenz Decl., Exh. R (emphasis added).  Thus, under the Policy, an agent, at minimum, is required to provide a seller's private, protected information to MLS "participants and subscribers"—*i.e.*, thousands of people—even if the seller does not consent or requests that her agent delete the personal information.

Beyond these CCPA-related concerns, the Policy also hampers an agent's ability to discharge her fiduciary duty to act in the best interest of her clients.  As discussed above, listing a property on the MLS simply may not be in a seller's best interest.  Moreover, the Policy sweeps so broadly that it prohibits agents from even using TAN to gather intelligence about a homeowner's property before placing it on the MLS.  Faudman Decl., ¶ 25.  Depriving homeowners of the "pre-MLS" intelligence, and/or requiring them to use the MLS when they do not want to, is manifestly against their best interest and further demonstrates how the Policy is simply not "pro-consumer."

## IV.   LEGAL ARGUMENT

To obtain a temporary restraining order, a plaintiff must prove "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest." *Martins v. United States Citizenship & Immigration Servs.*, 962 F. Supp. 2d 1106, 1119 (N.D. Cal. 2013) (citing *Winter v. Natural. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  A plaintiff that satisfies the latter three elements may obtain preliminary injunctive relief by showing the existence of "serious questions going to the merits" rather than a likelihood of success on the merits. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131–32 (9th Cir. 2011).

### A.   TAN Is Likely To Succeed On Each Of Its Claims.

#### 1.   TAN is likely to succeed on its Sherman Act Section 1 claim.

"To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was an unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  TAN will satisfy the first element, as numerous courts have found that NAR and its affiliate's structure and rulemaking, described above, satisfies Section

LEWIS +
LLEWELLYN
LLP

1's concerted action requirement.  *See, e.g., Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148-1150 (9th Cir. 2003) (discussing NAR and affiliates' structure and explaining why joint activities of real estate agent associations are subject to Section 1); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1361 (5th Cir. 1980) ("The concerted action necessary to establish a Section 1 violation exists in the agreement of [the MLS's] members to adopt and apply these rules and membership criteria."); *Reg'l Multiple Listing Serv. of Minnesota, Inc. v. Am. Home Realty Network, Inc*., 960 F. Supp. 2d 958, 981 (D. Minn. 2013) (concluding plaintiff adequately alleged a conspiracy among NAR and affiliates); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 912 (W.D. Mo. 2019) (same).[5]  For the avoidance of doubt, each NAR-affiliate, through its membership with NAR, has agreed to implement and enforce the unlawful Policy.  SFAR has already begun enforcement in earnest.

As to the second element, NAR's Policy is a per se illegal group boycott, and also separately fails under the "rule of reason."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (describing the two categories of antitrust violations under Section 1 of the Sherman Act).

### a.    NAR's Policy is a *per se* illegal group boycott.

Courts apply the *per se* approach to "group boycotts, which are "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle*."  Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 294 (1985).  "In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete . . . ."  *Id*.  "Elaborate market analysis and case-by-case evaluation are unnecessary in cases involving per se antitrust violations because the anticompetitive effects of the practice are presumed."  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101–02 (9th Cir. 1999).

---

[5]    TAN has standing for its Sherman Act claims because it has suffered an "antitrust injury."  *See Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 845 (9th Cir. 1980) (antitrust injury existed where plaintiff's "injury or potential injury is directly related to the size and market power of" defendants).  Moreover, this injury is a direct consequence of the Defendants' exclusionary conduct, and the harm is not speculative—TAN has already sustained injury in the form of lost memberships, with customers specifically citing the Policy.  Further, there is little risk of duplicative recovery— individual agents are unlikely to suffer harms tangible and substantial enough to sustain their own antitrust claims.

LEWIS +
LLEWELLYN
LLP

1   Once an association's agreement to boycott a competitor is established, "no further inquiry into the

2   practice's actual effect on the market or the parties' intentions is necessary to establish a § 1

3   violation." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

4       The court in *Reg'l Multiple Listing Serv. of Minnesota, Inc.*, applied these principles to a

5   situation similar to the instant case where the NAR and its affiliate had restricted access to the

6   supply necessary to compete against NAR: information regarding local residential properties for

7   sale.  The plaintiff, an online real estate service that was not affiliated with NAR, made money by

8   providing its users with data regarding local residential real estate, among other services.  The

9   plaintiff asserted that a local MLS and NAR conspired to boycott it by, among other things,

10  restricting its access to the NAR-affiliated MLSs, thereby "cut[ting] off access to information that is

11  critical to any business attempting to compete with them." *Am. Home Realty Network*, 960 F. Supp.

12  2d at 983.  The Court agreed, concluding that, given the defendants' market dominance and the

13  anticompetitive effects of the conspiracy, the plaintiff stated a claim for a *per se* group boycott under

14  Section 1 because defendants had deprived it of its supply of real estate listing information it needed

15  to compete.  *Id*; *see also Big Bear Lodging Ass'n,* 182 F.3d at 1103 (allegations that an association's

16  policy "restricts non-members' access to customers [ ] and supplies [ ] that may be necessary for

17  effective competition" stated claim for *per se* illegal unlawful group boycott).

18      The same is true here.  NAR's Policy deprives TAN of the supply of valuable information it

19  needs to compete against NAR-affiliates.  Whereas in *Am. Home Realty Network* NAR affiliates

20  restricted supply by blocking access to the MLS, here Defendants cut off supply in a pernicious,

21  backdoor manner by forcing agents to siphon valuable Off-MLS property listing information from

22  TAN's platform onto the MLS within one day.  While not explicitly prohibiting its affiliates from

23  providing TAN with supply, the effect is the same: as a practical matter, agents will have no reason

24  to supply information to TAN in the first place—they will just go on the MLS—and TAN will

25  therefore have far less to offer customers.  NAR's Policy, in other words, "persuad[es] or coerc[es]

26  suppliers or customers"—in this case both—"to deny relationships with competitors" and is

27  therefore a *per se* illegal group boycott.  *Nw. Wholesale Stationers, Inc.,* 472 U.S. at 294; *see also*

28  *Realty Multi-List,* 629 F.2d at 1366 (group boycott includes "coercion practiced indirectly on a rival

17

LEWIS +
LLEWELLYN
LLP

1    method of competition.").

2              **b.**     **The Policy fails under "Rule of Reason" analysis.**

3         Moreover, if the Policy is not *per se* illegal, it should be held unlawful under a rule of reason

4    analysis.  "A restraint violates the rule of reason if the restraint's harm to competition outweighs its

5    procompetitive effects." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

6    "The plaintiff bears the initial burden of showing that the restraint produces significant

7    anticompetitive effects within a relevant market.  *Id.*  "If the plaintiff meets this burden, the

8    defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff

9    must then show that "any legitimate objectives can be achieved in a substantially less restrictive

10   manner." *Id*.

11        Here, the Policy has caused, and will continue to cause, significant anticompetitive effects

12   within the market for centralized platforms real estate agents use to market residential properties and

13   the related market for real estate association membership fees.  TAN and NAR-affiliated MLSs

14   provide alternative, competing products within this market—TAN offers a more private platform for

15   Off-MLS marketing (*i.e*, a "private MLS"), and NAR-affiliates offer the opportunity to market a

16   property more broadly to thousands of people.  TAN and NAR affiliates compete throughout the

17   country in nearly every location TAN has a chapter. *Cf. Sitzer*, 420 F. Supp. 3d at 914 (holding

18   plaintiff adequately "define[d] the relevant geographic market as the geographic areas in which the

19   Subject MLS exclusively operate.").  As explained above, in each of these locations, including in

20   San Francisco, the NAR-affiliated MLS has dominant market power.  Faudman Decl., ¶¶ 3-5; *see*

21   *also id*. at 915 (plaintiffs adequately alleged NAR's market power "[g]iven the sheer market power

22   possessed by the Subject MLS and few available listing alternatives, combined with the fact that

23   each MLS participant must adhere to NAR listing rules or face professional sanctions and/or

24   repercussions"); *Realcomp II, Ltd. v. F.T.C*., 635 F.3d 815, 829 (6th Cir. 2011) (adopting ALJ

25   findings that NAR-affiliated MLS "possessed substantial market power in the relevant markets");

26   *Thompson v. Metro. Multi-List, Inc*., 934 F.2d 1566, 1576-1578 (11th Cir. 1991) (describing

27   evidence supporting MLS's market power).

28        Given NAR's market dominance, the Policy has significant anticompetitive effects.  It

LEWIS +
LLEWELLYN
LLP

eliminates any competitor that could potentially challenge NAR for agents' membership fees. *Sitzer*, 420 F. Supp. 3d at 914 (sufficient for plaintiff to show "the potential for genuine adverse effects on competition."). The Policy will also necessarily reduce output in the market for centralized real estate listing services and limit consumer choice, as TAN and other services disappear and buyers and sellers are diverted exclusively to NAR-affiliated MLSs and exempted large brokerages. This will "effectively deny consumers access to products that could be offered only by a network" outside the NAR-affiliated MLSs or large brokerages, with the effect that "product innovation and output [will be] stunted by the challenged policies." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir. 2003); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107–08 (1984) ( "A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law."). These anticompetitive effects will include consumers being locked into an MLS-system that requires them to pay non-negotiable buyer-broker commission rates, and it ensures that big brokerages can dominate Off-MLS listings through exempted "office exclusive" arrangements despite the clear potential for self-dealing—a potential that is absent when arms-length agents are connected via services such as TAN's. While NAR claims that the Policy is "pro-consumer," it in fact blatantly removes consumer choice. If the Policy truly is intended as "pro consumer," NAR has a less restrictive means of obtaining its goal: it could simply continue requiring agents to certify that their clients have instructed them to market/sell their home Off-MLS.

### 2. TAN's Section 2 Claim Under the Sherman Act is Likely to Succeed.

"A claim of monopolization under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1031 (N.D. Cal. 2008). Regarding the first element, as noted above, multiple courts have acknowledged the substantial market power wielded by NAR and its state and local affiliates through their associated MLSs. *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d at 828–29; *Metro. Multi-List, Inc.,* 934 F.2d at 1576-1578. This power extends to nearly every location TAN operates.

LEWIS +
LLEWELLYN
LLP

On the second element, the Policy demonstrates the willful maintenance of that power. "The test for willful maintenance or acquisition of monopoly power is whether the act complained of unreasonably restricts competition." *Drinkwine v. Federated Publication, Inc.,* 780 F.2d 735, 739 (9th Cir.1985), *cert. denied,* 475 U.S. 1087 (1968). "Section 2 claims may be premised upon predatory conduct that is aimed at achieving or maintaining a monopoly in a given market." *ICANN Transparency, Inc. v. VeriSign, Inc.,* 611 F.3d 495, 506 (9th Cir. 2010). "Unlawful or exclusionary conduct satisfies this element." *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, No. CV-19-01228-PHX-SMB, 2020 WL 122877, at *13 (D. Ariz. Jan. 10, 2020). As outlined above, the Policy is an exclusionary restriction that will—and is likely intended to—eliminate alternative listing services such as TAN, force home sellers into an anticompetitive MLS system, and allow NAR to avoid any competition that may challenge its market supremacy.

### 3.     TAN Is Likely To Succeed On Its Cartwright Act Claims.

California's Cartwright Act prohibits combinations "[t]o create or carry out restrictions in trade or commerce." Cal. Bus. & Prof. Code § 16720. As under federal law, group boycotts are *per se* illegal under the Cartwright Act. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000). The Act also prohibits anticompetitive exclusive dealing arrangements, which are illegal "if they unreasonably restrict competition in a particular market." *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 365 (2008). For the reasons discussed above, TAN is likely to establish that the Policy violates the Cartwright Act.

### 4.     TAN Is Likely To Succeed On Its Unfair Competition Claims.

TAN asserts claims under the "unlawful" and "unfair" prongs of California's Unfair Competition Law ("UCL"). Bus. & Prof. Code § 17200 *et seq.* A defendant's conduct is "unfair if it threatens an incipient violation of an antitrust law, or violates ***the policy or spirit of one of those laws*** because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal.App.4th 1134, 1147 (2003) (emphasis added). Thus, "[a]n act need not violate the antitrust laws to be actionable by a competitor as unfair[.]'" *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008); *see also Imperial Irrigation*

LEWIS +
LLEWELLYN
LLP

*Dist. v. Cal. Indep. Sys. Operator Corp.*, No. 15-CV-1576-AJB-RBB, 2016 WL 4087302, at *12 (S.D. Cal. Aug. 1, 2016) (declining to dismiss UCL claims for failure to allege an antitrust violation because UCL claim need only violate the "policy or spirit" of antitrust laws).  If Defendants' conduct described above does not technically break antitrust law, it violates the policy and spirit underlying those laws by effectively boycotting TAN and similar businesses, reducing competitive outputs, and removing the consumers' ability to choose among competing platforms.

Separately, "[a]n unlawful business practice under [§] 17200 is an act or practice, committed pursuant to business activity, that is at the same time forbidden by law." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1361 (2010).  Defendants' Policy is unlawful because it forces agents to choose between adhering to the CCPA and their fiduciary duty on the one hand, and complying with the Policy, on the other hand.  The CCPA allows consumers, like prospective home sellers, to require certain businesses to delete, and therefore no longer use, their "personal" information.  Cal. Civ. Code § 1798.105(a).  As CAR admits, (1) information associated with home listings is "personal"; and (2) the CCPA applies to some brokerage firms.  Nevertheless, the Policy requires agents at such firms to disclose a homeowner's personal information on the MLS—for thousands to view—even if the consumer does not consent/requests deletion.

Moreover, the Policy requires agents to violate their fiduciary duty by listing a home on the MLS even when that is not in the homeowners' interest for concerns regarding privacy, health, etc.  The Policy also prohibits agents from using TAN as a platform to gain market intelligence regarding a property before placing it on the MLS—an invaluable tool for many homeowners.  In other words, the Policy is so overbroad that it prevents TAN members from discussing properties that very well may end up on the MLS at the time of the sellers' choosing.  TAN has been injured and has lost money as a result of Defendants' unlawful business practice.  Cal. Bus. & Prof. Code § 17204.  TAN is therefore likely to succeed on its UCL claims.

**5.      TAN Is Likely To Succeed On Its Intentional Interference Claims.**

"[T]he elements for the tort of intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship;

21

LEWIS +
LLEWELLYN

1  (4) actual breach or disruption . . . ; and (5) resulting damage.'" *United Nat. Maint., Inc. v. San*

2  *Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).

3      Defendants knew TAN has membership contracts with agents.  Enacting the Policy was an

4  intentional act designed to disrupt those contracts—the Policy's goal is to limit Off-MLS marketing

5  and sales.  SFAR has already threatened to fine TAN members $5,000 for purportedly violating the

6  Policy.  Moreover, CAR and SFAR's prohibition on private one-on-one agent communication was

7  directly aimed to disrupt TAN's matchmaking service.  Actual disruption has occurred—TAN

8  clients have cancelled memberships and other have threatened to follow suit—and this has caused,

9  and will continue to cause, TAN damage.  TAN is therefore likely to succeed on its interference

10  claim.

11      **B.      TAN Will Suffer Irreparable Harm Absent Injunctive Relief.**

12      A plaintiff suffers irreparable harm "where the conduct of a defendant threatens the existence

13  of the business itself." *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051

14  (N.D. Cal. 2004); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir.

15  1985) (The "threat of being driven out of business is sufficient to establish irreparable harm."); *see*

16  *also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[S]ubstantial loss of business and perhaps

17  even bankruptcy" constitutes irreparable harm.).

18      Here, Defendants' May 1, 2020 implementation and enforcement of the Policy poses a direct

19  and immediate threat to TAN's existence.  As explained above, TAN's revenue comes from

20  membership dues paid in exchange for access to information regarding residential properties

21  unavailable on the MLS.  By forcing agents to funnel the information available from TAN's

22  platform onto the MLS, TAN's entire business model is undermined by the continued enforcement

23  of the Policy.  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.,* 273 F. Supp. 3d 1099, 1105 (N.D. Cal.

24  2017) (finding irreparable harm when defendant restricted access to data needed to sustain plaintiff's

25  business model).

26      TAN's members have already begun cancelling memberships and specifically cited NAR's

27  Policy as their reason for doing so.  TAN has been forced to waive dues to retain other members,

28  and many agents have communicated concern about their continued membership with TAN.

LEWIS +
LLEWELLYN
LLP

1    Furthermore, because TAN offers a recurring subscription service, every lost member represents the

2    loss of a persistent revenue source, not just a one-time transaction.  These increased departures can

3    lead to a "death spiral" where the loss of members means that remaining participants have less

4    incentive to remain, accelerating further departures—i.e., TAN's "network effect" will be lost.

5    Indeed, since NAR-affiliates adopted the Policy, TAN's usership among existing members has been

6    down.  Faudman Decl., ¶¶ 22-24. And, most recently, given CAR and SFAR's aggressive

7    interpretations, use of TAN's matchmaking services have significantly dropped off.  *Id.*

8        The Policy also severely harms TAN's ability to attract new members.  "Evidence of

9    threatened loss of prospective customers or goodwill certainly supports a finding of the possibility

10   of irreparable harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

11   2001).  New member signs ups have declined.  CAR and SFAR are specifically telling their

12   member-agents that the Policy applies to communications on TAN, thus tainting the pool of

13   potential new members in current and future locations.

14       TAN's challenge in obtaining new members given the Policy is illustrated by its current

15   members' confusion regarding their ability to use TAN.  For example, members have asked TAN

16   the following: "the MLS has effectively cut you off at the knees, with the new 'clear cooperation'

17   requirements, haven't they?"; "I'm a member in LA and hoping you can tell me if/how TAN is

18   complying with the new clear cooperation rules. I want to avoid penalties from The MLS, which I

19   belong to"; "Knowing the new MLS marketing rules coming up in May, how can I continue to use

20   TAN legally?"  Faudman Decl., Exh. A.  With this amount of uncertainty and fear among existing

21   members, it has been, and will continue to be, tremendously difficult, if not impossible, for TAN to

22   attract new members and retain its current membership given the Policy.

23       TAN's need for injunctive relief is immediate.  NAR's local affiliates were required to have

24   adopted and enforce the Policy by May 1.  As enforcement begins in earnest, TAN's members will

25   continue their exodus and it will remain impossible to attract new members.  Moreover, as more

26   local associations adopt CAR/SFAR's extreme interpretation of the Policy, TAN's matchmaking

27   service will crumble.  Each day that goes by with the Policy in place, TAN's reputation and ability

28   to continue as a going concern diminishes.

LEWIS +
LLEWELLYN
LLP

1

**C.     The Balance of Equities Strongly Favors TAN.**

2

In balancing equities between parties, the Court must use its discretion to weigh the effect of

3

harm to each party.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).  On the one

4

hand, temporarily enjoining enforcement of the Policy will cause Defendants little, if any, hardship.

5

They would simply be required to temporarily carry on under the system that existed prior to the

6

Policy in which they flourished and had market domination.  Under the pre-Policy system,

7

moreover, agents were still required to obtain seller-consent before opting to market/sell property

8

Off-MLS.  Thus, consumers are not being harmed by temporarily enjoining the Policy's

9

enforcement.  None of Defendants' public statements defending the Policy suggest that the Policy's

10

enforcement was somehow time sensitive or otherwise imperative.  Furthermore, none of

11

Defendants' public statements suggest that Defendants themselves will suffer any tangible harm

12

from the Policy's delay, and the purported harms that would indirectly accrue to consumers are

13

articulated only in vague, conclusory terms.

14

On the other hand, if the Policy continues to be enforced, TAN faces the certainty of

15

continued membership losses and a clear risk that its overall business will be severely diminished or

16

destroyed.  When compared with the complete lack of harm to Defendants that would result from

17

delaying the Policy, the balance of equities tips sharply in TAN's favor.  *See, e.g., Pac. Radiation*

18

*Oncology, LLC v. Queen's Med. Ctr.*, No. CIV. 12-00064 LEK, 2012 WL 381209, at *7 (D. Haw.

19

Feb. 3, 2012) (granting order enjoining hospital's decision to close facility to outside physicians;

20

while "Defendants certainly have an interest in operating [the hospital] in the manner they

21

reasonably believe is best suited for patients. . . . [they] will suffer little harm if the implementation

22

of their closed-facility policy is delayed by a temporary restraining order until the Court issues its

23

decision").  In the end, granting temporary injunctive relief here will "preserve status quo" and

24

"prevent irreparable loss of rights prior to final disposition of the litigation."  *Napa Valley Publ'g*

25

*Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1180 (N.D. Cal. 2002).

26

**V.     INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST**.

27

The public interest will only be served by preventing implementation of the Policy pending

28

resolution of this dispute.  The Policy (1) ensures no competitor to the MLS-NAR system can ever

meaningfully challenge it, thereby preserving its market control; (2) forces home sellers into the MLS system where they will lack negotiating power over commissions and be forced to expose personal information against their will; and (3) leaves big-brokerage firms inexplicably exempted from the Policy as the only feasible remaining option for Off-MLS sales. While Defendants no doubt will claim the public interest is served by eliminating Off-MLS sales, the Policy does not even attempt to do this—it just selectively eliminates Off-MLS *competitors* of Defendants while leaving non-competitor brokerages alone. This serves Defendants, not the public interest.

## VI. A BOND IS UNNECESSASARY.

"The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Fid. Brokerage Servs. LLC v. McNamara*, 2011 WL 2117546, at *8 (S.D. Cal. May 27, 2011) (declining to issue bond requested by defendants). Here, enjoining Defendants' enforcement of the Policy will not cause them any harm, financial or otherwise.

## VII. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a temporary restraining order and order to show cause why a preliminary injunction cannot issue in accordance with the Proposed Order submitted concurrently herewith.

Dated: May 13, 2020

Respectfully submitted,

LEWIS & LLEWELLYN LLP

By: ___*/s/ Nicolas V. Saenz*___
       Nicolas V. Saenz
       Attorneys for Plaintiff
       TOP AGENT NETWORK, INC.

LEWIS +
LLEWELLYN
LLP