LEWIS & LLEWELLYN LLP
Paul T. Llewellyn (Bar No. 216887)
pllewellyn@lewisllewellyn.com
Nicolas V. Saenz (Bar No. 284087)
nsaenz@lewisllewellyn.com
Tobias Snyder (Bar No. 289095)
tsnyder@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone:  (415) 800-0590
Facsimile:   (415) 390-2127

Attorneys for Plaintiff
TOP AGENT NETWORK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP AGENT NETWORK, INC. | CASE NO. 4:20-CV-03198 DMR |
| Plaintiff, | **DECLARATION OF DAVID FAUDMAN IN SUPPORT OF PLAINTIFF TOP AGENT NETWORK, INC.'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| v. | |
| NATIONAL ASSOCIATION OF REALTORS, CALIFORNIA ASSOCIATION OF REALTORS, INC., SAN FRANCISCO ASSOCIATION OF REALTORS, | |
| Defendants. | Date: |
| | Time: |
| | Judge:        Hon. Donna M. Ryu |
| | Complaint Filed: May 11, 2020 |

LEWIS +
LLEWELLYN
LLP

I, David Faudman, declare as follows:

1. I am the Chief Executive Offer of Top Agent Network, Inc. ("TAN"), the plaintiff in the above-entitled action. I make the statements here of my own personal knowledge, unless where stated on information and belief, which statements I believe to be true, and if called to do so, I could and would testify competently to those matters stated here.

2. Before joining TAN, I practiced as a real estate agent for 30 years in the San Francisco Bay Area. During this time, I was a top 1% real estate agent and a member of the National Association of Realtors ("NAR"), the California Association of Realtors ("CAR"), and the Marin Association of Realtors. I have also been the CEO of CleanOffer, Inc., an agent-client collaboration tool, since 2000. Throughout my many years in the real estate industry, I have become familiar with multiple listing services ("MLS") and used them often as part of performing my job. An MLS is a subscription-based database of properties listed for sale in a particular geographical region.

3. Upon information and belief based on my experience in the industry, the majority of real estate agents in the country are members of the National Association of Realtors ("NAR"), and NAR members constitute a substantially higher percentage of currently active real estate agents.

4. One of the most important benefits the NAR and its affiliates provide to real estate agents is access to an MLS. Based on my experience in the industry, upon information and belief, the substantial majority of real estate markets are serviced by a single comprehensive MLS in any given location. Thus, as a practical matter, to practice one's profession as a real estate agent, most real estate agents must be a member of the association that controls the local MLS. So, for a real estate agent to work in San Francisco, as a practical matter, he or she must pay SFAR to access the local MLS, "SFARMLS," and also agree to be bound by CAR and NAR rules.

5. Upon information and belief, most of the MLSs in the country are controlled by an NAR affiliate. Fundamentally, the NAR is an association of real estate agents who make their money on commissions buying and selling homes. The more home listings NAR can force onto its affiliated MLSs, the better chance NAR-affiliated agents have of working on those deals and earning a commission. While more experienced, top agents often have their own networks and methods, and

LEWIS + LLEWELLYN LLP

are less dependent on the MLSs, upon information and belief, most agents still rely heavily on the MLS system for obtaining information regarding listing properties that most of them need to earn a commission.  Upon information and belief, the NAR's ability to continue providing this information to its membership is a central reason for why agents pay fees to the NAR and its affiliates like CAR and SFAR.  Furthermore, upon information and belief, NAR and its affiliates make money by selling "data feeds" to various third-party vendors.

6.      Over at least the past ten years, the number of Off-MLS sales facilitated by TAN and other businesses has significantly grown.  Upon information and belief, in San Francisco alone, from 2010 to 2018, Off-MLS sales expanded by an estimated 68%, a trend that occurred throughout the country.

7.      Information regarding homes marketed and sold on the MLS is often made available to tens of thousands of people through the MLS-system.  Indeed, because of the interconnectivity of the MLS-system, tens of thousands of people could access an individual's personal information placed on SFARMLS alone.

8.      Given the wide dissemination of information on the MLS system, a potential home seller using the MLS can expect more people appearing at their residence for a showing.

9.      Other reasons a homeowner may want to proceed marketing and/or selling her own "Off-MLS" includes the following:  the seller may want to "test the waters" and retain the option to pull the home off the market without the stigma and downward price pressure that attaches to a property de-listed from the MLS; the counterparties may already know one another and have no need for the MLS; the seller may prefer to forego the typical expense of repairing and/or staging their home for potential buyers, and want to sell the home as-is; or the seller may want the sale to move faster or slower than the standard closing process associated with homes sold on the MLS

10.     Upon information and belief, NAR's rules require the seller to pay the commission of the buyer's agent with no meaningful ability to negotiate this amount.  These rules require a seller marketing the property on an NAR-affiliated MLS to make a "blanket" enforceable unilateral offer of compensation to the buyer's agent.  If the seller does not offer commission at a certain level, she risks being ignored or blacklisted by buyers' agents.  However, upon information and belief, after

1   this offer is made, it cannot be adjusted unless both the buyer and seller agree to do so.  Thus, as a

2   practical matter, the seller must pay a market-rate buyer's side commission regardless of

3   circumstances and/or the services the buyer's agent provides.

4           11.     Founded in 2010, TAN is a private, member-only community open to the most

5   successful real estate agents in a given geographic location.  TAN has nearly 10,000 members in 31

6   chapters across the country, including throughout California generally and the San Francisco Bay

7   Area specifically.  TAN's member-agents are collectively involved in an estimated $165 billion in

8   home sales each year—or around 11% of all homes sold in the United States.  To gain admittance to

9   TAN, an agent must show that they were within the top ten percent of closed home sale volume

10  within their chapter area in the preceding 24 months.  In general, the top ten percent of agents are

11  responsible for around 90% of closed home sales in any given area.

12          12.     TAN provides the agents in its network with a centralized online platform to share

13  information regarding residential real estate.  TAN members can use the platform to gain helpful

14  market information about a home that may ultimately go on the MLS.  This "pre-MLS" exploration

15  is often critical for homeowners and their agents to, for example, adequately price a property or

16  determine whether to put the home up for sale.  Beyond gaining market intelligence, TAN members

17  also use its platform to market properties for which they are acting as sellers' agents, including

18  properties the seller may not intend to list on an MLS.

19          13.     Furthermore, recently, TAN also introduced a new "match-making" service for its

20  members.  This service facilitates one-on-one private conversations between a buyer's agent and

21  seller's agent with symmetrical needs.  Once TAN matches the agents, they can communicate

22  privately over email, phone, privately on TAN or at a coffee shop, for example, regarding the

23  property at issue.  In sum, agents use TAN to access information—whether it be helpful market data,

24  a specific private home listing, or to discover a counterparty in which to transact business—that is

25  not available on the MLS.

26          14.     TAN makes money from membership fees.  Agents may purchase monthly, quarterly,

27  or annual memberships.  Further, as an associational organization, TAN's value for its members

28  derives in large part from network effects—the larger the share of top agents in TAN's membership,

3

LEWIS +
LLEWELLYN
LLP

1   the greater the value of TAN membership to other top agents, as it allows for access to a greater

2   volume of Off-MLS information in which to service their clients.

3         15.    TAN currently operates chapters in the following regions (some of which regions are

4   subdivided into multiple chapters): Scottsdale, Arizona; Alameda County, California; Contra Costa

5   County, California; Marin County, California; Monterey, California; San Fernando Valley,

6   California; San Francisco, California; San Jose, California; San Mateo County, California; Santa

7   Barbara, California; Santa Clara, California; Sonoma and Napa Counties, California; Los Angeles,

8   California; Washington, D.C.; Oahu, Hawaii; Chicago, Illinois; Boston, Massachusetts; Cape Cod,

9   Massachusetts; Howard County, Maryland; Portland, Oregon; Austin, Texas; Fairfax County,

10  Virginia; and Loudoun County, Virginia.

11        16.    Except for the Boston area, and Marin, Sonoma, and Napa counties, an NAR-affiliate

12  controls a dominant MLS in each of these locations.  Upon information and belief, NAR's

13  membership share is even higher among the top-level real estate agents who qualify for TAN

14  membership, as access to MLSs—most of which are affiliated with NAR—is almost always

15  required under current market conditions to achieve the sales volume necessary to qualify for TAN.

16  For example, in San Francisco Bay Area, upon information and belief, nearly all TAN members are

17  also members of SFAR and the surrounding NAR-affiliated associations.

18        17.    Real estate agents are not only TAN's customers.  They are also effectively TAN's

19  suppliers because they provide the information on TAN's platform that other TAN members visit

20  the platform to obtain.  TAN needs this supply of information regarding local residential real estate

21  in order to compete with NAR and its affiliates.

22        18.    Big brokerage firms, such as Compass, for example, are not in the market for

23  attracting membership dues/fees from agents.  Upon information and belief, they therefore are not

24  direct competitors of NAR and do not threaten NAR's monopoly control for such dues.  Moreover,

25  upon information and belief, big brokerage firms generally require their agents to be NAR members,

26  either through their own policies or an NAR mandate.

27        19.    While NAR's Clear Cooperation Policy (the "Policy") has been highly detrimental to

28  TAN's business, based on the plain language of the Policy, TAN understood that its successful

LEWIS +
LLEWELLYN
LLP

matchmaking service, described above, would not violate the Policy and provide TAN a lifeline. This is because TAN's matchmaking service does not publicly market a property and instead simply connects an individual seller's agent and buyer's agent who seemingly were a good fit for a potential real estate deal.  Once that connection is made, TAN's service ends; the prospective buyer and seller's respective agents then have private, one-on-one conversations regarding the property in question.

20.     Upon information and belief, CAR's interpretation of NAR's Policy is that if agents have private, one-on-one conversations regarding a property, for example, at a coffee shop, over email, privately on TAN or on the telephone, that property must be listed on the MLS within one business day thereafter.  For example, since the Policy's May 1, 2020 implementation date, CAR representatives have told TAN members in webinars that CAR is in communication with NAR regarding TAN "not complying" with the Policy and implied such noncompliance includes TAN's matchmaking service.   Furthermore, SFAR and other local CAR/NAR affiliates in California have adopted this interpretation.  For example, on May 7, 2020 SFAR's MLS Director stated in an email that TAN received, and I viewed, that "[o]nly submission to the MLS . . . once you start ANY use of a 3rd party platform is in compliance, it does not matter if their tools use any kind of blind-matching or otherwise."  SFAR's MLS Director further stated that TAN is "going to be putting many agents into non-compliance," because TAN "absolutely cannot self-certify that what they're doing is 'cleared' or 'approved.'"  Representatives of Bridge MLS, another Bay Area affiliate, stated that Bridge MLS had "talked a lot" with NAR and that TAN is still not working under the guidelines, no matter "how they spin it" even under TAN's new matchmaking product.

21.     Upon information and belief, agents can be banned from using the MLS after a third violation of the Policy.  Furthermore, following the May 1, 2020 implementation date, SFAR has threatened to fine TAN members for not complying with the Policy.  The Policy, in other words, undermines TAN's entire business model—platform communication and matchmaking services alike.

22.     Since the Policy's implementation, dozens of TAN members have cancelled their memberships.  Others have explicitly referenced the consequences stemming from their violation of

5

LEWIS +
LLEWELLYN
LLP

NAR's policy.  Many members have expressed confusion regarding whether they can legally use TAN.  New member signs ups have declined.  Thus, beyond lost memberships that have already occurred, the Policy casts a black cloud over TAN's reputation and undermines its entire business model.  Furthermore, since SFAR's enforcement of the Policy, TAN's usership on both its matchmaking and non-matchmaking services have dropped.

23.     Attached hereto as **Exhibit A** is a true and correct copy of communications from TAN members and former members specifically addressing concerns about their membership in TAN as a result of the Policy.  These are merely examples of the many communications TAN has received from its members regarding the Policy.  The names and personal identifying information of TAN's members/former members have been redacted to protect their privacy.

24.     If this Policy is allowed to stand, and particularly CAR/SFAR's draconian prohibition on private agent conversations, neither TAN nor other NAR competitors for agent membership can survive.  Indeed, other NAR-affiliated MLSs outside the country have already implemented similar approaches to CAR/SFAR, including Colorado MLS and Bright MLS in the Washington D.C. area.  The Bright MLS example demonstrates what is likely to happen to TAN on a national level.  In December 2019, "Bright MLS," which operates in the greater Washington D.C. area, instituted a rule similar to NAR's Policy, requiring agents to place a property that was "publicly marketed" on Bright MLS soon after it was "marketed" on TAN.  Member usage has dropped by 71% for TAN's non-matchmaking services.  With increased enforcement of TAN's matchmaking service, members' usage of TAN overall is almost certain to continue to drop.  Compare this with the greater Boston area, where the MLS is not NAR-affiliated and there is no similar rule to the Policy.  There, member's usage of TAN has increased nearly 23%.

25.     Before NAR enacted the Policy, a home seller wanting to market/sell her property Off-MLS had several options.  Through her agent, she could use TAN, or a competitor like thePLS.com, or the Austin Luxury Network.  Moreover, the Policy sweeps so broadly that it prohibits agents from even using TAN to gather intelligence about a homeowner's property before placing it on the MLS.

26.     Upon information and belief, attached hereto as **Exhibit B** is a true and correct copy

6

LEWIS +
LLEWELLYN
LLP

1    of an email sent by Compass CEO Robert Reffkin on March 5, 2020.

2

3         I declare under penalty of perjury pursuant to the laws of the United States that the foregoing

4    is true and correct.  This declaration was executed on May 13, 2020 at Larkspur, California.

5

6                                                              David Faudman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FAUDMAN DECLARATION ISO TAN'S APPLICATION FOR TRO; OSC RE: PI
CASE NO. 4:20-CV-03198 DMR

LEWIS +
LLEWELLYN LLP

# EXHIBIT A

# Screenshots of member communications related to NAR rule



Santa Clara West



**BB**

Hi Karissa,

Yes, of course, we certainly owe you a reason at the minimum. Quite frankly, with all the recent changes regarding the legality of off-market/pocket listings we are not seeing the future relevance of TAN. In the first few days of the new TAN rollout of properties, we are experiencing it as a bulletin board for what is happening the next day. In other words, on TAN today announcing the appearance on the MLS the next day. As a result, there has been a flood of postings on TAN that are of little value and more announcements than anything else. Early indications make it appear as though the value proposition of TAN may be shifting from a place where sellers (through their agents) could find a buyer from among many potential specific buyers without the requirement of it being known to the world that their home was even for sale, to one where buyers (through their agents) can find the home they are looking for in advance of its availability being known to the masses. I think that has relevance to a small amount of the buyer pool who depend entirely on their agent to do the shopping for them. We have had very few of those types of buyer clients as most buyers want to feel as though they have had a chance to view the relevant opportunities available to them. Granted, with virtual shopping perhaps becoming the wave of the future, we could find things shifting a bit in every respect. Apparently we have until July when the renewal comes into play to see the future unfold and the consider continuing the membership. Assuming we don't see a significant shift in relevance, at least our desire to not renew is known. If we do see the relevance, we will certainly notify you.

Thanks for acknowledging the request and for reaching out. We certainly enjoyed TAN of the past and hope that as the future unfolds there will be a renewed relevance that we are just not seeing at this point in time.

Make it a fantastic day,



San Mateo

  Nov 12, 2019 06:08 am

Good morning. I would like to cancel my membership at the end of this current billing period, but I cannot find a way to do this on the website. Please cancel my membership and confirm the cancellation by return email. The reason for my cancellation is the recent rule instituted by Bright MLS (and passed yesterday by NAR) restricting marketing of off-market listings. Because of these actions, TAN is no longer useful to me.

Please note that if I do not receive confirmation that my membership has been cancelled, I will dispute any further membership charges from TAN with my credit card company.

Sincerely,



Greater Capital Area



San Francisco



David, the onslaught of TAN emails is too great. I believe you should take the buyers needs off the public window altogether. Nearly 50% of my daily email now comes from such requests. The truth is, most agents aren't going to share that they know of a 4/2 in Piedmont as we haven't enough inventory to meet the demands of our own buyer pool. As for Coming Soons, the MLS has effectively cut you off at the knees, with the new "clear cooperation" requirements, haven't they?

In any case, is there a way to opt out of seeing the buyer requests altogether? It's truly become a problem. It's just one more job I don't need.

on 24 Apr, 6:52am

@ EMAIL

SIGNED UP   almost 2 years ago

Alameda North

  Apr 15 12:18 pm 

Hi there,

I'm a member in LA and hoping you can tell me if/how TAN is complying with the new clear cooperation rules. I want to avoid penalties from The MLS, which I belong to.

Best,



Westside LA



to David ▾

Hi TAN Team!

Knowing the new MLS marketing rules coming up in May , how can I continue to use TAN legally?

Thank you,

Santa Clara West



i do not want to renew my membership automatically.

on 6 May, 10:10am

@ EMAIL

📅 SIGNED UP  over 6 years ago     📍 San Francisco, United States

 the service is no longer relevant and should not be used because of the new clear coop rules

Neill on 6 May, 10:20am

San Francisco



I did not receive any renewal notification for the recent billing charge of $475.

If I decide to cancel my PRO TAN membership, will I get reimbursed?

Also, with the new laws from CAR going into effect today for "coming soon" listings, how does this influence the TAN platform. Essentially, it is now illegal to advertise listings without a listing agreement, amongst many other stipulations that will be enforced.

Please advise on both points.

Thank you,

on 5 May, 4:22pm

@ EMAIL

📅 SIGNED UP  almost 6 years ago      📍 West Hills, United States

San Fernando Valley

From: ████████████████
Date: Mon, May 11, 2020 at 5:58 PM
Subject: Renewal/Cancelation
To: david@topagentnetwork.com <david@topagentnetwork.com>

Hi David,

I just notice my TAN subscription just renewed without notice. As much as I do like TAN, we clearly cannot use this as a tool until the Clear Cooperation issues are resolved. Please cancel my membership and refund the balance from the renewal yesterday. Not sure why I didn't get a renewal notice this year...

Thanks,

████████



San Mateo



Hi Top Agent Network,

I noticed that the Top Agent Network changed their interface, is this to be compliant with the Clear Cooperation policy? Will we get in trouble for sharing homes on TAN in May?

Regards,

on 30 Apr, 11:46am

@ EMAIL

SIGNED UP  over 4 years ago     Mountain View, United States

Santa Clara West

Hi, I am not wanting to get into trouble so I am trying to understand the new policy on OFF MLS-

I have a client who doesn't want MLS at All or a sign-

She is single lives in the house alone with dogs..

Also property is in the Contra Costa County area I am assuming you have a branch there as well

This isn't just for a client its for someone I consider family. Help,

Thank you

on 25 Apr, 3:57pm

@ EMAIL

Santa Clara West



voicemail.mp3



JB

Voicemail on TAN Member Success

🏷️ NAR rule ⊗

13d

Caller Phone number :

Aircall number : TAN Member Success

Waiting time : 00:00:48

Find voicemail here https:// ████████████████ voicemail

Santa Clara West



With changes to the MLS rules, I think TAN will be less valuable than it has been. I know that you've made adjustments to the way TAN works, but the way my broker and I are interpreting the rules, as soon as you advertise a property outside of your brokerage, even if it is to one agent, that property must be listed as coming soon on the MLS. With the stiff penalties in place for non-compliance, I think there won't be many more pocket listings / networking of off market properties. Saddens me, but I can't control it.

on 30 Apr, 11:42am

Santa Clara West

EXHIBIT B

**From:** Robert Reffkin
**Sent:** Thursday, March 5, 2020 10:36 AM
**Cc**: Cory Perkins
**Subject:** New & Improved: Compass Private Exclusive

Compass Family,

In this high-tech world we live in, we're constantly being asked — *or worse, not even asked* — to sacrifice our privacy in the name of quality and convenience. Online and on our smartphones, **privacy has become the ultimate commodity.**

The same is true in real estate. When homeowners decide to sell, they are required to hand over their personal data — address, photos, pricing preferences — and unprecedented access to their home. **But for decades, wealthy homeowners have protected their privacy by taking advantage of the benefits of a private home sale.** It's a growing trend that led to the creation of companies like Aalto, Top Agent Network, and PLS that appealed to thousands of people who valued privacy but still wanted quality.

Today, as more consumers place more value on privacy, **we want to offer that same private, exclusive experience as an option to ALL Compass clients** (in every market where it is possible — NYC agents shouldn't proactively pitch the program to sellers and the program is not allowed in our Seattle market).

**So I'm excited to announce the launch of several new features in our Private Exclusive product** that will make it easier for your clients to sell their homes while preserving their privacy.

NAR's "Clear Cooperation Policy" will limit seller choice when it comes to using private home sale websites to pre-market or market their home, but seller demand for privacy and flexibility isn't going anywhere. Compass is the obvious choice for sellers who want to sell their homes or test the market, with the option to do so privately, while still getting exposure to a community of 15,000+ top agents in major markets across the county.

**Compass Private Exclusive will not be the right listing approach for every seller, but it could be the right answer for sellers who are looking for a different way to sell their home.** You can sell your home and keep your privacy, and at Compass, we believe in delivering homeowners the control and flexibility that should be their right.

Be on the lookout for an email soon from @Cory Perkins, who leads our Inventory Strategy & Operations team, outlining all of the exciting product features we're rolling out as part of the new & improved Compass Private Exclusive program.

In the meantime, here's how you can start using the Private Exclusive program today —

1. Download and share the attached Private Exclusive social assets on Facebook and Instagram

<u>Suggested Caption for Sellers</u>: The decision to sell your home is a personal one. By listing your home as a Compass Private Exclusive, you control what information is shared about your home, while still getting exposure to buyers across the country through our network of 15,000 top agents. Get in touch to learn more.
<u>Suggested Caption for Buyers</u>: Did you know that homeowners can choose to sell their home privately? This means their property isn't publicly displayed on home search websites. However, it's still fully available to interested buyers like you. Interested in expanding the search for your next home? Get in touch to learn more.

2. Print and bring the attached Private Exclusive seller or buyer one sheet to your next listing presentation or meeting with a potential client

3. Share the Private Exclusive landing page for sellers with your sphere of influence

4. Create a Hot Sheet that will surface Private Exclusive listings in your market so you can share 1:1 with interested buyers, in a private collection for example.

To learn more check out this video (please keep internal), email inventory@compass.com or contact Cory directly at cory.perkins@compass.com.

Best,
Robert

**Robert**
 **Reffkin** | Founder & CEO

90
 Fifth Avenue
New
 York, NY 10011
m:
 917.841.5555