LEWIS & LLEWELLYN LLP
Paul T. Llewellyn (Bar No. 216887)
pllewellyn@lewisllewellyn.com
Nicolas V. Saenz (Bar No. 284087)
nsaenz@lewisllewellyn.com
Tobias Snyder (Bar No. 289095)
tsnyder@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile:  (415) 390-2127

Attorneys for Plaintiff
TOP AGENT NETWORK, INC.


## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| TOP AGENT NETWORK, INC. | CASE NO. 3:20-cv-03198-VC |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF SHERMAN ANTITRUST ACT SECTION 1** |
| NATIONAL ASSOCIATION OF REALTORS, CALIFORNIA ASSOCIATION OF REALTORS, INC., SAN FRANCISCO ASSOCIATION OF REALTORS, | **(2) VIOLATION OF SHERMAN ANTITRUST ACT SECTION 2** |
| Defendants. | **(3) VIOLATION OF CARTWRIGHT ACT** |
| | **(4) UNFAIR COMPETITION UNDER BUSINESS AND PROFESSIONS CODE SECTION 17200** |
| | **(5) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | **DEMAND FOR JURY TRIAL** |

LEWIS +
LLEWELLYN
LLP

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This action is necessary to stop the National Association of Realtors ("NAR") and its affiliates from conspiring to shut down competition, disrupt the relationship between real estate agents and their clients, require agents to violate California law, and take away a family's freedom to choose how to market their home for sale.  NAR's most recent unlawful attempt at abusing its market dominance should be enjoined.

2.      The NAR is the largest trade association in the United States.  The NAR and its local affiliates throughout the country, such as the California Association of Realtors, Inc. ("CAR") and San Francisco Association of Realtors ("SFAR"), make money, in part, by charging real estate agents to use their multiple listing service ("MLS").  An MLS is a listing service containing a database of homes for sale in any given geographic region.  For example, the SFAR controls the San Francisco-based MLS, the "SFARMLS."  When a home is "listed" on the SFARMLS, tens of thousands of agents gain access to details about the home for sale and about the home seller.  For agents to access the MLS, first they must pay membership dues or a fee and agree to be bound by NAR's rules.

3.      As a practical matter, to practice their profession, the overwhelming majority of real estate agents currently must use the NAR-affiliated MLS in the area in which they operate.  This market control ensures that NAR and its affiliated associations are guaranteed substantial membership dues and fees— around $200 million annually—from agents needing access to the MLS.

4.      Beyond these fees, the NAR has a second, less obvious motivation to make sure the MLS-system continues to grow in power.  At its basic level, the NAR is just an association of competing real estate agents who have joined together to cooperate on some issues.  But a small number of the agents are responsible for the overwhelming majority of all home sales.  Many of these experienced agents have established their own networks and created methods outside of the MLS to service their clients.  They are therefore less reliant on the MLS as a percentage of their overall business than less experienced or lower producing agents.  Many of these top performers frequently conduct "Off-MLS" sales and gather market research by using alternative networks.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

5.      These alternative networks pose a problem for NAR.  If a home for sale is never "listed" on the MLS, and instead is marketed "Off-MLS" through alternative means, most NAR members have a reduced chance of being involved in the transaction, and therefore are less likely to make a commission.  Absent the ability to make a commission from using the MLS, NAR's members have less incentive to pay NAR to access it.  Off-MLS sales, then, threaten NAR's revenue stream, its market dominance, and its entire reason for existing.  And the number of Off-MLS sales has grown significantly in recent years.  NAR, its affiliates, and many of its individual agent-members, therefore have a huge incentive to stamp out these alternative networks to ensure homes for sale *must* be listed on the MLS.

6.      Plaintiff Top Agent Network, Inc. ("TAN") is a prime example of a competitor providing an alternative to NAR-controlled MLS.  TAN's membership is limited to the top ten-percent of agents in select regions throughout the country.  TAN, in effect, is a private MLS with standards.  Its platform allows high-producing agents to exchange market data and information on a more selective, controlled basis.  It also allows a home seller to avoid the exposure, and associated risks and hassles, that come along with listing on the MLS: for example, disclosing her personal information to thousands of people and having strangers trounce through the house for showings.  TAN also provides behind-the-scenes "matchmaking" services, connecting a seller's agent and buyer's agent who have communicated symmetrical needs to TAN.  Once TAN matches them, the seller and buyer agents can then have private one-one-one conversations off the TAN platform regarding their respective clients' needs.  Put simply, agents pay TAN membership dues to get access to *information not available on the MLS*.

7.      Unable to compete with TAN through free and fair innovation, NAR has sought to eliminate TAN through anticompetitive regulation.  Realizing the threat TAN poses, the NAR recently promulgated a rule, which each of its affiliates and members must follow, intended to undercut TAN's entire business model.  The rule provides, in effect, that any property an agent discusses on TAN or similar platforms must be listed on the MLS within one business day thereafter.  As NAR knows, if information shared on TAN must be placed on the MLS, agents have much less reason to ever use TAN in the first place.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

8.      Furthermore, some NAR local affiliates, including SFAR, have used the rule to take aim not only at private marketing of properties on TAN's platform, but also TAN's matchmaking service.  SFAR has taken the position that properties discussed in private one-on-one meetings between agents must be listed on the MLS within one-business day—meaning the utility of agents using TAN to facilitate these one-on-one conversations is significantly diminished.  Agents who violate NAR's rule are subject to penalties—SFAR has already specifically threatened to fine its members $5,000 for the first violation, and such fines double and triple for subsequent violations.

9.       The NAR has attempted to justify the rule by claiming it somehow is in the best interest of home sellers and buyers, for example by purportedly making housing more accessible.  But the rule itself undermines these claims: big brokerage firms like Compass can still market properties internally among its thousands of agents without ever having to list that property on the MLS.  The difference, of course, is that, unlike TAN, the large brokerage companies do not compete against the NAR for membership fees, and they require their agents to be NAR members.  NAR's rule, in other words, is a transparent attempt at protecting its turf, not helping consumers.

10.     The truth is the rule drives out competition, ensuring the NAR's continued market dominance.  It forces agents to (1) violate the California Consumer Privacy Act by listing clients' protected, personal information on the MLS for thousands of people to find, forcing sellers to choose either to risk their privacy or not to have their home marketed in any way, and (2) breach their fiduciary duty to clients by listing properties on the MLS even when that is against the seller's best interest or wishes.  It forces home sellers to participate in a fundamentally anticompetitive MLS-system.  The rule also causes irreparable harm to TAN's business and reputation—members have already canceled subscriptions and communicated fear of reprisal from NAR for using TAN's services.  NAR's conduct amounts to violations of federal and state antitrust statutes, a violation of California's unfair competition law, and intentional interference with TAN's contractual relations with its members.

## THE PARTIES

11.     Plaintiff TAN is a California corporation with its principal place of business in San Francisco, California.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

12.     Defendant NAR is a nongovernmental trade association organized under the laws of Illinois with its principal place of business in Chicago, Illinois.  The NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state.  It has approximately 200,000 members in California, derives revenue from California, and holds meetings in California.  For example, in November 2019, the annual NAR conference took place in California.  It also directs its California-based members to follow rules it promulgates.

13.     Defendant CAR is an association of licensed real estate brokers and real estate agents throughout the state of California.  CAR is affiliated with, and chartered by, the NAR.

14.     Defendant SFAR is the official association of licensed real estate brokers and real estate agents in San Francisco.  SFAR is affiliated with, and chartered by, the NAR.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 2.

16.     This Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also proper in this District pursuant to 15 U.S.C. § 22 because all Defendants are found in this District and transact business herein.

18.     The Court has personal jurisdiction over CAR and SFAR because they are residents of California and their wrongful conduct occurred in this state.  As described in more detail herein, the Court has personal jurisdiction over NAR both because of its substantial contacts with California, its specific contacts with the state give rise to this action, and pursuant to 15 U.S.C. § 22 because of its nationwide sufficient minimum contacts.

## INTERSTATE COMMERCE

19.     The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

LEWIS +
LLEWELLYN LLP

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

## FACTUAL BACKGROUND

### I.    THE NAR AND MULTIPLE LISTING SERVICES.

20.     Founded in 1908, the NAR is a North American trade association for professionals in the residential and commercial real estate industries.  It is America's largest trade association, representing approximately 1.4 million members including real estate brokers, salespeople, property managers, appraisers, counselors and others engaged in the real estate industry.

21.     The majority of real estate agents in the United States are members of the NAR. Indeed, a popularly applied term for real estate agents, "realtors," is a licensed trademark owned by the NAR for use by its professional membership.  On information and belief, NAR has approximately 200,000 members in California and, through its membership dues and fees described below, collects substantial revenues and fees from its members located in this District.

22.     In addition to its own realtor membership, NAR acts as an umbrella organization for a chartered network of competing realtor associations, including 54 at the state-level, and over 1200 local associations.  Thus, the NAR and the state and local associations are effectively vehicles for competing brokers to share their clients' listings and to cooperate in other ways, both at a local, statewide and national level.  Indeed, as the NAR itself concedes on its website, its "local REALTOR® associations may now be viewed as competitors" and that "[b]y definition associations consist of groups of competitors gathered together to promote their common business interests."

23.     The NAR has promulgated rules and codes of conduct for its realtor-members and chartered organizations, and chartered affiliates are generally required to adopt the NAR's rules and recommended bylaws and to enforce the NAR promulgated rules upon real estate agents comprising the state and local associations.  Indeed, the NAR requires its member associations to incorporate mandatory provisions verbatim into their bylaws.  Member associations and MLSs must also adopt new or amended NAR policies.

24.     In California, the statewide realtor association is the CAR.  Founded in 1905 and headquartered in Los Angeles, the CAR is one of the largest state trade organizations in the United States, with more than 185,000 members.  The association, and each of its members, is required to follow NAR rules, as described above.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

25.     One such local realtor association is the SFAR, the central real estate association in San Francisco.  Over 4,000 real estate agents are members of the SFAR.  This association, and each of its members, is required to follow NAR rules, as described above.

26.     NAR's members are typically enrolled in NAR's national, state and local organizations in tandem.  For example, a Bay Area real estate agent who seeks to join the SFAR, a local NAR affiliate, must also become a member of the CAR and the NAR, paying dues to, and agreeing to abide by, the membership rules of the local, state, and national organizations.

## II.     OFF-MLS VERSUS ON-MLS HOME SALES.

27.     One of the most important benefits of membership in the NAR and its affiliates is access to a Multiple Listing Service ("MLS").  An MLS is a subscription-based database of properties listed for sale in a particular geographical region.  In sum, each local MLS is a platform for agents to share information regarding residential properties for sale.

28.     MLSs in the United States have undergone a process of mergers and acquisitions that have consolidated the market for professional real estate listing services.  As of 2010, approximately 1,400 MLSs were active in the United States; today, there are roughly 640, most of which are controlled by a local NAR affiliate.

29.     Through its chartering of the local affiliates, the NAR is able to establish standard rules and codes of conduct for the MLSs and participating realtors that its local affiliates must adopt and enforce.  For example, SFAR operates and controls the San Francisco MLS ("SFARMLS").  The SFARMLS is effectively a database of properties marketed for sale in San Francisco.  Because the SFAR is affiliated with the NAR, any real estate agent that uses the SFARMLS must first agree to abide by the NAR's rules.

30.     More than 80% of residential homes put up for sale are listed on an MLS.  In the vast majority of locations across the country, including San Francisco, an NAR-affiliated MLS dominates the market for listed homes and is the primary gateway for residential real estate sales.  In these locations, a real estate agent must use the local MLSs to meaningfully practice his or her profession.  For instance, the SFARMLS controlled by the SFAR is the only San Francisco-specific MLS available to agents.  So, for a real estate agent to work in San Francisco, as a practical matter,

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

he or she must pay the SFAR for the right to access the SFARMLS and also agree to be bound to the NAR's rules.

31.     In general, access to NAR-affiliated MLSs is restricted to NAR members.  The sole exceptions are those MLSs located in California, Alabama, Florida and Georgia, as a result of decisions in California state court and the Eleventh Circuit Court of Appeals, which found that such membership restrictions violate state and federal antitrust laws.  Even in these jurisdictions, however, before gaining access to the NAR-affiliated MLSs, non-member participants must first agree to follow and be bound by the NAR-affiliated rules, and any such additional rules the NAR-affiliated association promulgated, and also pay the required fees (which can be higher than membership fees).  For example, an agent cannot access the SFARMLS without first paying a fee and agreeing to be bound by NAR and SFAR's rules.

32.     Individuals who use an NAR-affiliated MLS to market their homes generally follow a standardized timeline of staging or repairs, listing on an MLS, open houses, scheduled viewings, dissemination of property disclosures, collection of bids, acceptance, the escrow process (usually including inspections, appraisals and securing financing), and ultimately closing and conveyance. Importantly, because the vast majority of agents have access to their local MLS databases, once a seller's property is placed on that database, specific information regarding that home is widely available to, in the case of SFARMLS, for example, thousands of people.

33.     There are a variety of reasons a home-seller might choose to forego this process and wish to pursue an alternative to using the NAR-affiliated MLS.  For example, the seller may also want to avoid exposing herself to the potential adverse health effects of having large numbers of unknown potential buyers parade through her home; the seller may wish to avoid publicly disclosing that the property is for sale, the details of the ultimate sale, or both, especially if the seller is a high-profile individual; the seller may want to test the waters, and retain the option to pull the home off the market without the stigma and downward price pressure that attaches to a de-listed property; the counterparties may already know one another; the seller may prefer to forego the typical expense of repairing and/or staging their home for potential buyers, and want to sell the home as-is; or the seller may want the sale to move faster or slower than the standard closing

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

process.  As a columnist phrased it in a recent article regarding the NAR rule change discussed below, "[e]ven for the non-famous, selling your home can be a disruptive circus.  Listing off-market [*i.e.*, off MLS] can reduce the number of lion tamers and jugglers, separate the browsers from the buyers and perhaps remove some stress for sellers who, studies have shown, are often already undergoing periods of life stress (divorce, relocation, death of a parent)."[1]

34.     Beyond these reasons, a potential home seller may want to avoid NAR-affiliated MLSs to avoid disclosing private details about themselves and their family.  The information that is posted on these MLSs is quite sensitive.  In fact, the CAR recently opined that agents who post on an MLS are likely revealing information that is "personal" pursuant to the recently enacted California Consumer Privacy Act ("CCPA").  CAR also advised potential home sellers: "[e]ven after a sale is complete, the MLS distributes sales information to the real estate community.  Brokers, agents, and MLSs may also share your personal information with others who post the personal information on websites or elsewhere, or otherwise use it.  Thus, there are various service providers and companies in a real estate transaction who may be engaged in using or sharing your personal information."  Accordingly, home sellers seeking to protect their personal information may understandably not want to list their property on the MLS.

35.     While there are myriad reasons why a home seller may decide to forgo the MLS, there are also reasons why a potential buyer would rather purchase a home "Off-MLS."  For example, a buyer may wish to avoid battling against dozens of others for a for-sale home listed on the MLS; a buyer may also want to maintain her privacy regarding the fact that she is in the market for a home.

36.     In sum, the MLS is the dominant—but not only—platform that facilitates residential home transactions in San Francisco and across the United States.  Many times, sellers and buyers decide it is advantageous to utilize the local MLS.  Other times, however, an alternative makes sense.  And in recent years, more and more home sellers are opting to use "Off-MLS" avenues.  On information and belief, in San Francisco, for example, Off-MLS sales increased 68% between 2010

---

[1] Larry Rosen, "Will the ban on real estate 'pocket listings' help or hurt?"  *San Francisco Examiner*, December 3, 2019.



PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

and 2018.  As explained below, TAN provides an "Off-MLS" alternative choice for agents representing home sellers and buyers.

## III.     TOP AGENT NETWORK.

37.     Founded in 2010, TAN is a private, member-only community open to the most active and successful real estate agents in a given geographic location.  TAN has nearly 10,000 members across 31 chapters across the country, including in the San Francisco Bay Area.  TAN's members are collectively involved in $165 billion in home sales each year—or around 11% of all homes sold in the United States.

38.     To gain admittance to TAN, an agent must show that they were within the top ten percent of closed home sale volume within their chapter area in the preceding 24 months.  In other words, membership in the TAN community is entirely performance-based.  In general, the top ten percent of agents in a given area are responsible for around 90% of closed home sales.

39.     Like an NAR-affiliated MLS, TAN provides the agents in its network with a platform to share market information and data.  TAN members also use the service to share information about properties for which they are acting as sellers' agents, including properties the seller does or does not intend to list on an MLS.  In effect, as NAR's counsel recognized in pre-litigation correspondence, the service TAN offers is effectively a more ***private MLS*** providing a competing platform for home sellers and buyers looking for an alternative to the widely accessible NAR-affiliated MLS.

40.     Recently, TAN also introduced a new "match-making" service for its members.  In effect, beyond serving as a platform for exchanging information, TAN also facilitates one-on-one private conversations between a buyer's agent and seller's agent with symmetrical needs.  For example, a TAN member can inform TAN that she represents a homeowner in San Francisco looking to sell in a general price range.  TAN will then "match" that prospective seller with an interested potential buyer-member who communicated similar criteria to TAN.  The prospective buyer and seller agents can then move off the TAN platform and begin communicating privately over email, phone or at a coffee shop regarding the specifics of their respective clients' goals.  This recent service has been very successful, but, as explained below, is threatened by CAR and SFAR's

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

interpretation and enforcement of NAR's newly promulgated, anti-competitive rule.

41.     For those properties that sellers do not want listed on an MLS, TAN represents a crucial platform for its members to locate and arrange off-MLS sales.  As mentioned above, home sellers and buyers may wish to pursue such off-MLS sales for a variety of reasons, including maintaining privacy and confidentiality.  Another major reason that TAN members and their homeowners use TAN is to gather critical market research about the potential home for sale by utilizing the collective experience of other top agents (across all brokerages) to answer questions regarding pricing, demand, condition, marketability, etc.  In sum, access to information regarding off-MLS properties is one of the primary benefits TAN advertises to its membership, and one of the most important features to TAN's member agents.

42.     TAN's income derives from membership fees.  Top agents may purchase monthly, quarterly, or annual memberships.  Further, as with many associational organizations, TAN's value for its members derives in large part from network effects—the larger the share of top agents in TAN's membership, the greater the value of TAN membership to other top agents, as it allows for access to a greater volume of market intelligence and more opportunities to pursue off-market sales.

## IV.     RELEVANT MARKET AND NAR'S MARKET POWER.

### A.     The Nature of the Market.

43.     As discussed more thoroughly below, TAN and MLSs are participants in the market for professional real estate listing services.  Participants in this market are real estate agents and brokerages on the one side, and centralized listing services on the other.  These participants exchange recurring membership fees for access to a platform allowing them to share and view for-sale property information.

44.     This market is not a two-sided market, as no transactions occur on the listing platforms.  Neither TAN nor MLSs market their listing services directly to consumers; rather, agents rely on listing services to locate potential counterparties for their clients and conduct market research. Roughly 90% of home sellers and buyers use the services of a professional real estate agent, and roughly 90% of agent-led home transactions are arranged using information acquired through a professional real estate listing service.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

45.     Specifically, the product offered by sellers in this market is access to a centralized portal containing information regarding properties available for sale.  The consumers of this product are individual real estate agents and brokerages, who use these portals to (1) obtain information regarding for-sale properties and the identity of the associated listing agent, for the purpose of locating potential counterparties for clients seeking to purchase real estate, (2) to disseminate information regarding properties offered for sale by the agents' clients, for the purpose of attracting the notice of agents for potential counterparties, and (3) to conduct research regarding the real estate market, for the purpose of providing better advice to clients seeking to purchase or sell properties.

46.     The primary competitive input for sellers in this market are (1) the membership of professional real estate agents and (2) the listing information that these agents provide.  The supply of agent memberships is necessary because an agent representing a home seller would have no reason to purchase the ability to list properties on a service that was not routinely accessed by agents representing home buyers.  Similarly, an agent representing a home buyer would have no reason to access a listing service that did not contain for-sale property information submitted by sellers' agents.  An agent looking to conduct market research would also find no value in a listing service that did not contain current property listings and information.  Therefore, no property listing service could survive without access to a "supply" of agent-members and the listing information they provide.

47.     The preceding paragraph describes what is known as a "network effect," referring to a common phenomenon in which the value of purchasing access to a network directly depends on the number of other individuals who have also purchased access to the same network.  Network effects are common with associational products; for instance, access to the professional networking website LinkedIn is only valuable to the extent that individuals the user wishes to network with are also members of the site.

48.     Network effects create a substantial barrier to entry, because the new player must be capable of quickly expanding its network to create value for potential customers.  Returning to the example above, even if a potential rival to LinkedIn creates a service that is objectively better in terms of technology and user experience, potential customers would still choose the "inferior"

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

LinkedIn service if that is where their fellow professionals are.  For this reason, it is extremely difficult for an associational product to scale up organically over time; the new entrant must possess the capital and resources to build an initial user base at inception that is large enough to provide value to additional potential customers.

49.     As stated, TAN and NAR-affiliated MLSs derive their income in the same manner, by charging fees for access.  In 2019, the NAR charged members an annual fee of $150 and a $35 "Consumer Advertising Campaign Special Assessment."  These dues accounted for roughly three quarters of NAR's revenue, which totals around $200 million per year.  In California alone, based on these figures, NAR makes over $35 million in fees.  And given NAR's large membership in its associations in the Bay Area, a substantial portion of this amount is derived from agents and associations in this Judicial District.

50.     Dues payments are typically routed through NAR's local affiliates, such as SFAR, where NAR members have concurrent memberships.  The MLSs controlled by NAR's local affiliates also generally charge NAR members a monthly fee for access, typically around $25 to $50 per month, and also charge non-members who want to participate in the relevant MLS a separate fee, which can be higher than the membership dues.

51.     Similarly, TAN derives its income primarily from membership dues, with annual membership generally costing $475 per year.

52.     MLSs may also earn income by licensing their listings to consumer-facing websites such as Zillow or Trulia.  These websites display listing information licensed from an MLS to attract users, and earn revenue by selling advertising space to agents or brokers; charging property management companies to list rental properties; offering other broker services, such as website tools; or directly investing in real estate properties.

53.     Aside from a handful of small membership organizations such as TAN, there are presently no commercial alternatives to MLSs.  Customer-facing websites such as Zillow or Trulia do not compete with TAN or MLSs, as they are consumers rather than suppliers of property listing services.  The only reasonable equivalents are informal contacts between individual real estate agents, or internal information-sharing tools within a single brokerage.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

**B.      NAR Substantially Controls the Market for Professional Real Estate Listing Services.**

54.      For many decades, NAR has substantially controlled the market for professional real estate listing services, both nationwide and in all of the local markets in which TAN operates. NAR's dominance in the market allows it to exercise direct control over real estate agents, who constitute TAN's entire consumer base and sole competitive input.

55.      According to NAR, roughly 80-90% of residential real estate put up for sale in the United States is listed on an MLS, and the vast majority of these MLSs are affiliated with and ultimately controlled by NAR.  On information and belief, most homes sold in the United States are listed on an NAR-affiliated MLS.  The typical experience of real estate agents working in the United States is to almost entirely rely on one or more MLSs that are all ultimately owned or controlled by NAR.

56.      The centrality of the MLS to the practice of real estate was discussed in a joint report published by the United States Department of Justice and Federal Trade Commission (the "Report").[2]  As the Report stated, "MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."  However, as the Report noted, this necessity of MLS membership means "it is possible for one dominant group of brokers to establish MLS rules that favor them and disfavor other brokers who compete in a manner that they dislike."  As the Report further noted, "[s]uch rules are illegal if they unreasonably restrict competition, and the Agencies recently have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."

57.      NAR relies on this exact dynamic to maintain control over local MLSs and, through them, over individual brokers.  As mentioned above, the NAR maintains strict rules and guidelines for its membership and chartered affiliates, including for the various regional MLSs under these affiliates' control.  Specifically, among other things, the NAR publishes an annual Handbook on

---

[2] "Competition in the Real Estate Industry: A Report by the Federal Trade Commission and U.S. Department of Justice," April 2007.



PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

Multiple Listing Policies (the "Handbook"), which the NAR states is "intended to guide members associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors."

58.     The Handbook includes model provisions for MLS bylaws and other rules and regulations established by the NAR for the operation of MLSs.  State and local NAR affiliates are required to apply the Handbook to any MLS operated by those affiliates.

59.     Each policy item in the Handbook is denoted by a "compliance classification category": "Informational," "Optional," "Recommended," and "Mandatory."  The Handbook states that "[a]doption [of 'Mandatory' policies] is necessary to ensure compliance with mandatory policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy."  The Handbook further states that "[a]ssociation and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

60.     Walter T. Baczkowski, Jr., Chief Executive Officer of SFAR, has described how NAR affiliates are compelled to follow the dictates of the Handbook:

> SFAR is a member of NAR, and SFAR's multiple listing service is affiliated with NAR. SFAR therefore follows the rules and policies that NAR requires affiliated multiple listing services to follow.  SFAR is following NAR's Clear Cooperation Policy ("Policy") because it is a mandatory policy.  SFAR, however, has no discretion to decide whether or not to follow mandatory NAR policies, and it has no power to change NAR's Policy.

61.     Because most local real estate markets are almost entirely dominated by one or several NAR-affiliated MLSs, as a practical matter any agent operating in those markets must subject themselves to the Handbook's authority.  Even in the handful of locations where NAR-affiliated MLSs do not affirmatively require NAR membership, the MLS rules themselves would adopt and impose the Handbook's restrictions.  Furthermore, many local real estate brokerage companies, under pressure from the NAR, require that all of their agents be members of the local MLS association, thereby leaving most real estate agents no choice but to join an NAR affiliate.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

62.     As a result of the above, a very large share of all real estate agents are NAR members.  As of 2019, NAR claimed to have 1,383,010 members, of which "68% percent . . . are licensed as sales agents, 20% hold broker licenses, and 14% hold broker associate licenses."  There are estimated to be roughly two million licensed real estate agents in the United States, a substantial portion of whom are not currently active.  In rough comparison, NAR's national market totals at least half of all licensed real estate agents in the United States, and on information and belief NAR members constitute a substantially higher percentage of currently active real estate agents.  Indeed, the anecdotal experience of agents in major real estate markets is that substantially all active agents are NAR members.

63.     In sum, NAR's dominance of the market for professional property listing services, both nationally and in the markets in which TAN operates, is substantial.  As discussed below, in virtually all of those locations, NAR-affiliated MLSs dominate the market in terms of the share of property sales that are initiated through listings on those platforms.  As a result, in virtually all of those markets, NAR dominates the market in terms of the share of local real estate agents who currently purchase access to an NAR-affiliated MLS.  And as a subsequent result, NAR dominates the market in terms of its ability to use its MLSs as leverage to impose restrictions on substantially all of the agents to whom TAN might market its services.

64.     NAR has a strong commercial incentive to use its leverage over brokers to maintain its dominant position in the market for property listing services.  The desire to continue receiving membership dues is obvious, but NAR has a general interest in ensuring it dominates the market for access to valuable home-sale information.  Fundamentally, the NAR is merely an association of real estate agents who make their money on commissions buying and selling homes.  The more home listings NAR can force onto its affiliated MLSs, the better chance NAR-affiliated agents have of working on those deals and earning a commission.  Moreover, MLSs earn income by licensing their listings as data feeds, and the monetary value of these feeds increases if the feeds are comprehensive of the market.

65.     The problem for the NAR is that for a variety of reasons people may not want to post their home on an MLS.  If a seller already has an agent and feels comfortable proceeding "off MLS"

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

by exploring alternative options for finding a buyer, like by using TAN, for example, the NAR-affiliated agents who do not meet TAN's high standards will need to expend extra effort to know about that property.  And, if smaller "private MLSs" like TAN's proliferated, which is likely given home sellers increasing use of Off-MLS alternatives, NAR and its affiliated MLSs would no longer be a necessary tool for all agents to pay for; their market dominance would be threatened.  In fact, many agents have expressed a strong desire for more alternatives to the MLS's one-size-fits-all approach.  To protect against this threat, as explained below, the NAR instituted a new rule intended to force its member-agents to abandon TAN and similarly situated businesses

> **C.     The Market for Professional Real Estate Listing Services: Geographic Areas.**

66.     The market for professional for real estate listing services exists nationwide, and also in each of the regions within which TAN operates, including San Francisco.  Real estate is, by nature, a localized product.  Each real estate market has its own immobile inventory of available real estate, and real estate professionals gain experience specific to the local markets in which they operate.  For this reason, both NAR and TAN primarily interface with their membership through local chapters or affiliates, allowing members to associate and share property information with professionals operating within the same geographic area.

67.     Typically, a given local area will be dominated by a single MLS.  In most markets, this MLS is controlled by a local or regional affiliate of NAR, or a group of such affiliates.

68.     TAN currently operates chapters in the following regions (some of which regions are subdivided into multiple chapters): Scottsdale, Arizona; Alameda County, California; Contra Costa County, California; Marin County, California; Monterey, California; San Fernando Valley, California; San Francisco, California; San Jose, California; San Mateo County, California; Santa Barbara, California; Santa Clara, California; Sonoma and Napa Counties, California; Los Angeles, California; Washington, D.C.; Oahu, Hawaii; Chicago, Illinois; Boston, Massachusetts; Cape Cod, Massachusetts; Howard County, Maryland; Portland, Oregon; Austin, Texas; Fairfax County, Virginia; and Loudoun County, Virginia.  Other than the Boston area, an NAR-affiliated MLS operates in all of these locations.

69.     No government agency or regulatory body tracks or publishes comprehensive

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL



statistics regarding the listing services used by real estate agents in local areas.  Similarly, there is no set industry delineation of geographic markets for the purpose of residential home sales.  Thus, until discovery can be taken in this action, TAN lacks access to complete information regarding the market share of each participant in each market above.  Nor does any organization, including the NAR, publish an official list of national MLSs. TAN must instead rely on information published by NAR affiliates themselves, alongside anecdotal information gathered by TAN employees and members.

70.     TAN has identified the following specific geographic areas dominated by NAR and impacted by the Policy, in which TAN also operates.[3]

> i.   Phoenix, Arizona: The Phoenix-Mesa-Chandler Metropolitan Statistical Area (the "Phoenix Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in the Phoenix suburb of Scottsdale, Arizona.  On information and belief, the Arizona Regional Multiple Listing Service ("ARMLS"), which is indirectly controlled by NAR, commands the overwhelming majority of the market for property listing services sold to agents in the Phoenix Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service. ARMLS is jointly owned by five local NAR affiliates and operates primarily in Maricopa County and Pinal County, which contain the Phoenix Market. ARMLS claims to have roughly 37,000 agent or broker members; on information and belief, approximately 73,500 real estate agents are licensed to operate in the entire state of Arizona.  Two other major MLSs operate in the state, Multiple Listing Service of Southern Arizona and the Western Arizona REALTOR® Data Exchange, both of which are controlled by NAR.

---

[3] Because MLSs generally define a specific coverage area in their user agreements, it is possible to identify particular regional markets.  Given the massive share of the American MLSs controlled by NAR, any colorable alternative definitions for these markets are likely to still define local areas dominated by NAR.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN LLP

ii.  Central Coast, California.  The San Francisco Peninsula and Monterey Bay areas (the "Central Coast Market") comprise a discrete local market for real estate property listing services.  The Central Coast Market, which is centered around Silicon Valley, includes Monterey, San Benito, San Mateo, Santa Clara and Santa Cruz Counties.  TAN services this market through chapters based in San Mateo County, Monterey and San Jose, California.  On information and belief, MLSListings Inc. ("MLSListings"), which is indirectly controlled by NAR, commands the overwhelming majority of the market for property listing services sold to agents in the Central Coast Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.  On information and belief, MLSListings is jointly controlled by seven local NAR affiliates operating within the Central Coast Market.  On information and belief, two additional major MLSs have coverage areas that overlap portions of the Central Coast Market, SFARMLS and Bay East MLS, both of which are indirectly controlled by NAR.

iii.  North Bay Area, California. The counties north of San Francisco, centered around Northern California's wine country (the "North Bay Market"), comprise a discrete local market for real estate property listing services.  The North Bay Market includes the counties of Marin, Sonoma and Napa.  TAN services this local market through chapters based in Marin County and Sonoma & Napa Counties.  This market has historically been served by Bay Area Real Estate Information Services, Inc. ("BAREIS"), an independent MLS that has not adopted the Policy.  However, BAREIS has entered into information sharing agreements with several NAR-controlled MLSs and requires that its members' follow the rules of its partner MLSs when accessing their information; moreover, BAREIS's bylaws grant several board seats to local NAR affiliates.  In addition, California Regional MLS, the

19

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN LLP

nation's largest MLS with a service area that spans California, entered the North Bay Market in 2016.  On information and belief, an overwhelming share of agents within the North Bay Market are NAR members, and a substantial share of property sales in the North Bay Market are arranged through listings on an NAR-affiliated MLS.

iv.  San Francisco, California.  The city of San Francisco and the East San Francisco Bay Area (the "San Francisco Market") comprise a discrete local market for real estate property listing services.  The San Francisco Market includes the counties of San Francisco, Alameda and Contra Costa, and TAN services this market through chapters based in these three counties.   On information and belief, this market is primarily serviced by the San Francisco Association of REALTORS® MLS ("SFARMLS"), Bay East MLS and Bridge MLS, all of which are owned and controlled by local NAR affiliates. On information and belief, these three MLSs command the overwhelming majority of the market for property listing services sold to agents in the San Francisco Market, both in terms of the share of local agents who are users of these services and the share of local property sales that are initiated through listings on these services.

v.  Los Angeles, California.  The county of Los Angeles (the "Los Angeles Market") comprises a discrete local market for real estate property listing services.  TAN services this market through chapters based in Los Angeles, California and the San Fernando Valley.  This market is primarily serviced by the California Regional MLS, which is controlled by NAR, and Combined L.A./Westside MLS, Inc. ("CLAW"), d/b/a TheMLS, which is party to a state-wide information sharing agreement with multiple NAR-affiliated MLSs, alongside a number of more localized NAR-affiliated MLSs.  On information and belief, NAR-affiliated MLSs command the overwhelming majority of the market for property listing services sold to agents in the Los

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN LLP

Angeles Market, both in terms of the share of local agents who are users of these services and the share of local property sales that are initiated through listings on these services.

vi. Santa Barbara, California. The county of Santa Barbara (the "Santa Barbara Market") comprises a discrete local market for real estate property listing services. TAN services this market through chapters based in Santa Barbara, California. This market is primarily serviced by an MLS operated by the Santa Barbara Association of REALTORS®, a local NAR affiliate. On information and belief, NAR-affiliated MLSs command the overwhelming majority of the market for property listing services sold to agents in the Santa Barbara Market, both in terms of the share of local agents who are users of these services and the share of local property sales that are initiated through listings on these services.

vii. Washington, D.C. The Washington–Arlington–Alexandria, DC–VA–MD–WV Metropolitan Statistical Area, centered around the nation's capitol (the "Washington DC Market") comprises a discrete local market for real estate property listing services. TAN services this market through chapters based in Washington, D.C.; Howard County, Maryland; and Fairfax Loudon Counties, Virginia. This market is primarily serviced by Bright MLS, an independent MLS based in Maryland. On information and belief, the majority of real estate agents active in the Washington DC Market are members of NAR.

viii. Hawaii. The State of Hawaii (the "Hawaii Market") comprises a discrete local market for real estate property listing services. TAN services this local market through a chapter based in Oahu, Hawaii. This market is primarily serviced by the Hawaii Central MLS ("HiCentralMLS") and the Hawaii Information Service (HIS). HiCentralMLS is owned and controlled by local NAR affiliate Honolulu Board of REALTORS®, while HIS is jointly controlled by the Kauai Board of REALTORS®, Hawaiian Island

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS + LLEWELLYN LLP

REALTORS®, and West Hawaii Association of REALTORS®, all of which are indirectly controlled by NAR.  On information and belief, NAR-affiliated MLSs command the overwhelming majority of the market for property listing services sold to agents in the Hawaii Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.

ix.   Chicago, Illinois.  The Chicago Metropolitan Statistical Area (the "Chicagoland Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Chicago, Illinois.  This market is primarily serviced by Midwest Real Estate Data ("MRED"), which services the greater Chicago metropolitan area.  MRED is owned by the Chicago Association of REALTORS® and is indirectly controlled by NAR.  On information and belief, MRED commands the overwhelming majority of the market for property listing services sold to agents in the Chicagoland Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.

x.   Boston, Massachusetts. The Boston–Cambridge–Nashua, MA–NH Metropolitan NECTA (the "Greater Boston Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Boston, Massachusetts.  This market is primarily serviced by MLS Property Info Network ("MLSPIN"), which services New England.  MLSPIN, is jointly owned by NAR members and is indirectly controlled by NAR.  On information and belief, MLSPIN commands the overwhelming majority of the market for property listing services sold to agents in the Greater Boston Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

xi. Cape Cod, Massachusetts.  Barnstable County, Massachusetts (the "Cape Cod Market"), comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Cape Cod, Massachusetts.  This market is primarily served by MLSPIN and Cape Cod & Islands MLS ("CCIMLS"); CCIMLS boasts that it is "is the only locally based Multiple Listing Service in the region."  CCIMLS is owned and controlled by a local NAR affiliate, Cape Cod & Islands Association of REALTORS®.  On information and belief, NAR-affiliated MLSs command the overwhelming majority of the market for property listing services sold to agents in the Cape Cod Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.

xii. Portland, Oregon.  The Portland–Vancouver–Hillsboro, OR–WA Metropolitan Statistical Area (the "Portland Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Portland, Oregon.  This market is primarily serviced by Regional Multiple Listing Service ("RMLS"), which services Oregon and Southern Washington.  RMLS is jointly owned by the Portland Metro Association of REALTORS®, East Metro Association of REALTORS®, and Clark County Association of REALTORS®, and is indirectly controlled by NAR.  On information and belief, MRED commands the overwhelming majority of the market for property listing services sold to agents in the Portland Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.  On information and belief, overall membership for the two largest Portland-area NAR affiliates, Portland Metro Association of REALTORS® and East Metro Association of REALTORS®, exceeds the total number of estimated real estate agents active in the Portland

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS + LLEWELLYN LLP

area.

    xiii.  Austin, Texas.  The Austin–Round Rock–San Marcos MSA (the "Austin Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Austin, Texas.  This market is primarily serviced by Austin/Central Texas Realty Information Service ("ACTRIS"), which services the greater Austin area and central Texas.  ACRIS is owned by the Austin Board of REALTORS® and is indirectly controlled by NAR.  On information and belief, ACRIS commands the overwhelming majority of the market for property listing services sold to agents in the Austin Market, both in terms of the share of local agents who are users of the service and the share of local property sales that are initiated through listings on the service.

## V.  NAR TARGETS TAN WITH A NEW ANTICOMPETITIVE RULE.

71.  According to Rene Galicia, Director of Multiple Listing Services Engagement for NAR, in the mid-2010s NAR became concerned about increasing competition from TAN and similar market alternatives to the MLS system.  NAR is aware that a certain percentage of home-sellers and buyers do not wish to use the MLS; for instance, a 2013 NAR working group found that certain consumers value privacy over the broad marketing of the property.  However, NAR also believed that the use of alternative property listing services reduced agents' incentives to upload all property information to an NAR-affiliated MLS, reducing the value of the MLS product to brokers—and reducing NAR's ability to maintain control over brokers.

72.  In mid-2019, NAR began taking affirmative steps to eliminate TAN and other competitors from the market.  Specifically, on September 20, 2019, the NAR's MLS Technology and Emergency Issues Advisory Board issued an opinion recommending that the following mandatory policy, which it referred to as "MLS Statement 8.0" or the "MLS Cooperation Proposal," be incorporated into the Handbook:

    Within 24 hours of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), ***multi-brokerage listing sharing networks***, and applications available to the general public.

(Emphasis added).

73.     The NAR provided a short "FAQ" with the September 20, 2019 opinion.  The FAQ stated that "office exclusives"—where agents within a single brokerage office share listings among themselves—would not be considered "public" and would not covered by the rule.  However, the FAQ specifically stated that the rule would cover listings "advertised to a select group of brokers outside the listing broker's office" and would constitute "public advertising or display" under the policy.  In other words, NAR's inclusion of  "multi-brokerage listing sharing networks" in its definition of "public marketing" was aimed squarely at TAN's business model because the rule was intended to make it difficult, if not impossible, for agents to arrange off-MLS deals or simply share property information with each other when determining whether, or when, to post the listing on the MLS—despite the sellers requests to do so.  At the same time, it bolstered the centrality of MLS listings to the residential real estate market

74.     Defining broker communications on TAN as "public marketing" is nonsensical and simply makes the NAR's anticompetitive motives plain.  Unlike the other activities that NAR defines as "public marketing," TAN's "multi-brokerage listing sharing network" is entirely private with only a select group of agents who can join—it is not "public facing" or "available to the public" by any stretch of the imagination.  NAR's own counsel admitted that TAN is effectively a "private MLS."  In fact, including multi-brokerage listing sharing networks like TAN as part of the policy violates NAR's own antitrust compliance rules set forth in the Handbook.  For example, the Handbook provides that "Boards and associations of Realtors® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with participants in their relations with each other, in their broker/client relationships" and "shall not . . . [p]rohibit or discourage cooperation between participants and brokers that do not participate in the MLS." Handbook at p. 7.  Yet NAR's policy directly interferes with participants' business relationship, requiring them to place properties on the MLS regardless of whether any participant to the transaction wants to do so.  The policy therefore discourages cooperation among participants on

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

TAN and similar services, and instead requires participants to widely share properties on a competing platform.

75.     NAR officials have been explicit that the intended purpose of Policy is to eliminate TAN as a competitor.  Mr. Galicia has testified, in this litigation, that NAR believed that real estate agents' use of services like TAN reduced the value of NAR's product, and that this justified eliminating it.  A so-called "study" published by CAR claimed that the Policy was "designed to . . . more or less take a sledgehammer" to MLS alternatives like TAN.  In March 2020, the president-elect of an NAR-affiliated MLS in Los Angeles questioned why TAN would continue working to improve its service, given that "soon the new NAR [Policy] will be official and TAN will no longer exist?"

76.     Indeed, the bad faith intent behind the Policy is shown by the obviously pretextual justification for the Policy.  Likely anticipating the antitrust scrutiny the rule would bring given NAR's stranglehold on the residential real estate market, NAR claims the policy is "pro-competitive and pro-consumer" on the basis that pursuing home sales through so-called "pocket listings" is worse for consumers than pursuing sales through an MLS.[4]

77.     At the outset, NAR is a private organization of competing professionals, not a regulatory agency—NAR has no mandate to unilaterally declare the manner in which consumers are allowed to purchase homes.  Setting that aside, however, this justification is clearly offered in bad faith because the Policy *does nothing to eliminate or reduce the use of pocket listings*.  Rather, the Policy carves out an exception for "broker exclusives," a term used by NAR to describe pocket listings that are distributed within a single brokerage.  Despite dozens of opportunities—including in this litigation—NAR has yet to attempt an explanation for why pocket listings, which are purportedly so dangerous for consumers, are not dangerous if pocketed within a single brokerage.  Indeed, basic logic would seem dictate the opposite: if a reduction in competitive bidding risks harm

---

[4] Indeed, the NAR is acutely aware of its potential antitrust liability, and the organization's website maintains a page detailing past antitrust challenges to its restrictive MLS policies—and arguing for their legality.  *See* "Non-Member Access to REALTOR® Association Multiple Listing Services," available at https://www.nar.realtor/legal/non-member-access-to-realtor-association-multiple-listing-services.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL


LEWIS +
LLEWELLYN LLP

to the home-seller, that risk is only magnified if the seller is represented by a self-dealing brokerage negotiating against itself.

78.     The reality is that NAR is happy to allow pocket listings to occur within large brokerages because these brokerages do not compete with NAR in the market for property listing services.  Indeed, because these brokerages tend to require that agents obtain membership in their local NAR-affiliated MLS, those agents are already a captive market of NAR's.  At the same time, members of these brokerages tend to be overrepresented in the leadership of NAR affiliates.

79.     Further, as NAR knows, a segment of consumers in the retail housing market do not wish to market their homes publicly, and these consumers are often the highest value clients for real estate agents.  Thus, if NAR wishes to keep members happy, it must find a way to allow member agents to serve these clients without allowing them to use the services of a competitor.

80.     Indeed, the large brokerages themselves understand the Policy to be a windfall, driving high-value clients to agents employed at the larger firms.  As described by the CEO of Compass, one of America's largest brokerages:

> "NAR's [Policy] **will limit seller choice** when it comes to using private home sale websites [*i.e*, TAN] to pre-market or market their home, but seller demand for privacy and flexibility isn't going anywhere.  Compass is the obvious choice for sellers who want to sell their homes or test the market, with the option to do so privately, while still getting the exposure to a community of 15,000+ top agents in major markets . . . ."   (emphasis added)

81.     Attempting to give NAR the benefit of the doubt, despite its clear intent to eliminate TAN as a competitor, on November 5, 2019, TAN's counsel sent a letter to NAR requesting confirmation whether NAR interpreted the proposed policy as applying to "private communications between and among TAN agent-members."  The letter also expressed concern regarding the Policy, and in particular the impact the policy would have on agents' freedom to represent their clients, their fiduciary duty to those clients, and the privilege given to large brokerages by the "office exclusive" carve-out.

82.     Counsel for NAR responded by letter dated November 7, 2019, confirming NAR's position that, "if a communication among TAN members involved an offer to sell or otherwise to market a particular property, the property would have to be listed on the MLS within 24 hours after the communication was made."  The letter continued by asserting that, if any TAN members

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

exchanged communications about a property for sale, "the TAN community is basically operating a private MLS that is confined to TAN members and that is keeping listings from all other MLS participants," claiming that this "reduces the . . . network effects of the MLS."

83.     In a November 26, 2019 email to another real estate organization that had expressed concern about the policy, counsel for NAR repeated NAR's concern that allowing off-MLS sales through outside fora would "devalue the MLS."

84.     The NAR ultimately adopted the rule in November as the "MLS Clear Cooperation Policy," (the "Policy") and it was incorporated into NAR's 2020 governing "Handbook." It became effective on January 1, 2020, and each NAR-affiliated MLS was required to implement the Policy by May 1, 2020. MLS participants who do not comply with the Policy face punishment, including monetary fines.

85.     On information and belief, a central motivation of NAR for including "multi-brokerage listing sharing networks" in the Policy was to destroy the ability of smaller, exclusive companies such as TAN to compete with NAR-affiliated MLSs. Indeed, on information and belief, during its internal debates regarding the Policy, NAR specifically discussed eliminating TAN.

## VI.     CAR AND SFAR'S ADOPTION AND IMPLEMENTATION OF NAR'S POLICY.

86.     As an NAR-affiliated association, SFAR was required to implement the Policy by May 1, 2020. In March 2020, SFAR and its affiliated MLS, SFARMLS, provided details on its implementation of the rule. SFAR provided that any agent found to have violated the Policy—*i.e.* not submitting a property that was "publicly marketed" to SFARMLS within one business day— would be fined $5,000 for the first offense, and the "fines double and triple for subsequent offences just like any other violation of the Rules & Regulations." On information and belief, after the third purported violation, which would attract a fine of $15,000, an agent is banned from using the MLS.

87.     Beyond this, SFAR has adopted an extreme interpretation of the Policy that injects SFAR directly into private business dealings of individual agents and puts TAN's entire business model at risk. As noted above, TAN recently developed a new "matchmaking" service to supplement its traditional private MLS platform. This matchmaking service simply connects a seller's agent and a buyer's agent who seemingly were a good fit for a potential real estate deal.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

Once that connection is made, TAN's service ends; the prospective buyer and seller's respective agents move to private, one-on-one conversations regarding the property in question. In other words, no "marketing" of any property—public or otherwise—occurred on a "multi-brokerage listing sharing network." Based on the plain language of NAR's Policy, TAN understood this private one-on-one broker communication would under no circumstances qualify as "public marketing" and thus at least a portion of its business would be able to continue despite NAR's draconian Policy. TAN also communicated its position on webinars that were widely available.

88.    Following TAN's webinars, SFAR, apparently realizing that TAN's new service would allow it to continue to flourish, recently interpreted the Policy to prohibit one-on-one private communications among brokers unless they placed the property they discussed on the SFARMLS within one business day. In numerous webinars and documents, SFAR explicitly stated that no matter what TAN says or how it functions, if an agent uses TAN's services in connection with a property, the agent must place the property on the MLS within one business day. To be clear, if an agent has coffee with another agent and mentions a property for sale, SFAR's (and potentially CAR and NAR's) position is that within one-business day the agent must list that property on the MLS. Put simply, if a property must be placed on the MLS within a day of private conversations, the value of TAN's private matchmaking service diminishes significantly because all agents can simply find the same information by searching the MLS—even if the seller has no interest is marketing her property this way.

89.    CAR has similarly adopted an extreme interpretation of the Policy. For example, in a presentation about the new rule given on April 27, 2020, the CAR identified the "public" as "anyone outside the broker(s) and agent(s) licensed within a single listing brokerage and their clients."

90.    Furthermore, other NAR-affiliates have initiated similar rules based on NAR's Policy. For example, "Bright MLS," the NAR-affiliate based in the Washington D.C. area, has also explicitly prohibited private one-on-one conversations among brokers unless the property at issue is placed on the MLS within one business day. Moreover, following TAN's webinars and SFAR's interpretation, two other Bay Area MLSs—Bridge MLS and MLS Listings—have now adopted the same prohibition on one-to-one agent communication. In fact, a Bridge MLS representative recently

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

told a TAN member that Bridge MLS had been in contact with NAR regarding TAN's matchmaking service, and that the service is not in compliance with the Policy. Other NAR-affiliated MLS's are likely to follow if this extreme restraint on trade is permitted.

## VII.   THE ANTI-COMPETITIVE IMPACT OF NAR'S POLICY.

91.    NAR's Policy has and will continue to negatively impact competition in the market for professional real estate listing services. And while TAN does not operate in the related market for residential home sales, NAR's policy will also negatively impact consumers in that market as well. Each of these impacts has occurred nationally, and in the specific markets in which TAN operates.

### A.   The Policy's Impact on the Market for Real Estate Listing Services.

92.    The Policy leverages NAR's domination of real estate listing services—and in turn its control over American real estate agents—to starve services like TAN of both the consumers and the inputs it needs to compete in the market. The Policy coerces the relevant market players—experienced agents—to stop using TAN. This is NAR's tool to stamp out any competitive threat before its market dominance dwindles away.

93.    The impact on the market is clear and direct: an artificial limitation on output in the market for property listing services. This output restriction takes two forms. First, a limitation on the availability of alternatives to the NAR-dominated MLS system, which continues to undergo a process of consolidation under NAR control. As a result of the Policy, real estate agents are rapidly losing the ability to market their clients' homes through any avenue besides their regional MLS. The scope of listing on all services is also reduced, as listing for privacy-minded clients that might otherwise go to services like TAN are instead sidelined into the closed environment of self-dealing large brokerages. Outputs are also limited for potential buyers, because instead of being able to search for homes for sale on the MLS, on services like TAN, and within large brokerages, now prospective buyers only have the option of using (through their agents) the MLS, or selecting an agent within a large brokerage, who then can proceed Off-MLS within the brokerage without running afoul of the Policy.

94.    Many TAN members have already made the decision to cancel their membership if

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

they cannot freely use TAN to initiate off-MLS communications, much less sales.  Dozens of TAN members, when canceling their memberships, have explicitly referenced the consequences stemming from their violation of NAR's policy.  For example, one TAN member posted, "Will likely NOT be renewing TAN membership since the new clear cooperation policy of MLS basically makes TAN obsolete."  Many of these members also noted specific concern with SFAR's threats of aggressive enforcement of fines stemming from private one-on-one conversations facilitated by TAN's matchmaking service.  Other MLSs across the country, such as Bright MLS in Washington D.C., have adopted similarly extreme versions of the Policy.  If this Policy is allowed to stand, many other local MLSs may join in an attempt to drain TAN of its members nationwide.

95.     TAN is not the only alternative property listing service to face this harm.  In June 2020, for instance, ThePLS.com, which bills itself as the "Pocket Listing Service," brought its own lawsuit in the Central District of California alleging that the anticompetitive impacts of the Policy have destroyed its ability to operate.  ThePLS.com alleges an experience identical to TAN's:

> By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy degrades the quality of competing listing networks, reduces the incentives of licensed real estate professionals to use those competing listing networks, and makes those competing listing networks less effective competitors to the NAR-affiliated MLSs.

96.     NAR has admitted openly that it adopted the Policy to boost the value of NAR-affiliated MLSs, and to reduce the use of property listing services that compete with NAR-affiliated MLSs.  While NAR has not admitted publicly that it adopted the Policy for the purpose of reducing membership in professional associations that compete with NAR, it is and was fully aware that adoption of the proposal would have this effect, and on information and belief it intentionally adopted the proposal at least in part to create this effect.  Furthermore, on information and belief, NAR specifically designed the Policy to target TAN and discussed this goal during its internal deliberations before formally adopting the Policy.

97.     TAN has been injured in the exact way NAR intended when attacking competitiveness in the market for real estate listing services.  Starved of access to customers and the inputs necessary to run its business, as a result of NAR's group boycott and exclusive dealing requirement, the market for property listing services outside the MLS ecosystem faces a grim future.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

**B.** **The Policy's Impact on the Residential Real Estate Market and the Broker Service Market.**

98.    While TAN does not operate in the market for residential real estate or broker services, it has directly observed the Policy's negative impact on these markets.

99.    As discussed above, home sellers and buyers often choose off-MLS sales for the increased efficiency and lower costs they offer in relation to on-MLS sales. Accordingly, NAR's adoption of the MLS Policy will have the effect of precluding many home sellers and buyers from pursuing the sales avenue of their choosing, and prevent brokers from offering these alternate channels to consumers—all to the benefit of NAR and its members and affiliates.

100.    NAR has justified the Policy through vague allusions to competition and fairness, but as explained above, the "broker exclusive" carveout shows this justification to be a pretextual farce. The Policy does not actually limit or reduce pocket listings, but simply ensures that these listings are restricted to the large brokerages that work hand-in-glove with NAR. A consumer wishing to pursue a private sale is thus restricted in the range of real estate agents that he or she will reasonably obtain, as only the large brokerages will have access to a substantial number of potential counterparties. Thus, not only does the Policy create an artificial restriction on the supply of agents reasonably available to privacy-minded consumers, these agents will *by definition* be subject to the massive conflict of interest inherent to intra-brokerage self-dealing. Thus, the only impact on these sellers is to see their options both reduced and degraded.

101.    Second, the Policy forces home sellers onto the MLS system which effectively limits a home seller's ability to negotiate the commission amount. NAR has promulgated a rule that, in effect requires all seller's agents to make blanket, unilateral and effectively non-negotiable offers of buyer-agent commission amount when listing a property on an MLS. In effect, because of NAR's rule (adopted by its affiliates), the seller pays the buyer's agent a set commission based on the price of the home. Without NAR's rule, the seller would have the ability to negotiate in a free and open market. NAR's "commission rule" has been the subject of litigation in other jurisdictions. *See Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 912 (W.D. Mo. 2019) (denying NAR's motion to dismiss Sherman Act claims).

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

102.    Third, NAR attempts to justify the Policy by asserting that increased competition by the use of centralized MLSs will increase home sale prices—indeed, NAR's representatives explicitly cited increased home prices when attempting to justify the policy to TAN.  This argument ignores, however, the obvious point that home sales are a two-sided transaction—whatever benefit consumers at large gain by increased *sale* prices is washed out by the concomitant increase in home *purchase* prices.  What parties do unequivocally benefit from increased home prices? REALTORS®.  And not just agent members of the NAR, who can expect increased commissions, but also the swarming ecosystem of other NAR members involved in the residential home industry, such as appraisers and home staging professionals.  As any potential home buyer knows, the standard on-MLS transaction passes through a number of stages, such as staging, inspection, etc. that require the retention of additional vendors—steps that are generally excluded from off-MLS sales.  By destroying services such as TAN, NAR is able to force homeowners into an MLS process that extracts money from them and puts it into the pockets of NAR members.  In other words, NAR's goal is both to increase the overall price of home sales in the United States, while ensuring that a larger share of that pie is leeched from average Americans and placed within their own pockets.

103.    Fourth, the Policy will reduce outputs and negatively affect prices by eliminating the utility of smaller brokerages, which, because of their size, cannot reap the benefits of the Policy's "office exclusive" exception.  Because of the Policy, many consumers who would normally work with a small brokerage will not use them anymore because the small brokerage (1) cannot utilize traditional Off-MLS avenues like TAN; and (2) also does not have enough agents to meaningfully market a home on an "office exclusive" basis, *i.e.*, only internally at that brokerage.  The result is another advantage for the big brokerage, which no longer has to worry about either platforms like TAN or small brokerages as Off-MLS alternatives—the Policy makes the big brokerage the only meaningful avenue for marketing and selling a home Off-MLS.

104.    Beyond this, NAR's Policy—and CAR and SFAR's adoption, interpretation, and enforcement of it—has a particular impact on real estate markets in California.  First, California recently passed the Consumer Privacy Act ("CCPA"), which generally prohibits certain businesses

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

from disclosing a consumer's "personal information" without his or her consent.  As the CAR has acknowledged, "a real estate broker is likely to submit personal information to a Multiple Listing Service ("MLS") in order to help find a buyer for a seller's property," and also that some brokers will be subject to the CCPA.  Now with NAR's Policy, a seller's agent associated with a covered brokerage firm ***must*** submit such personal information to the MLS within one business day or be fined and/or banned from using the MLS.  Second, California real estate agents owe a fiduciary duty to their clients.  As noted, some clients do not want their property listed on the MLS, and in some cases placing the property on the MLS is simply not in the client's best interest.  Or, in other cases, it is in the client's best interest for an agent to utilize an Off-MLS platform like TAN to obtain market intelligence about a property before putting it on the MLS.  But the Policy leaves only one day in which to do this, which is insufficient.  Put simply because of the NAR Policy and CAR and SFAR's adoptions of the same, agents are faced with the prospect of violating the Policy and being fined on the one hand, or violating their duty to act in their clients best interest, on the other hand.  This unlawful policy, in other words, not only harms competition and disrupts TAN's contractual relationship with its members—it requires agents to violate the law.

### FIRST CLAIM FOR RELIEF:

### VIOLATION OF SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

### UNLAWFUL COMBINATION IN RESTRAINT OF TRADE

#### (Against all Defendants)

105.    TAN realleges and incorporates paragraphs 1 through 104 by reference.

106.    NAR's Policy constitutes a Group Boycott by NAR's associated members against TAN, and thus the NAR's actions are a per se antitrust violation.  The MLS Clear Cooperation Policy constitutes a Group Boycott because it effectively cuts off TAN's access to the supply and customers in the relevant market needed to compete with NAR-affiliated MLSs—*i.e.* information regarding properties being marketed and/or sold Off-MLS, and the agents paying membership dues for this information—by undermining the entire purpose for TAN's services.  Furthermore, as described above, the NAR has a dominant market position, and the Policy is not justified by overall efficiency or competitive policy reasons.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS + LLEWELLYN LLP

107.     Moreover, NAR's Policy is also invalid under a rule of reason antitrust analysis. First, NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this Policy among its membership, regional affiliates and NAR-related MLSs, constitutes a contract, combination, or conspiracy by and between NAR's members and its affiliate associations that unreasonably restrains competition within the market for professional affiliation for real estate agents throughout the United States, and within each regional market in which TAN operates, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As the NAR itself concedes, its individual members and affiliated associations are competitors in the market without a unity of economic interest.  The associations comprising the NAR are therefore legally capable of agreeing and conspiring to unlawfully restrain competition.

108.     Second, as described above, NAR added reference to the "multi-brokerage listing sharing networks" in the Policy to target TAN and businesses similarly situated, competitors with NAR-affiliated MLSs, for the purposes of undermining TAN's business in the relevant market, thereby intending to harm or restrain trade.  Third, NAR's Policy has actually injured competition by already causing damage to TAN's business—namely, TAN's members have cancelled memberships specifically out of fear of running afoul of NAR's Policy, with the prospect of many more cancelling in the near future given enforcement of the Policy began on May 1, 2020.  TAN has also suffered untold reputational harm, with members openly questioning whether they can continue to use TAN's services or risk being fined.  The Policy also forces consumers onto the MLS where they will be faced with restricted means for negotiating commissions, and also bolsters large brokerage firm's ability to monopolize Off-MLS marketing and sales given they, unlike TAN and similarly situated businesses, are exempt from the Policy.  NAR's Policy also reduces brokers' independent decision-making regarding how to compete among themselves.

109.     The aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

110.     This contract, combination, or conspiracy is not reasonably necessary to accomplish

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

111.    NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this proposal among its membership, regional affiliates and NAR-related MLSs, including through the CAR and SFAR, constitutes an unlawful exclusive dealing arrangement.

112.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real estate listing services.

113.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

114.    TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues.

115.    Separately, the CAR's adoption of the Policy, and SFAR's adoption and enforcement of the NAR's Policy in San Francisco, is a violation of section 1 of the Sherman Act.

### SECOND CLAIM FOR RELIEF:

### VIOLATION OF SHERMAN ANTITRUST ACT, 15 U.S.C. § 2

### UNLAWFUL MONOPOLIZATION

### (Against all Defendants)

116.    TAN realleges and incorporates paragraphs 1 through 115 by reference.

117.    NAR possesses monopoly power in the market for professional associations among real estate professionals and the market for residential real estate listing services.

118.    NAR's conduct constitutes the intentional and unlawful maintenance of that monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

119.    For the purpose of maintaining its monopoly power, NAR adopted the MLS Clear

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL



Cooperation Policy, which rule it forced on its members and affiliates, including regional NAR-affiliates and NAR-affiliated MLSs.

120.    NAR does not have a legitimate business purpose for its anticompetitive behavior, and any alleged benefits to competition or consumers is pretextual and designed to justify a policy intended to maintain NAR's monopoly over real estate professional associations and real estate listing services.

121.    Adoption of the MLS Clear Cooperation Policy had the intended purpose and actual effect of preventing or discouraging real estate professionals from joining professional associations that compete with NAR; of preventing or discouraging real estate professionals from competing real estate listing services, or pursuing off-market homes sales on behalf of their clients; and of artificially inflating the value of NAR membership and membership in NAR-affiliated MLSs.

122.    NAR's unlawful attempts to suppress competition, including through the CAR and SFAR, have harmed competition in the markets for real estate professional associations, real estate listing services, and residential home sales.  TAN has and will continue to suffer actual injury as a result of the anticompetitive effect of NAR's unlawful acts, primarily through the loss of TAN members and membership dues.

## THIRD CLAIM FOR RELIEF:

## VIOLATION OF THE CARTWRIGHT ACT, BUS. & PROF. CODE § 16700

## EXCLUSIVE DEALING

### (Against all Defendants)

123.    TAN realleges and incorporates paragraphs 1 through 122 by reference.

124.    NAR maintains monopoly power over the market for residential real estate listing services.

125.    NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this proposal among its membership, regional affiliates and NAR-related MLSs, including through the CAR and SFAR, constitutes an unlawful exclusive dealing arrangement in violation of the Cartwright Act, Bus. & Prof. Code § 16720(e)(1).

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

126.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real estate listing services.

127.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

128.    NAR's actions are not reasonably necessary to accomplish any procompetitive objective, or, alternatively, and its procompetitive justifications are pretextual.

129.    TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues.

<u>**FOURTH CLAIM FOR RELIEF:**</u>

<u>**VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200**</u>
<u>**(Against all Defendants)**</u>

130.    TAN realleges and incorporates paragraphs 1 through 129 by reference.

131.    Section 17200 of the California Business and Professions Code prohibits any unfair or unlawful business practice.

132.    Defendants have engaged in acts of unfair competition within the meaning of Section 17200 by engaging in unlawful and unfair conduct.

133.    Defendants engaged in unlawful conduct by committing the acts described herein in violation of Sections 1 and 2 of the Sherman Act, and the Cartwright Act.

134.    Defendants have further engaged in unlawful conduct by requiring agents to disseminate their clients' private information on MLSs without client consent in violation of California's Consumer Privacy Act.  Defendants have further engaged in unlawful conduct by requiring real estate agents to violate their fiduciary duty to their clients by placing their homes on the NAR-affiliated MLS when it is not in the clients' best interest.

135.    Defendants have engaged in unfair conduct by adopting the MLS Clear Cooperation

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL



Policy, for the purpose of using their market power to prevent entities such as TAN from recruiting dues-paying members and from participating in the market for real estate listing services, thereby violating the policy and spirit underlying the federal and state antitrust laws.

136.    Defendants' unfair and unlawful acts have harmed competition in California by preventing and/or discouraging real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  Defendants' unlawful acts have had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

137.    TAN has and will suffer actual injury and economic loss as a result of the Defendants' unfair and unlawful actions, primarily through the loss of TAN members and membership dues.

**FIFTH CLAIM FOR RELIEF:**

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against all Defendants)**

138.    TAN realleges and incorporates paragraphs 1 through 137 by reference.

139.    Numerous membership contracts existed between TAN, on the one hand, and TAN's members on the other, through which TAN exchanged membership benefits in its network for membership dues.  Many of TAN's membership contracts were made with real estate agents who were also members of NAR, CAR and SFAR.

140.    Defendants were aware that TAN had entered into membership contracts with real estate agents, including NAR members, and was aware that these members often shared off-market real estate listings through TAN for the purpose of engaging in off-market transactions.

141.    NAR, CAR and SFAR's adoption of the MLS Clear Cooperation Policy made performance of these contract more difficult by preventing or hindering their membership from sharing off-market real estate listings, preventing TAN from serving as a forum for off-market sales and thereby reducing the value of the membership benefits TAN could offer to members.  This interference has caused and will continue to cause TAN members to terminate their membership.

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

LEWIS +
LLEWELLYN
LLP

142.    NAR deliberately adopted the MLS Clear Cooperation Policy for the admitted purpose of hindering NAR members from engaging in off-market transactions facilitated by TAN. NAR intended for adoption of the MLS Clear Cooperation Policy to denude the value of TAN membership.  NAR either intended to induce TAN members to cancel their TAN membership, or knew that such terminations were substantially likely (if not certain) to occur.

143.    TAN has and will suffer actual injury as a result of the NAR's interference, primarily through the loss of TAN members and membership dues.

## PRAYER FOR RELIEF

WHEREFORE, TAN prays for judgment against NAR as follows:

1. For treble damages, including lost profits, according to proof, together with prejudgment and postjudgment interest thereon;

2. For costs of this suit, including attorneys' fees and costs, pursuant to 15 U.S.C. § 26 and to the maximum extent permitted by law.

3. For an award of punitive damages;

4. For restitution;

5. For an order directing termination of the anticompetitive conduct, including but not limited to rescission of the MLS Clear Cooperation Policy;

6. For a permanent injunction barring enforcement of the MLS Clear Cooperation Policy; and

7. For such other and further relief as the Court deems just and proper.


Dated:  August 21, 2020                              LEWIS & LLEWELLYN LLP


                                                    By:   _/s/  Paul T. Llewellyn_____
                                                          Paul T. Llewellyn
                                                          Attorneys for Plaintiff
                                                          TOP AGENT NETWORK, INC.


LEWIS +
LLEWELLYN
LLP

PLAINTIFF TAN'S FAC AND DEMAND FOR JURY TRIAL

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demand a jury trial for all claims for relief so triable.

Dated:  August 21, 2020                          LEWIS & LLEWELLYN LLP


By:  <u>  /s/  Paul T. Llewellyn             </u>
     Paul T. Llewellyn
     Attorneys for Plaintiff
     TOP AGENT NETWORK, INC.

LEWIS +
LLEWELLYN
LLP