QUINN EMANUEL URQUHART & SULLIVAN, LLP
Ethan Glass (Bar No. 216159)
ethanglass@quinnemanuel.com
William A. Burck (*pro hac vice* pending)
williamburck@quinnemanuel.com
Michael D. Bonanno (*pro hac vice* pending)
mikebonanno@quinnemanuel.com
1300 I St. NW, Suite 900
Washington, District of Columbia 20005
Telephone:     (202) 538-8000
Facsimile:     (202) 538-8100

*Attorneys for Defendants*
*National Association of REALTORS®,*
*California Association of REALTORS®, Inc., and*
*San Francisco Association of REALTORS®*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| TOP AGENT NETWORK, INC.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>NATIONAL ASSOCIATION OF REALTORS, CALIFORNIA ASSOCIATION OF REALTORS, INC., and SAN FRANCISCO ASSOCIATION OF REALTORS,<br><br>　　　　　　Defendants. | Case No. 3:20-cv-03198-VC<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM – FED. R. CIV. P. 12(B)(6)**<br><br>Hearing Date: December 3, 2020<br>Time:　　　　10:00 a.m.<br>Place:　　　　Courtroom 4, 17th Floor<br>Judge:　　　　Hon. Vince Chhabria |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 3, 2020, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Vince Chhabria, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, California, 94102, Defendants National Association of REALTORS® ("NAR"), California Association of REALTORS®, Inc., and San Francisco Association of REALTORS® (collectively, "Defendants") will and hereby do move this Court for an order granting their Motion to Dismiss the First Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). Pursuant to Standing Order ¶ 8, counsel for Defendants conferred with opposing counsel prior to filing this motion, and all parties agree that December 3, 2020, is a convenient date for the motion to be heard.  The motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Court's files in this action, all matters of which the Court may take judicial notice, and any other written or oral argument that may be presented to the Court at or before the time the Court takes this motion under submission.

## RELIEF REQUESTED

Defendants request that the Court dismiss Plaintiff Top Agent Network, Inc.'s ("TAN's") First Amended Complaint ("FAC") with prejudice, in its entirety, on the ground that TAN fails to state a claim upon which relief can be granted.

DEFENDANTS' MOTION TO DISMISS TAN'S FIRST AMENDED COMPLAINT

DATED: October 2, 2020                    Respectfully submitted,

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By _/s/ Ethan Glass_____
                                             Ethan Glass (Bar No. 216159)
                                             William A. Burck (*pro hac vice* pending)
                                             Michael D. Bonanno (*pro hac vice* pending)
                                             1300 I St. NW, Suite 900
                                             Washington, District of Columbia 20005
                                             Telephone:    (202) 538-8000
                                             Facsimile:    (202) 538-8100

                                             *Attorneys for Defendants*
                                             *National Association of REALTORS®,*
                                             *California Association of REALTORS®, Inc., and*
                                             *San Francisco Association of REALTORS®*

DEFENDANTS' MOTION TO DISMISS TAN'S FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT ........................................................................................................................4

    I.       TAN's Allegations Do Not Establish Antitrust Injury ................................4

    II.     TAN Has Not Pleaded Valid Sherman Act or Cartwright Act Claims....................7

        A.      TAN Has Not Pleaded a Valid *Per Se* Case ....................................7

            1.      TAN's Allegations Do Not Show It Has Been "Cut Off" ..............8

            2.      TAN's Allegations Do Not Show Defendants Have Market Power ...................................................................................9

                a.      TAN's Relevant Market Allegations Are Facially Unsustainable ........................................................9

                b.      TAN's Market Share Allegations Do Not Show Market Power ..................................................................12

                c.      TAN's Allegations Do Not Show Barriers to Entry ..........13

            3.      The Policy Enhances Overall Efficiency and Competition ...........14

        B.      TAN Has Not Pleaded a Valid Rule of Reason Case ...............................15

    III.    TAN Has Not Pleaded Valid Unfair Competition or Tort Claims........................15

CONCLUSION.....................................................................................................................15

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ................................................. 4

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ............................................ 11

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    No. 15-1416, 2016 WL 3880989 (N.D. Cal. July 18, 2016) ............................................ 5, 12

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,
    613 F.2d 727 (9th Cir. 1979) ................................................. 7

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ....................................................... 15

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ............................................... 7

*DocMagic, Inc. v. Ellie Mae, Inc.*,
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) .................................... 14

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) .......................................................... 10

*Finkelstein v. AXA Equitable Life Ins. Co.*,
    325 F. Supp. 3d 1061 (N.D. Cal. 2018) .................................... 3

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986) ........................................................... 9

*Hahn v. Or. Physicians' Serv.*,
    868 F.2d 1022 (9th Cir. 1988) ........................................ 8, 14, 15

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ........................................... 4

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................. 12

*United States v. Joyce*,
    895 F.3d 673 (9th Cir. 2018) ................................................ 7

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ........................................................................ 6

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
  No. 07-1057, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007) ...................................... 4

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) ...................................................................... 4

*Los Angeles Land Co. v. Brunswick Corp.*,
  6 F.3d 1422 (9th Cir. 1993) ....................................................................... 13, 14

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ....................................................................... 10

*Nexsales Corp. v. Salebuild, Inc.*,
  No. 11-3915, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ...................................... 15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ................................................................................... 8

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..................................................................... 5, 7, 10, 11

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  939 F. Supp. 2d 1002 (N.D. Cal. 2013) .............................................................. 11

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024, 1036 (9th Cir. 2001) ............................................................ 4, 5, 6

*Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*,
  No. 11-2652, 2013 WL 3873074 (S.D. Cal. July 25, 2013) ...................................... 12

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Companies, Inc.*,
  598 F. Supp. 694 (N.D. Cal. 1984) ................................................................... 13

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................. 9, 12, 13

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
  No. 12-5847, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ...................................... 12

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
  88 F.3d 780 (9th Cir. 1996) ........................................................................ 6, 14

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ......................................................................... 5

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
  No. 14-5604, 2017 WL 5973279 (C.D. Cal. Mar. 7, 2017) .................................................. 5, 8

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ................................................................................................ 9

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
  668 F.2d 1014 (9th Cir. 1981) ................................................................................................ 5

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

At the outset of this case, TAN moved to preliminarily enjoin the enforcement of NAR's Clear Cooperation Policy, claiming the Policy reduces competition "by coercing agents—who are TAN's suppliers and customers—to take information off TAN's platform and give it to NAR." ECF 8-1, at 2. The Court denied that motion. The Court concluded TAN's "theories for how the policy hurts buyers and sellers are dubious" because "[i]t is far more likely that the policy benefits buyers and sellers by increasing access to information about the housing market, thus increasing market efficiency and stimulating competition." ECF 43, at 2. Following the Court's decision, TAN amended its complaint. Nothing in TAN's amended complaint, however, addresses the fundamental flaws in TAN's theories and allegations that were discussed in the Court's prior analysis. The Policy still indisputably benefits consumers by increasing access to listings. And TAN's case still relies on the faulty premise that the Policy "coerces the relevant market players— experienced agents—to stop using TAN," FAC ¶ 92 (ECF 48), even though TAN concedes that the Policy does not prohibit agents from belonging to TAN and a local multiple listing service and publicizing listings in both places at the same time. Because the flaws in TAN's complaint persist and the Policy has no impact on competition, Defendants respectfully ask the Court to dismiss TAN's entire case with prejudice.

While TAN continues to claim the Policy is unlawful because it shifts residential real estate listings away from TAN and to TAN's competitors, TAN's lost sales do not, as a matter of law, amount to harm to competition. It is blackletter law that a change in the allocation of sales among competitors is not a cognizable injury to competition and does not satisfy the antitrust injury element of a Sherman Act claim. The antitrust laws exist to protect competition, and competition is only harmed if a defendant's actions reduce output, increase prices, or reduce product quality. Because TAN's allegations clearly show that the Policy in fact ***benefits*** home buyers and sellers

by giving them greater access to information about residential real estate listings, TAN has failed to plead facts that plausibly show that consumers have been harmed in any way by the Policy.

In addition to failing to plead facts sufficient to show antitrust injury, TAN's antitrust claims fall short on several other elements.  TAN has failed to plead facially plausible antitrust markets.  It has failed to plead facts that plausibly suggest Defendants have market power in any properly defined antitrust market.  It has failed to plead facts sufficient to show Defendants' market position is protected by barriers to entry.  And it has failed to plead facts showing the Policy threatens to harm competition in any way.  These flaws, standing alone or collectively, are fatal to TAN's antitrust claims.

TAN's remaining state law claims fare no better.  As TAN concedes, the Policy only requires real estate agents who participate in a multiple listing service to submit all of their publicly marketed listings to the multiple listing service.  The Policy does not prohibit real estate agents from joining TAN.  It does not require them to terminate their existing relationships with TAN.  And it does not restrict choices for home sellers, who remain free to market properties outside of a multiple listing service.  Thus, nothing about the Policy is unlawful, unfair, or fraudulent, and nothing in the Policy requires agents to break their contracts or relationships with TAN.

For all of these reasons, TAN cannot state a claim upon which relief could be granted and the defects in its amended complaint cannot be cured with further amendment.

## BACKGROUND

NAR is a trade association that, among other things, promulgates rules and policies for multiple listing services that are operated by associations of REALTORS®.  FAC ¶ 23.  Multiple listing services "contain[] a database of homes for sale in any given geographic region."  *Id.* ¶ 2.  When "a seller's property is placed on that database," the multiple listing service makes "information regarding that home . . . widely available to . . . thousands of people."  *Id.* ¶ 32.

TAN allegedly "provid[es] an alternative to NAR-controlled MLS."  FAC ¶ 6.  It is a "private MLS" that "allows high-producing agents to exchange market data and information on a more selective, controlled basis."  *Id.*  According to TAN, real estate agents "pay TAN membership dues to get access to ***information not available on the MLS***."  *Id.* (emphasis in original).

Since at least 2013, NAR has been concerned with the growth of so-called "pocket" or "Off MLS" listings because, among other things, they (1) can "compromise agents' fiduciary duty to their clients, ignoring oceans of potential buyers in favor of a targeted few"; and (2) "are a way for agents to prey on sellers," including through double-agency relationships, where a single agent represents both the buyer and the seller in the same transaction.  Larry Rosen, "Will the Ban on Real Estate 'Pocket Listings' Help or Hurt?," *S.F. Examiner*, Dec. 3, 2019 (cited at FAC ¶ 33 n.1).[1]

In light of the problems caused by pocket listings, NAR publicly proposed, discussed, and ultimately adopted the Clear Cooperation Policy, which provides:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.

ECF 17-6, Galicia Decl., Ex. E, at 32 (cited at FAC ¶ 84); *see also* FAC ¶ 72.  "The rule provides, in effect, that any property an agent discusses on TAN or similar platforms must be listed on the MLS within one business day thereafter."  FAC ¶ 7.  The Policy, however, also permits "direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage,

---

[1]    "The Court . . . may take into account documents that are not physically attached to the complaint if the contents of the document are alleged in the complaint and the authenticity of the documents is not questioned."  *Finkelstein v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061, 1066 (N.D. Cal. 2018).  TAN quoted the contents of the Rosen article in its allegations.  FAC ¶ 33.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

[or] one-to-one promotion between these licensees and their clients," through a practice known as an "office exclusive" listing.  ECF 17-5, Galicia Decl., Ex. D, at 5 (cited at FAC ¶ 73).

The Policy therefore gives a seller complete control over how her home is marketed: (1) she can choose to publicly market the property and engage a broker who uses a multiple listing service; or (2) she can forgo the benefits of a multiple listing service and market her property to a limited group of potential buyers (through an office exclusive or by working with a real estate agent who is not a member of the local multiple listing service).  *See* FAC ¶ 77 (recognizing that the Policy permits sellers to choose between public marketing and broker exclusives).

## ARGUMENT

## I.   TAN's Allegations Do Not Establish Antitrust Injury

"It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  "[P]rivate plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent," so they must prove "antitrust injury"—which is an injury caused by "acts that harm allocative efficiency *and* raise the price of goods above their competitive level or diminish their quality."  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034, 1036 (9th Cir. 2001) (cleaned up).  When a plaintiff's "allegations do not identify how [it] suffered any antitrust injury," it has not stated an antitrust claim and its complaint should be dismissed.  *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07-1057, 2007 WL 2318906, at *4 (N.D. Cal. Aug. 13, 2007); *see also Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (unpublished) (affirming dismissal of a complaint in which plaintiff "failed to adequately plead injury to competition"); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (unpublished) (holding that plaintiff's "failure to allege causal antitrust injury, which is an element of all antitrust suits, serves as an independent basis for dismissal" (cleaned up)).

TAN's claim that it was harmed by the Policy because it "los[t] . . . members and membership dues," *e.g.*, FAC ¶¶ 114, 122, is not sufficient to establish antitrust injury. "Shifting . . . sales to . . . other competitors in the market does not directly affect consumers and therefore does not result in antitrust injury." *Pool Water*, 258 F.3d at 1036; *see also Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. 14-5604, 2017 WL 5973279, at *9 (C.D. Cal. Mar. 7, 2017) ("The fact that one competitor took the place of another competitor in the relevant market does not, on its own, constitute harm to competition."); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, No. 15-1416, 2016 WL 3880989, at *11 (N.D. Cal. July 18, 2016) ("Plaintiffs[] still have not adequately alleged injury to competition and . . . focus on the injury to themselves."). Thus, neither TAN's purported financial harm, nor its suggestions that the Policy harms small real estate brokerages by shifting office exclusive listings to large brokerages, *see* FAC ¶¶ 77-78, 103, show that the Policy "reduced output, increased prices, or decreased quality" for consumers. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*").

It also is not enough for TAN to claim the Policy was motivated by NAR's concerns "about increasing competition from TAN and similar market alternatives to the MLS system." FAC ¶ 71. "[I]ntent to vanquish a rival in an honest competitive struggle cannot help to establish an antitrust violation." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1028 (9th Cir. 1981). TAN must go beyond allegations of NAR's purported intent and proffer facts sufficient to show the Policy has actually had anticompetitive effects. *Id.* It has failed to do so.

And TAN cannot compensate for these shortcomings by pointing to conclusory, unsupported statements that the Policy hurts competition by reducing consumer choice or raising prices. The Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*,

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

266 F.3d 979, 988 (9th Cir. 2001); *see also SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) ("Dismissal for failure to state a claim is appropriate where the complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose." (quotation marks omitted)).   TAN's amended complaint is riddled with such wholly unsupported, conclusory allegations:

- TAN's hyperbolic claim that the Policy "take[s] away a family's freedom to choose how to market their home for sale," FAC ¶ 1, may be disregarded because it is based on nothing more than *ipse dixit* and contradicted by TAN's claims elsewhere in its amended complaint that "the Policy *does nothing to eliminate or reduce the use of pocket listings*," *id.* ¶ 77 (emphasis in the original); *see also id.* ¶ 100 ("The Policy does not actually limit or reduce pocket listings, but simply ensures that these listings are restricted to the large brokerages that work hand-in-glove with NAR.").

- TAN's claim that the Policy is a "limitation on output in the market for property listing services," FAC ¶ 93, may be ignored because nowhere does TAN allege that the Policy has or will reduce the overall number of property listings or home sales.  TAN alleges only that the Policy will shift agents from TAN to multiple listing services and office exclusives.  *See id.*  That shift is neither anticompetitive nor an output restriction.  *See Pool Water*, 258 F.3d at 1036.

- And TAN's claim that the Policy will "negatively affect prices" is completely unsupported, FAC ¶ 103; it is made in a paragraph that does not include any discussion, much less factual allegations, about how the Policy "negatively" impacts prices, considering the prices for home buyers *and* home sellers.

Because none of these claims are supported by well-pleaded factual allegations, they need not be credited by the Court and they do not meet TAN's burden to plead antitrust injury.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008).

While TAN has failed to plead antitrust injury, there are factual allegations in its complaint that confirm the Policy offers substantial **benefits** to consumers.  According to TAN, the Policy provides "that any property an agent discusses on TAN or similar platforms must be listed on the MLS within one business day thereafter," FAC ¶ 7, and once a property is listed on a multiple listing service, information about the property "is widely available to, in the case of SFARMLS,

for example, thousands of people," *id.* ¶ 32.  Thus, as the Court previously recognized when ruling on TAN's motion for preliminary injunctive relief, the Policy "benefits buyers and sellers by increasing access to information about the housing market, thus increasing market efficiency and stimulating competition."  ECF 43, at 2.

Because TAN has not alleged facts showing that the Policy harmed consumers through higher prices, reduced output, or reduced quality—and because TAN's allegations actually establish that the Policy increases consumers' access to information—TAN has not satisfied its burden to plead antitrust injury, and its antitrust claims should be dismissed.

## II.    TAN Has Not Pleaded Valid Sherman Act or Cartwright Act Claims

TAN has asserted claims under Section 1 and Section 2 of the Sherman Act, and  under the Cartwright Act (which is modeled on Section 1 of the Sherman Act and governed by the same substantive pleading standards, *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)).  Sherman Act claims "[t]ypically . . . involve[] a factual inquiry commonly known as the 'rule of reason,'" which "weighs legitimate justifications for a restraint against any anticompetitive effects."  *United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018); *see Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 737 (9th Cir. 1979) (the rule of reason applies to Section 2 claims).  "A small group of restraints," however, "are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output."  *Amex*, 138 S. Ct. at 2283 (quotation marks omitted).  TAN has not pleaded facts that can sustain an antitrust claim under either a *per se* or rule of reason analysis.

### A.    TAN Has Not Pleaded a Valid *Per Se* Case

TAN claims the Policy is a group boycott that is illegal *per se*.  FAC ¶ 106.  But "[t]he mere allegation of a concerted refusal to deal does not suffice" to invoke the *per se* rule "because

not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985).  According to the Ninth Circuit,

> *Northwest Wholesale* identified three characteristics as indicative of per se illegal boycotts: (1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition.

*Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988).  TAN has failed to allege sufficient facts that, taken as true, satisfy any of the three elements.

### 1.    TAN's Allegations Do Not Show It Has Been "Cut Off"

To establish a *per se* illegal boycott, the plaintiff must allege facts showing that defendants "prevented their access to a relevant 'supply, facility, or market.'"  *Surf City Steel*, 2017 WL 5973279, at *5.  When a plaintiff has continued to compete in the relevant market following the implementation of the alleged "boycott," this requirement is not satisfied.  *See id.* (dismissing complaint and holding that *per se* treatment is inappropriate because "Plaintiffs . . . do not allege that [Defendant] prevents them from competing for *all* relevant work").  And here, TAN admits that it "currently operates" in the markets it alleges to be relevant.  FAC ¶¶ 68, 70.

In any event, TAN has not alleged it has been "cut off" from a supply, facility, or market. The Policy merely requires agents to list a property on the multiple listing services to which they belong **in addition to** any other means they have used to publicly market the property.  *See* FAC ¶ 7.  TAN does not allege the Policy bars it from offering its services to brokers and agents.  TAN does not allege the Policy prevents brokers and agents from joining TAN.  TAN does not allege the Policy prevents brokers and agents from using TAN's platform to discuss specific properties so long as they also put listings into the local multiple listing service within one business day.

TAN concedes, moreover, that "experienced agents have established their own networks and created methods outside of the MLS to service their clients," making them "less reliant on the

MLS as a percentage of their overall business."  FAC ¶ 4.  The Policy has no effect on TAN's ability to compete for the business of those agents.  Nor does the Policy prevent agents from withdrawing from their local REALTOR® association-owned multiple listing service to work with TAN exclusively.  The Policy does not cut off TAN from anything.

### 2.    TAN's Allegations Do Not Show Defendants Have Market Power

In the context of an alleged boycott, "the *per se* approach has generally been limited to cases in which firms ***with market power*** boycott suppliers or customers in order to discourage them from doing business with a competitor."  *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (emphasis added).  Market power can be shown through "direct evidence of the injurious exercise of market power" or "circumstantial evidence pertaining to the structure of the market."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  TAN has not alleged sufficient facts to satisfy either standard.

Direct evidence would require facts showing "restricted output and supracompetitive prices."  *Rebel Oil*, 51 F.3d at 1434.  As discussed, TAN has not pleaded facts showing how the Policy has harmed consumer welfare through increased prices, reduced output, or reduced product quality.  *See supra* § I.  Its allegations with respect to circumstantial evidence fare no better.  To establish market power using indirect proof, "a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  *Rebel Oil*, 51 F.3d at 1434.  TAN's allegations do not satisfy these elements.

### a.    TAN's Relevant Market Allegations Are Facially Unsustainable

In an antitrust case, the plaintiff must allege plausible product and geographic markets.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-65 (9th Cir. 2001).  "[A] complaint may be

dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

**Product market**.   TAN's putative product market of "professional real estate listing services," FAC ¶ 43, is facially unsustainable because it does not account for the commercial realities of the residential real estate industry. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").   Because multiple listing services "offer[] different products or services to two different groups"—home buyers and sellers—"who both depend on the platform to intermediate between them," *Amex*, 138 S. Ct. at 2280, they are a classic example of what economists call two-sided markets with network effects. That means any relevant antitrust market in which multiple listing services compete must be defined to "include both sides of the platform," *id.* at 2286, *i.e.*, buyers and their agents on one hand, and sellers and their agents on the other.   TAN has not done this. *See* FAC ¶ 44.

To avoid the requirements of *Amex*, TAN claims its putative market for professional real estate listing services "is not a two-sided market, as no transactions occur on the listing platforms." FAC ¶ 44.   But TAN concedes that the purpose of a multiple listing service is to facilitate sales of residential real estate. *See, e.g.*, *id.* ¶ 36 ("[T]he MLS is the dominant—but not only—platform that facilitates residential home transactions . . . .").   And TAN further concedes it is "obvious . . . that home sales are a two-sided transaction." *Id.* ¶ 102.   TAN's allegations therefore confirm that multiple listing services are "platforms" that compete to "facilitate" "a two-sided transaction." *Id.* ¶¶ 36, 102.   Under Supreme Court precedent, TAN was required to define the relevant market to include both sides of the platform. *Amex*, 138 S. Ct. at 2286.   TAN expressly declined to do so, FAC ¶ 44, rendering its product market facially unsustainable.

*Geographic market.*   TAN contends that "[t]he market for professional . . . real estate listing services exists nationwide, and also in each of the regions within which TAN operates, including San Francisco."  FAC ¶ 66.  A nationwide market for residential real estate is facially unsustainable, as it would mean that house buyers are indifferent to the city in which they purchase their homes.  As TAN concedes, "[r]eal estate is, by nature, a localized product," and "[e]ach real estate market has its own immobile inventory of available real estate, and real estate professionals gain experience specific to the local markets in which they operate."  *Id.*  Furthermore, "the relevant market is defined as the area of effective competition."  *Amex*, 138 S. Ct. at 2285 (quotation marks omitted).  TAN does not allege any nationwide competition—none of the Defendants operate a national multiple listing service, FAC ¶¶ 12-14, 28-30, *see also id.* ¶ 27 (acknowledging that listings in a multiple listing service are limited to a "particular geographical region"), and thus they are not competitors in a nationwide market.

The local geographic markets described in TAN's amended complaint are also facially unsustainable.  "[A] geographic market cannot be drawn simply to coincide with the market area of a specific company."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002).  But that is exactly what TAN has done.  It claims a relevant market exists "in each of the regions within which TAN operates."  FAC ¶ 66.  TAN's sole support for this approach appears in a footnote in its amended complaint, where it states: "Because MLSs generally define a specific coverage area in their user agreements, it is possible to identify particular regional markets."  *Id.* ¶ 70 n.3.  TAN fails, however, to identify the bounds of those "particular regional markets."  "Information about the reach of [each] market is not exclusively within the Defendants' possession," so TAN should have pleaded "the geographic range of the relevant market[s] with greater specificity."  *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

### b.    TAN's Market Share Allegations Do Not Show Market Power

To withstand a motion to dismiss using indirect proof of market power, TAN must allege facts that are sufficient to show that Defendants have a significant market share in the alleged markets.  *See Rebel Oil*, 51 F.3d at 1434 (a plaintiff must "define the relevant market," then "show that the defendant[s] own[] a dominant share of that market").  To meet this burden, TAN has offered only conclusory allegations concerning Defendants' market "dominance."  FAC ¶¶ 54, 63, 65.  That is not enough for TAN's complaint to survive a motion to dismiss.  *See Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-2652, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013) (allegation that defendant was a "dominant force" insufficient); *Bay Area Surgical*, 2016 WL 3880989, at *10 ("The fact that Defendants are 'goliaths' or 'dominant players' are nothing more than conclusory allegations. . . ."); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-5847, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (dismissing complaint when plaintiffs "d[id] not state [defendant's] market share in any of the . . . markets identified in the FAC").  Nor are TAN's conclusory claims that the "majority," FAC ¶ 70, of property listing services in its putative local markets are controlled by NAR affiliates sufficient to meet its burden.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").

Even for the parts of the country where there is a "NAR-affiliated" multiple listing service, TAN has made no effort to plead facts sufficient to plausibly allege the market shares held by each "NAR-affiliated" multiple listing service.  For example, in the "San Francisco Market" (as defined in TAN's amended complaint), TAN alleges only that the three NAR "affiliated" multiple listing services—Defendant SFARMLS, Non-Defendant Bay East MLS, and Non-Defendant Bridge MLS— "command the overwhelming majority of the market for property listing services sold to agents in the San Francisco Market, both in terms of the share of local agents who are users of

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

these services and the share of local property sales that are initiated through listings on these services."  FAC ¶ 70 (iv).

As explained, such conclusory claims are not enough for TAN to meet its burden.  Nor can TAN meet its burden by aggregating the market shares held by several multiple listing services (including non-defendants) within each of its putative local markets.  Absent allegations of a conspiracy between all of the multiple listing services in each of its putative markets, TAN "may not aggregate the respective market shares of individual [multiple listing services] to establish market power."  *Ralph C. Wilson Indus., Inc. v. Am. Broad. Companies, Inc.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984).  TAN has not alleged such a conspiracy.  TAN has instead alleged (1) a conspiracy among REALTORS®, FAC ¶ 106 (alleging a conspiracy "by NAR's associated members against TAN"); and (2) a conspiracy between REALTORS® and associations of REALTORS®, *id.* ¶ 107 (alleging a conspiracy between "NAR's members and its affiliate associations").  Thus, to meet its burden, TAN must adequately allege facts showing a multiple listing service "affiliated" with NAR has market power in each of its putative markets.  It has not done so.

### c.    TAN's Allegations Do Not Show Barriers to Entry

"Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil*, 51 F.3d at 1439 (quotation marks omitted).  "To justify a finding that a defendant has the power to control prices, entry barriers must be significant . . . ."  *Id.*  Even if a defendant has a 100% market share, that fact alone "does not demonstrate that it ha[s] the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants."  *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993).

TAN makes general and conclusory allegations that Defendants' acts have the effect of "raising barriers to entry." *E.g.*, FAC ¶¶ 109, 113. But the only specific "barriers" TAN alleges are "network effects," which TAN contends are a barrier to entry "because the new player must be capable of quickly expanding its network to create value for potential customers." *Id.* ¶ 48. But short-run costs are not barriers to entry. *See Los Angeles Land Co.*, 6 F.3d at 1428 ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." (citation omitted)). And network effects are not barriers to entry when they do not result in customer "lock-in" that prevents consumers from using services provided by new competitors. *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1138 (N.D. Cal. 2010). The FAC does not allege any such "lock-in." Nothing prevents a broker from belonging to more than one listing service or listing a property with more than one listing service. Indeed, TAN expressly alleges it is "typical" for a real estate agent to belong to "one or more MLSs." FAC ¶ 55. If TAN offered a valuable listing service, agents presumably would join both TAN and their local multiple listing service. Nothing in the Policy prevents that.

### 3.     The Policy Enhances Overall Efficiency and Competition

TAN nakedly asserts that the justifications for the Policy are "pretextual," FAC ¶ 76, but it has not offered any facts that would show there are not "plausible arguments" *Hahn*, 868 F.2d at 1030, that the Policy enhances competition. Conclusory assertions, such as, "any alleged benefits to competition or consumers [are] pretextual and designed to justify" the Policy, FAC ¶ 120, are not enough. *See SmileCare Dental*, 88 F.3d at 783 ("conclusory language regarding . . . improper purpose" not sufficient to withstand a motion to dismiss (citation omitted)). Here, the Policy has procompetitive benefits—it increases access to listings, promoting sales, transparency, and efficiency—that are evident from TAN's amended complaint. *See supra* § I.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

TAN has failed to plead facts sufficient to suggest these benefits do not enhance competition and justify the implementation of the Policy.

### B.      TAN Has Not Pleaded a Valid Rule of Reason Case

For the same reasons that TAN's allegations do not pass muster under the *Hahn* test, *supra* § II.A., TAN has failed to state a valid claim under the rule of reason.  *See Hahn*, 868 F.2d at 1030 n.9 (stating that, for boycott cases, the analysis of whether the defendants' conduct is *per se* illegal is substantively the same as a full rule of reason analysis).

### III.    TAN Has Not Pleaded Valid Unfair Competition or Tort Claims

TAN's state law claims, which are premised on the same facts as its antitrust claims, also fail as a matter of law.  TAN has not alleged sufficient facts to support an unfair competition claim under California law.  TAN's allegations do not show the Policy is "unlawful" under a state or federal antitrust law; nor do they show it is "unfair" because it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999); *see supra* §§ I.-II.

Nor is TAN's vague and conclusory allegation that Defendants interfered with "[n]umerous membership contracts," FAC ¶ 139, sufficient to state an intentional interference claim.  *See Nexsales Corp. v. Salebuild, Inc.*, No. 11-3915, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012) (dismissing claims because "Plaintiff generally alleges that a contract existed but fails to identify any terms of the contract, the parties involved, the terms of the contract that were breached, how Defendant would have known of the contract . . . .").  Moreover, TAN's members still can participate in TAN as they did before the Policy was adopted; the Policy does not require agents to terminate their relationship with TAN or break their contracts with TAN.

### CONCLUSION

Defendants respectfully submit TAN's first amended complaint should be dismissed.

DATED: October 2, 2020          Respectfully submitted,

                                QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP


                                By */s/ Ethan Glass*
                                   Ethan Glass (Bar No. 216159)
                                   William A. Burck (*pro hac vice* pending)
                                   Michael D. Bonanno (*pro hac vice* pending)
                                   1300 I St. NW, Suite 900
                                   Washington, District of Columbia 20005
                                   Telephone:     (202) 538-8000
                                   Facsimile:     (202) 538-8100

                                   *Attorneys for Defendants*
                                   *National Association of REALTORS®,*
                                   *California Association of REALTORS®, Inc., and*
                                   *San Francisco Association of REALTORS®*

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS