QUINN EMANUEL URQUHART & SULLIVAN, LLP
Ethan Glass (Bar No. 216159)
ethanglass@quinnemanuel.com
William A. Burck (admitted *pro hac vice*)
williamburck@quinnemanuel.com
Michael D. Bonanno (admitted *pro hac vice*)
mikebonanno@quinnemanuel.com
1300 I St. NW, Suite 900
Washington, District of Columbia 20005
Telephone:      (202) 538-8000
Facsimile:      (202) 538-8100

*Attorneys for Defendants*
*National Association of REALTORS® and*
*San Francisco Association of REALTORS®*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| TOP AGENT NETWORK, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>NATIONAL ASSOCIATION OF REALTORS; SAN FRANCISCO ASSOCIATION OF REALTORS,<br><br>          Defendants. | Case No. 3:20-cv-03198-VC<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM – FED. R. CIV. P. 12(B)(6)**<br><br>Hearing Date: July 15, 2021<br>Time:         2:00 p.m.<br>Place:        Courtroom 4, 17th Floor<br>Judge:       Hon. Vince Chhabria |

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 15, 2021, at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable Vince Chhabria, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants National Association of REALTORS® and San Francisco Association of REALTORS® will and hereby do move this Court for an order granting their Motion to Dismiss the Third Amended Complaint (ECF 80) in its entirety under Federal Rule of Civil Procedure 12(b)(6). [1]   The motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Court's files in this action, all matters of which the Court may take judicial notice, and any other written or oral argument that may be presented to the Court at or before the time the Court takes this motion under submission.

## <u>RELIEF REQUESTED</u>

Defendants request that the Court dismiss Plaintiff Top Agent Network, Inc.'s TAC with prejudice, in its entirety, and without leave to amend, on the ground that TAN fails to state a claim upon which relief can be granted.

---

[1]   As in the SAC, TAN names NAR and SFAR as the only defendants, so there are no pending claims against the California Association of REALTORS®.  *See* TAC ¶¶ 21-22; SAC ¶¶ 15-17. As a result, TAN has effectively dismissed C.A.R. from this lawsuit.  *See Wilens v. Automattic Inc.*, No. 14-2419, 2015 WL 498745, at *2 (N.D. Cal. Feb. 5, 2015) (citing authority for the propositions that "amendment under Rule 15 may be used to drop a party" and that an "amended complaint that voluntarily drops a defendant named in the original complaint effectively dismisses that defendant from the action" (citing Schwarzer, Tashima & Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* §§ 8:1386, 8:1551)); *see also* 6 Charles Alan Wright, et al., *Federal Practice & Procedure* § 1474 (3d ed.) (collecting cases holding that a party "may make a Rule 15(a) amendment to . . . drop parties to the action" (footnote omitted)).

DATED: June 1, 2021                         Respectfully submitted,

                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP


                                    By _/s/ Ethan Glass_
                                        Ethan Glass (Bar No. 216159)
                                        William A. Burck (admitted *pro hac vice*)
                                        Michael D. Bonanno (admitted *pro hac vice*)
                                        1300 I St. NW, Suite 900
                                        Washington, District of Columbia 20005
                                        Telephone:    (202) 538-8000
                                        Facsimile:    (202) 538-8100

                                        *Attorneys for Defendants*
                                        *National Association of REALTORS® and*
                                        *San Francisco Association of REALTORS®*

DEFENDANTS' MOTION TO DISMISS TAN'S THIRD AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

ARGUMENT ....................................................................................................................1

     1.     The TAC Still Does Not Account For Defendants' Status as Associations, Which Cannot Focus On the Interests of a Particular Entity, Like TAN ...............2

     2.     The TAC Still Shows That the Policy Benefits Consumers Because It Makes More Listings Available to More Agents and Prospective Buyers.............3

     3.     The TAC Still Shows That TAN Is Not Cut Off From Anything ..........................4

     4.     Alleged Harm to TAN Alone Is Not Enough to State a Claim, Especially Since the Alleged Harm to TAN Is Not From the Policy ........................................7

     5.     The TAC Fails to Show Harm to Competition ......................................................8

CONCLUSION.................................................................................................................10

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page**

## Cases

*AFMS, LLC v. United Parcel Serv. Co.*,
No. 10-5830, 2011 WL 13128436 (C.D. Cal. Nov. 23, 2011) ................................................. 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................. 9

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
441 U.S. 1 (1979)........................................................................................................... 2, 3

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...................................................................................................... 10

*Hahn v. Or. Physicians' Serv.*,
868 F.2d 1022 (9th Cir. 1988) ............................................................................................ 3

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ............................................................................................ 9

*Nexsales Corp. v. Salebuild, Inc.*,
No. 11-3915, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012)....................................................... 10

*Northwest Wholesale Stationers v. Pacific Stationary*,
472 U.S. 284 (1985)............................................................................................................ 2

*Pool Water Prods. v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ............................................................................................ 8

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ............................................................................................ 4

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) .......................................................................................... 10

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
No. 14-5604, 2017 WL 5973279 (C.D. Cal. Mar. 7, 2017)....................................................... 8

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

Over the year-long life of this case, the Court has denied TAN's motion for a temporary restraining order, denied its motion for a preliminary injunction, and twice granted TAN the opportunity to re-plead its claims.  Most recently, the Court issued a written Order granting Defendants' motion to dismiss, which outlined the most acute problems with TAN's Second Amended Complaint, and gave TAN the opportunity to amend a third time to address those failures.  We are now on the Third Amended Complaint—TAN's fourth attempt to state a claim. But the TAC does not actually address any of the deficiencies that were identified in the Court's Order.  TAN simply triples down on its assertion that, at best, some listings that it believes would have been placed on TAN have been shifted to office exclusives, which as a matter of law is not sufficient to state a claim.

Defendants respectfully request that the Court dismiss TAN's TAC with prejudice.

## ARGUMENT

Because TAN's allegations have not materially changed, and Defendants have briefed all the flaws in TAN's claims many times, Defendants will use this brief to simply compare the Court's Order of Dismissal With Leave to Amend, ECF 75, with the TAC, to show that TAN has no claim.  The legal framework for evaluating the sufficiency of TAN's allegations remains the same as that set forth in Defendants' prior briefing, *see, e.g.*, Motion to Dismiss TAN's SAC, ECF 66, at 3-4, 10-11, 15, and comparing the TAC to the Court's Order confirms that TAN has not resolved the many problems with its case: (1) the TAC still fails to address the fact that Defendants are associations that cannot cater just to TAN's whims, but must account for the people who will try to take advantage of the multiple listing service and other members by taking other members' listings while withholding their own; (2) the policy on its face results in greater access to a greater number of listings; (3) TAN has not been cut off from anything (in fact, it is TAN who seeks to

cut off multiple listing service members from access to listings); (4) the TAC still only alleges harm to TAN itself; and (5) the TAC still fails to plausibly allege harm to competition.  Any one of these deficiencies is enough to dismiss this case.

Defendants now take them in turn.

### 1.    The TAC Still Does Not Account For Defendants' Status as Associations, Which Cannot Focus On the Interests of a Particular Entity, Like TAN

Defendants are associations that must adopt rules to govern their members' use of multiple listing services, which allow members, home buyers, and home sellers to buy and sell real estate in different ways and under different business models.  *See* TAC, ECF 80, ¶¶ 21-22, 54.  As the Court previously observed, "[a]n association whose mission is to enable a more efficient market by serving the interests of many different people must have a certain amount of room to impose reasonable ground rules that prevent a minority of members from benefitting at the undue expense of the majority."  ECF 75 at 1 (citing *Northwest Wholesale Stationers v. Pacific Stationary*, 472 U.S. 284, 296 (1985)).

In other cases involving similar entities, courts have cautioned that the antitrust laws do not condemn restrictions that are necessary to provide procompetitive benefits that would not otherwise be available without cooperation between competitors.  For example, in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 5 (1979), members of the broadcasting industry created a nonprofit to license their musical works under a "blanket license" at a single price, rather than individually negotiating licenses for each work.  The Supreme Court rejected a *per se* antitrust challenge to blanket licenses, recognizing they resulted in "substantial lowering of costs, which is of course potentially beneficial to both sellers and buyers."  *Id.* at 21. The Court noted that the challenged restriction (the one-size-fits-all blanket price, set by competitors) had procompetitive benefits because "[t]he blanket license [wa]s composed of the

individual compositions plus the aggregating service." *Id.*  As a consequence, "the whole [wa]s truly greater than the sum of its parts; it [wa]s, to some extent, a different product." *Id*. at 21-22. The same principles apply here—absent cooperation between brokers, the multiple listing service would not exist, and any rule that is designed to encourage members to share their listings with other members improves the quality of the multiple listing service, which is procompetitive.

While associations are not immune from antitrust scrutiny, an antitrust plaintiff must account for an association's legitimate and beneficial functions, particularly when the association is the steward of a product that would be undermined without the challenged rule—in *BMI*, the blanket license, and here, the policy.  Specifically, the policy ensures that those who want to take the benefits of access to the multiple listing service also contribute to it.  TAN has not accounted for those considerations.  Instead, TAN wants to create a loophole where members can take other members' listings, but not share their own, secreting them to a private, exclusive, and costly location that only adds cost and burden to the real estate system.  As a result, "the complaint's analysis of NAR's policy, which is plausibly designed to prevent a minority of member agents from selectively withholding listings to the detriment of the entire group (not to mention consumers), is artificial."  ECF 75 at 1.

### 2. The TAC Still Shows That the Policy Benefits Consumers Because It Makes More Listings Available to More Agents and Prospective Buyers

TAN still has not called into question "NAR's plausible assertion . . . that the policy has procompetitive effects because it causes more listings to be available to more agents (and thus to more prospective buyers)," ECF 75 at 1-2, which it must do to plead a valid *per se* case.  *See Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988) (explaining that a group boycott claim requires the plaintiffs to show "the practices are not justified by plausible arguments that they enhance[] overall efficiency or competition").  To the contrary, the TAC expressly alleges

that "it is generally more efficient and pro-competitive for a region's on-MLS listings to be consolidated in one place." TAC, ECF 80, ¶ 102. The TAC also alleges that, "in most cases, listing a property on the MLS is the strategy most likely to bring a quick, high value sale." *Id.* ¶ 91. Therefore, the facts alleged in the TAC confirm that the policy benefits consumers because it requires more listings to be submitted to the multiple listing service, which in turn "causes more listings to be available to more agents (and thus to more prospective buyers)." *See* ECF 75 at 2.

The efficiencies of multiple listing services have long been recognized in antitrust cases: "There is good in the multiple listing system. It is, above all, an effective response to the pervasive market imperfections in the real estate industry." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980) (citation and quotation marks omitted). "The service produces its own incentives to membership by presenting the possibility of significant market efficiencies through its pooling of listings and consequent reduction of market imperfections." *Id.* at 1377. Those "significant market efficiencies" are only available if members of multiple listing services actually share their listings with each other, and the policy is specifically intended to require just that. The policy does not exclude anyone from the multiple listing service or prevent members from advertising their listings elsewhere, *see* TAC, ECF 80, ¶ 94—it only ensures that the benefits of the multiple listing service are preserved, to "induce individuals . . . to join the association" and "make the association's procompetitive goals a realistic possibility," *Realty Multi-List*, 629 F.2d at 1376-77.

### 3.    The TAC Still Shows That TAN Is Not Cut Off From Anything

As it was in the SAC, "TAN's theory of a group boycott," in the TAC, is still "that it is being cut off from the supply of real estate listings." ECF 75 at 2. But the TAC shows, just like the SAC before it, that "the only thing the NAR policy prevents its members from doing is placing listings *exclusively* on TAN." *Id.* For example, in Paragraph 10, the TAC summarizes the policy

as "requir[ing] that any property an agent markets in any way outside of his or her own brokerage off-MLS—either on TAN, similar platforms, or through informal marketing—must be listed on the local MLS within one business day thereafter." TAC, ECF 80, ¶ 10. The TAC also quotes the proposed version of the policy as providing, "[w]ithin 24 hours of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." *Id*. ¶ 94. Nowhere in the lengthy section of the TAC about the policy does it allege facts that show the policy does anything except prohibit members of a multiple listing service from withholding publicly marketed properties from the other members. *See id*. ¶¶ 91-108.

The TAC, like the SAC, simply "assumes that the policy will prevent competing listing services (such as TAN and another competitor, The PLS.com) from operating." ECF 75 at 2. "But it does not adequately explain why this would be so." *Id.* In fact, the allegations in the TAC show TAN has not been cut off from anything. According to the TAC, TAN boasts "over 10,000 members in 31 chapters across the country," who "are collectively involved in approximately $165 billion in home sales each year—or around 11% of all homes sold in the United States." TAC, ECF 80, ¶ 77. At the April 15, 2021 hearing on Defendants' motion to dismiss TAN's SAC, counsel for TAN represented that TAN has "about 3,000 or 4,000" agents in the San Francisco area alone, ECF 77 at 17:10-11, and the TAC alleges that there are "over 3,000 Bay Area agents within TAN's network," TAC, ECF 80, ¶ 122. That is about as many members as SFAR has: "Over 4,000 real estate agents are members of the SFAR." *Id*. ¶ 46.

The TAC goes on to allege that, notwithstanding the implementation of the policy and a once-in-a-generation pandemic, TAN has maintained much of its membership since the policy took effect. For example, while the TAC carefully avoids discussing TAN's overall membership changes since the policy was implemented, it alleges that, in ten unidentified and likely cherry-

picked "NAR-dominated markets," TAN kept at least 70% of its membership during the past year. TAC, ECF 80, ¶ 115.  The TAC also alleges that TAN lost members in three other cities "not dominated by NAR-affiliated MLSs and the Policy," and that "[r]eal estate sales declined overall in 2020, likely an effect of the Covid-19 pandemic."  *Id*. ¶ 115 & n.14.  Thus, there is nothing in the TAC about any alleged change in TAN's nationwide or San Francisco membership since the policy was implemented eighteen months ago.  And there is nothing that addresses how much of TAN's alleged declines in the unidentified cities were pandemic-based, policy based, or based on something else (like agents not finding value in TAN's product).  Because it alleges that TAN has thousands of members, most of whom have maintained their memberships despite the policy and the pandemic, the TAC shows that TAN is not cut off.  TAN is still operating, even where NAR allegedly dominates, and even during a pandemic that is allegedly causing real estate sales to decline.  *See id*. ¶ 115 n.14 ("Real estate sales declined overall in 2020, likely an effect of the Covid-19 pandemic.").

The TAC also ignores that TAN's members are, as the Court observed, "top agents," who presumably could forgo the multiple listing service.  *See* ECF 77 at 11:24-12:6.  The TAC alleges that TAN's purported value comes from "the large[] . . . share of top agents in [its] membership." TAC, ECF 80, ¶ 80.  And while TAN deleted other references to its members, in the original Complaint and the FAC, TAN claimed its "membership is limited to the top ten-percent of agents in select regions throughout the country."  Compl., ECF 1, ¶ 6; FAC, ECF 48, ¶ 6.  According to the TAC, these top agents allegedly account for the bulk of real estate transactions.  *See* TAC, ECF 80, ¶ 35 ("Roughly 10% of licensed agents are responsible for 90% of home sales.").  This means that, even if TAN did not approach the size of a local multiple listing service, it presumably has a greater share of sales since its members are involved in most transactions.  By contrast, the TAC

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

alleges that Defendants have many inactive or retired members.  It alleges that "half of licensed agents . . . generate no sales," including "unskilled and retired agents who obtained their license with the hope of making some sales but have not been successful."  *Id.* ¶ 36.  "This group also," allegedly, "includes agents who do not actively practice real estate professionally—for instance, [agents who maintain licenses] to gain access to MLS data for research and analysis purposes." *Id.*

Moreover, the top agents, TAN's ostensible clientele, "frequently market on TAN alongside other marketing channels, such as direct contacts, email lists, and web or print advertising."  TAC, ECF 80, ¶ 120.  The TAC alleges these "skilled agents" have a "competitive advantage" because they are "capable of executing alternative marketing strategies."  *Id.* ¶ 97. And it further alleges, "[t]o market homes off-MLS, agents rely on alternative channels such as soliciting other agents within his or her contact network or brokerage, contacting past clients, or advertising the property on their own web site."  *Id.* ¶ 75.  That TAN allegedly has thousands of "top agents" in its network, with a built-in competitive advantage over the other agents who are not members of TAN, further shows that the policy does not cut off TAN from anything.

### 4.   Alleged Harm to TAN Alone Is Not Enough to State a Claim, Especially Since the Alleged Harm to TAN Is Not From the Policy

TAN's core theory is not really about the policy itself.  Its claims come back time and time again to its problem with the long-standing allowance of office exclusives, which, the TAC alleges, result in a transfer of business from TAN to brokers.  But to be clear, office exclusives are allowed with or without the policy.  So TAN's argument that it loses listings to office exclusives is not about the policy.  It is a claim that TAN has not brought against the separate NAR rules that allow office exclusives.  Indeed, at best, the TAC alleges that the policy shifts a small number of "Off-MLS" listings from TAN to office exclusives.  *See* TAC, ECF 80, ¶ 75 (alleging only "***the minority***

*of home sellers and buyers* . . . prefer to market and transact off-MLS" (emphasis added)); *id.*
("Few agents sustain their entire income on such sales."); *id.* ¶ 43 ("[I]t is rare for any real estate
agent to earn a living *exclusively* or even primarily from off-MLS sales," and "agents within TAN
earn the bulk of their income by representing clients for whom they market or list properties on
the local MLS.").

That is not enough to establish harm to competition, because harm to a single competitor
is not enough, standing alone, to establish antitrust injury. *See AFMS, LLC v. United Parcel Serv.
Co.*, No. 10-5830, 2011 WL 13128436, at *16 (C.D. Cal. Nov. 23, 2011) ("The only allegation
that any party has suffered concrete harm concerns AFMS's monetary losses; as noted, however,
injury to a single competitor does not suffice to support a Section 1 claim."). As the Court noted,
"although the opportunity to post and view exclusive listings may be part of how TAN convinces
agents to pay its subscription fee, TAN has not plausibly alleged that having a number of separate,
smaller listing services, each offering its own set of exclusive listings and commanding its own
subscription fee, would benefit the ultimate consumers in the market for homes." ECF 75 at 2-3.
Actions that merely shift sales between competitors, without raising prices or reducing output, do
not harm consumers. *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001);
*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. 14-5604, 2017 WL 5973279, at
*9 (C.D. Cal. Mar. 7, 2017) ("The fact that one competitor took the place of another competitor in
the relevant market does not, on its own, constitute harm to competition.").

### 5.    The TAC Fails to Show Harm to Competition

Nothing in the TAC shows that brokerage membership fees are higher as a result of the
policy. The policy became effective on January 1, 2020, *see* TAC, ECF 80, ¶ 95, but the TAC
fails to allege that any membership fees are higher or that there is even a correlation between the
price of membership fees and implementation of the policy. In fact, it is TAN that now seeks to

impose additional costs on brokers.  If TAN's business succeeds, and it continues offering an exclusive listing service for top agents only, it could force brokers to join both TAN and the multiple listing service or join TAN at a membership fee that is higher than what the multiple listing service charges.  Thus, the policy saves brokers money.

As for home buyers and sellers, the TAC ignores home buyers (who of course benefit from the policy) and then spins a series of complex theories about harm to home sellers that have nothing to do with the policy at issue.  *See* TAC, ECF 80, ¶¶ 116-39.  The TAC acknowledges, as it must, that the policy simply requires a "listing broker [to] submit [a] listing to the MLS for cooperation with other MLS participants," within one business day "of marketing [the] property to the public." *Id.* ¶¶ 10, 94.  Nothing in that policy requires home sellers to take any action.  It does not prevent marginal home sellers from testing the market, negotiating brokerage commissions, pricing their home as they see fit, using advertising in addition to (or instead of) the multiple listing service, selecting an agent that meets their needs, or choosing to improve their homes through renovation or staging (or not) before listing them for sale.  *See* TAC, ECF 80, ¶¶ 116-39.  Since none of the alleged harms to home sellers are caused by the policy, they are irrelevant to TAN's case.  TAN had to plead that the policy "actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  And it had to do so through "[f]actual allegations . . . [that] raise a right to relief above the speculative level." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  It has not done so.

* * *

While Defendants have focused on TAN's failure to address the problems identified by the Court in its April 27, 2021 Order, any one of which is sufficient to dismiss this case with prejudice, the TAC still has all the flaws identified by Defendants in their first three motions to dismiss.  That

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

includes TAN's state law claims, which fail as a matter of law.  The unfair competition claim should be dismissed because the TAC does not show the policy is "unlawful" under a state or federal antitrust law or that it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999); *see supra* §§ I-IV.  Nor is the vague and conclusory allegation that Defendants interfered with "[n]umerous membership contracts," TAC, ECF 80, ¶ 181, sufficient to state an intentional interference claim, *see Nexsales Corp. v. Salebuild, Inc.*, No. 11-3915, 2012 WL 216260, at *4 (N.D. Cal. Jan. 24, 2012).  The policy does not require agents to terminate their relationship with TAN, stop using TAN, or break their contracts with TAN.  Moreover, the new allegation in the TAC that "NAR and SFAR's adoption of the MLS Clear Cooperation Policy made performance of these contracts more difficult by threatening agents with steep financial and professional penalties for using TAN," TAC, ECF 80, ¶ 183, is contradicted elsewhere in the pleading.  As discussed above, TAN does not and cannot allege the policy bars brokers and agents from joining or using TAN.  *See id.* ¶¶ 10, 94.

## CONCLUSION

TAN has now amended its complaint three times, and it has been provided with ample opportunity to make its best effort to address the pleading defects repeatedly raised by Defendants. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (holding that a district court has "particularly broad" discretion to deny leave to amend when the plaintiff has previously amended).  It is apparent that TAN cannot allege a valid claim.  Defendants respectfully submit TAN's TAC should be dismissed with prejudice and without leave to amend.

DATED: June 1, 2021                    Respectfully submitted,

                                       QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


                                  By _/s/ Ethan Glass_____
                                       Ethan Glass (Bar No. 216159)
                                       William A. Burck (admitted *pro hac vice*)
                                       Michael D. Bonanno (admitted *pro hac vice*)
                                       1300 I St. NW, Suite 900
                                       Washington, District of Columbia 20005
                                       Telephone:      (202) 538-8000
                                       Facsimile:      (202) 538-8100

                                       *Attorneys for Defendants*
                                       *National Association of REALTORS® and*
                                       *San Francisco Association of REALTORS®*

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS