UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP AGENT NETWORK, INC., | Case No.  20-cv-03198-VC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE** |
| NATIONAL ASSOCIATION OF REALTORS, et al., | |
| Defendants. | Re: Dkt. No. 81 |

The National Association of Realtors ("NAR") and its local chapters operate listing services through which people can buy and sell homes. The listings can be accessed by any licensed real estate agent who pays the subscription fee. NAR has adopted a rule to prevent its subscribers from withholding available properties from the listing service—if you are marketing a property in any way, you need to include it on the local listing service so that all other agents can see it. If you don't, you will lose access to the listing service.

A relatively new company called Top Agent Network ("TAN") offers a competing listing service. But it only makes the service available to a small minority of agents—ones that the company has deemed "top agents." These TAN members are also subscribers to NAR's listing service. TAN wants its members to be able to list properties on its own service without also being required to list them on NAR's service. It has sued NAR, claiming that NAR's policy violates the antitrust laws.

The lawsuit is dismissed with prejudice. It may well be that NAR's policy has anticompetitive effects. But it is not anticompetitive to the extent that it prevents members of an

exclusive listing service like TAN from concealing listings from NAR's subscribers while simultaneously benefitting from access to NAR's service. Indeed, it is TAN's business model that would, if it succeeded, have anticompetitive effects on the real estate market. Thus, although the policy presumably causes real estate agents to be less interested in using TAN's service and becoming TAN members, this is not the type of harm that the antitrust laws are designed to prevent.

I

Unless otherwise noted, the facts described in this section come from the well-pled allegations in the complaint, materials incorporated by the complaint, or materials subject to judicial notice.

A

Selling a home requires finding the right match between an available home and a willing buyer. This involves a certain amount of cooperation: sellers' agents and buyers' agents need to be able to exchange information about what their clients are looking for in a given transaction. Since the 1800s, local realtors' associations have organized forums for this kind of information exchange. While the process has evolved with time and technology—from in-person meetings to online data platforms—the basic concept remains the same. Real estate agents representing home sellers publish information about homes available for sale, and agents representing home buyers search through that information to find homes that might suit their clients' needs.

Today, the vast majority of home sales occur on the local "multiple listing service" ("MLS") run under the purview of the National Association of Realtors. Founded in 1908, NAR is a trade association of licensed real estate agents that serves as a national umbrella organization for state and local chapters. Typically, the local chapter will run the MLS for that region. The MLS is essentially a subscription-based online database of properties listed for sale in a particular geographic region. Nearly all active licensed real estate agents in the country pay for access to the MLS in their region. They can either just pay a subscription fee or choose to join as a full-blown member—either way, they must also agree to abide by the rules and policies

2

imposed by NAR and its local chapters. Although there are "independent" or non-NAR affiliated listing services, any given geographic market is typically dominated by the MLS.[1] And in markets where the MLS dominates, around 90% of homes in that market will be sold on the MLS. It is therefore important for real estate agents to subscribe to their local MLS—it's how they are able to share listings with all the other agents in their market. As the complaint explains it, putting a home on the MLS "generally puts a listing before the most eyeballs the fastest." The San Francisco Association of Realtors, the second defendant in this case, operates the "SFARMLS" covering the San Francisco area.

While the local affiliates actually operate the MLS for their area, NAR promulgates rules and policies through a "Handbook" that all local chapters are required to enforce. Those rules control everything from the process for negotiating buyers' agents' commissions to how the MLS can share data with consumer-facing websites like Zillow, Trulia, and Redfin. Local chapters can, to some extent, also add their own rules. For example, a common requirement is that owners make listed properties available for showing to any subscribing buyers' agent. The thrust of many of the rules is that they create and maintain an open marketplace: once a sellers' agent posts a listing, it becomes publicly available to all subscribing agents (and, when listings are syndicated, anyone with a web browser), and any buyers' agent has an opportunity to pursue that home for their client.

**B**

Founded in 2010, Top Agent Network is a for-profit company that describes itself as a "private, member-only community open to the top ten percent of agents by sales volume." For those members, TAN offers a competing listing service. While the MLS is available to any licensed agent willing to pay the subscription fee, TAN's model is to attract an "elite" membership by promising an opportunity to deal exclusively with other highly productive

---

[1]Throughout this ruling, the term "MLS" will be used to refer to NAR-affiliated platforms, while independent platforms will be described as "alternative" or "private" listing services or just "listing services."

agents. TAN's current membership is approximately 10,000 agents (compared to 1.4 million NAR members), and those agents are involved in roughly $165 billion in home sales every year.

Specifically, TAN offers its member agents two avenues for engaging in home sales. The first is simply a service closely analogous to the NAR-affiliated MLS. For home sellers who want their home marketed to a fairly large pool of buyers without opening themselves to the completely public market of the MLS and without being required to follow NAR's various rules, listing on TAN might provide a more palatable alternative. In addition to having a significantly smaller and selective membership, TAN does not syndicate its listings data to consumer websites like Redfin.

Second, for sellers and buyers who want an even more private experience, TAN offers a "matchmaking" service. Through this service, a seller's agent can inform TAN that the agent has a client looking to sell a home in a given price range, while at the same time buyers' agents let TAN know what range their clients are looking in. TAN then pairs off the seller's agent with a buyer's agent looking in the right range, and the two agents can negotiate a potential sale directly. That means sales can be made without ever listing the home at all.

The reason some home sellers might prefer using services like TAN's rather than listing their home on the MLS is the same as the reason many want to use the MLS: the publicity. Homeowners who prefer not to broadcast the fact that they are selling or don't wish to publicize pictures of their home might prefer to engage a seller's agent who will go about finding a buyer more quietly. Generally speaking, this can be done by circulating the listing only to other agents within the same real estate agency or brokerage, or by the agent reaching out informally to buyers' agents in their personal network. Homes sold through these more private channels are referred to as "off-MLS sales." Essentially, TAN is offering a platform for a select group of agents to conduct off-MLS sales for their clients.

But not all of the $165 billion-worth of annual sales involving TAN's member agents occur on TAN's platform. In San Francisco and beyond, TAN's members also subscribe to their local NAR affiliate. As the complaint explains, the vast majority of home sellers still want their

homes to be listed on the MLS where it can be readily viewed by the largest possible pool of potential buyers. That makes it nearly impossible for any agent to earn a living without access to the MLS, and TAN's member agents are no exception. Indeed, the way an agent becomes a "top agent" who can qualify for TAN is through success on the MLS. TAN's members are people who have leveraged access to the information on the MLS to drive a high volume of sales. Rather than giving up that access, TAN agents continue to view and post most listings on the MLS while selectively placing some homes exclusively on TAN's platform—out of reach of the vast majority of agents.

## C

According to the complaint, NAR has long been wary of agents engaging in off-MLS sales. In 2015, the trade association commissioned a consulting firm to undertake a "threat assessment." This was the inception of "The D.A.N.G.E.R. Report: Definitive Analysis of Negative Game Changers Emerging in Real Estate." The Report zeroed in on a key feature of NAR's financial structure: the organization is almost entirely reliant on subscription fees and membership dues. To stay afloat, NAR needs to retain as many agents as it can by making sure its services are worth the annual fees. But that's difficult to do, because it turns out that the vast majority of licensed real estate agents are not terribly productive. The Report used a variety of unflattering terms to describe this mass of agents, ranging from "unproductive" to "technically unsophisticated" to "not so good." The upshot is that a disproportionately large segment of NAR's dues and fees come from agents who are not making more than a handful of sales per year, and who have difficulty coping with any new market innovations or technological developments. If those agents were prevented from making even the few sales that they currently make, they would likely drop their NAR subscriptions.

One major threat to those unproductive agents (and, in turn, to NAR) is the rise of off-MLS sales. To the "not so good" agents, off-MLS sales are a way for their competitors to unfairly hide listings from everyone on the MLS. And in fact, as more listings are kept off the MLS and placed on services like TANs, it becomes harder for less productive agents to catch the

occasional opportunity to close a deal. The reason NAR is able to attract and retain those agents is that the MLS offers them relatively simple "one-stop shopping"—all the information they need, available in one place. And because NAR needs their subscription fees to stay afloat, the threat that off-MLS sales pose to unproductive agents is also a threat to NAR.

In 2019, NAR took decisive action to limit the ability of subscribing agents (and so, effectively, all licensed agents) to engage in private, off-MLS transactions. The organization adopted a rule called the "MLS Clear Cooperation Policy" that essentially prohibits MLS subscribers from marketing listings anywhere else unless they also post the listing to their local MLS. In full, the Policy states: "Within 24 hours of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerages website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public." In other words, almost as soon as a home is listed for sale in any forum, it must be listed on the MLS too. If you want to benefit from the information available on the MLS, you can't withhold information from the MLS.

The Policy contains an exemption for agents discussing listings within their own firms. This means that agents employed by large brokerages are able to list properties on internal platforms, send firm-wide emails describing an available home, or discuss a property over coffee with a colleague without needing to post the listing on the MLS. These arrangements are known as "office exclusives." The complaint alleges that allowing office exclusives to continue under the Policy while forbidding other off-MLS listings unfairly benefits large brokerages, to the detriment of consumers. Any home seller who wishes to avoid a public listing on the MLS is left with no choice but to hire an agent at a brokerage. The problem is that sales within brokerages do not entail negotiations between financially independent actors. Agents from the same company— whose financial incentives are inherently linked—represent both the buyer and the seller. According to the complaint, this situation "robs consumers of the independent advice they expect

from an agent."

The Policy is enforced through local NAR affiliates, which were required to fully implement it by May 1, 2020. In San Francisco, SFAR took a fairly strict approach to implementation and enforcement. In March 2020, the local organization announced that any subscribing agent found to have violated the Policy would be subject to a $5,000 fine for the first offense and a $10,000 fine for a second offense. An agent caught violating the rule for a third time would owe a $15,000 fine and would also get kicked off the MLS. Additionally, SFAR interprets "public marketing" to include one-on-one communication about a listing between two agents. As the complaint puts it, "if an agent has coffee with another agent and mentions a property for sale," that property must be listed on the MLS within one business day. In short, MLS subscribers in the San Francisco area now face a fairly dramatic choice: cease negotiating off-MLS home sales entirely or lose access to the MLS.

For TAN, the fact that all of its members are also MLS subscribers means that every listing posted on TAN's exclusive service now must also be posted on the MLS. In San Francisco (and in any other area where the local NAR affiliate has interpreted the Policy to reach one-on-one conversations), the same is true even if a TAN member uses the company's matchmaking service and only discusses the home with one other agent.

TAN alleges that NAR's explicit purpose in instituting the Policy is to eliminate competition from TAN and other alternative listing services. The company points to NAR's statements in this litigation and in another case challenging the Policy that agents' use of competing listing services reduces the value of subscribing to an MLS, as well as public statements by various NAR-associated entities expressing expectations that the Policy would put TAN out of business. Moreover, TAN alleges that the Policy is achieving its aim. The company reports that over the last year, membership in its various local chapters has dropped by an average of more than 20%, and some chapters have seen membership cut nearly in half. While some of this loss is likely attributable to the overall drop in real estate sales during the Covid-19 pandemic, TAN states that in three markets that are not dominated by a NAR-affiliated MLS,

membership has only declined by an average of about 11%. In short, TAN alleges that the Policy is stifling competition by cutting off the ability of other platforms to recruit and retain member agents, which in turn harms people who wish to sell their homes off-MLS.

## II

TAN claims that the Policy constitutes a violation of the Sherman Antitrust Act's prohibition on agreements creating unreasonable restraints of trade. 15 U.S.C. § 1. Specifically, the complaint frames the Policy as a "group boycott," meaning an agreement among competitors to cut off certain businesses from the supplies needed to compete in the market. *Northwest Wholesale Stationers v. Pacific Stationary and Printing Co.*, 472 U.S. 284, 290 (1985). As described above, TAN alleges that the Policy constitutes an agreement among NAR member agents not to compete with each other through off-MLS marketing, thereby cutting off TAN and other private listings services from the supply of agent memberships.

## A

Although the Sherman Act itself does not include a private right of action, competitors are sometimes permitted to bring suit if they can allege that the defendant's activities in violation of the antitrust laws have caused them harm. 15 U.S.C. § 15. But not just any harm will do. In addition to alleging an actual injury to support Article III standing, the Supreme Court has also required plaintiffs like TAN seeking to bring antitrust claims against their competitors to specifically plead "antitrust injury." The canonical rule is that an antitrust injury must be an injury that flows from the anticompetitive aspect of the defendant's activity. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). The theory is that a company should only be able to invoke the antitrust laws to recoup its own losses when those losses result from harm done to competition in the market, "since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Id.* (internal quotations omitted). If a company harms a competitor, the competitor must explain why the company's actions ultimately result in higher prices, lower quality, or reduced choice, and how the competitor's harms can be traced to the same aspects of the company's activity.

*Atlantic Richfield* involved an agreement between a large gasoline seller called ARCO and its retailers not to sell the company's gasoline for more than a maximum price, intended to out-price independent gas stations like the plaintiff USA Petroleum. The complaint alleged that the agreement had caused USA Petroleum and other independents to lose sales, while retailers selling ARCO gas saw an increase in sales. But the Supreme Court explained that this kind of shift in sales was not one of the reasons that such vertical maximum-price fixing arrangements are deemed illegal. The kinds of harm to competition that arise from such agreements largely have to do with the ways they restrain the retailors who are part of the agreement from competing with each other: the artificially low price might prevent such retailors from recouping their operating costs, cause them to stop engaging in non-price competition by offering perks or services consumers find valuable, and ultimately result in what is effectively a minimum-price fixing scheme as none of the retailors are willing or able to charge less than the maximum agreed price. *Id*. at 335.  In short, reduction in competition among those retailers ultimately reduces consumer choice. But USA Petroleum had alleged that the agreement allowed retailors who joined the agreement to *increase* their sales and improve their viability—the opposite of the anticompetitive effects antitrust law is concerned with. As a result, although USA Petroleum's lost sales constituted a real injury, they did not count as an antitrust injury because they did not result from "the aspects of vertical, maximum price fixing that render it illegal." *Id*. at 337.

One helpful rule is that an injury can never be an antitrust injury if it flows from an aspect of the defendant's activity that actually benefits competition. *Pool Water Products v. Olin Corporation*, 258 F.3d 1024, 1034 (9th Cir. 2001) (citing *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995)). The *Pool Water Products* case involved two companies that manufactured certain chemicals used to sanitize swimming pools. Among several allegedly anticompetitive activities, the Olin Corporation had purchased another chemical manufacturer that also packaged and distributed the sanitizers, thereby integrating its activities across multiple levels of the supply chain. Pool Water Products alleged that the integration allowed Olin to reduce its prices and increase its own market share as competitors were unable to match the price drop. The goal, Pool

Water Products alleged, was to drive all the competition out of the market and then start charging monopoly prices. But Olin had not actually begun charging high prices, and low prices are not necessarily anticompetitive—in fact, lower prices are usually better for consumers. *Id.* at 1035. Because the plaintiff had not alleged that the low prices were predatory (i.e. that Olin was charging consumers less for its products than it was spending to produce and distribute them), they could not allege an antitrust injury. The fact that Pool Water Products and other competitors lost market share while Olin gained market share did not mean that the level of competition in the market for pool sanitizers had been harmed; it actually showed that consumers had benefited. Thus, Pool Water Products did not have antitrust injury.

Antitrust injury is a threshold issue, meaning that if a plaintiff cannot allege an antitrust injury, the suit cannot proceed no matter how egregious the defendant's alleged antitrust violation may be. On a motion to dismiss, the normal pleading rules apply. The Court must take all allegations plausibly pled in the complaint as true and draw all inferences in favor of the plaintiff. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555-56 (2007). In short, the inquiry at this stage is whether the complaint alleges facts giving rise to a plausible inference that the plaintiff has suffered some injury that flows from the anticompetitive effects of the defendants' allegedly illegal activities.

**B**

The complaint lays out a reasonable argument that the Policy is so broad that its overall effect on the market for homes is anticompetitive. The Policy leverages NAR's control of the real estate market to coerce most agents into giving up their off-MLS activities entirely, without regard to the competitive value of those activities. The complaint alleges with particularity that there is demand among consumers—that is, home buyers and sellers—for options to engage agents who can help them buy or sell a home without going through the MLS. And the complaint plausibly alleges that the Policy, by forcing those consumers to choose between the MLS and a problematic in-house transaction at a large brokerage, reduces consumer choice and stymies competition among agents for off-MLS sales. While not as clear-cut as concerns about super-

competitive pricing, these kinds of harms are also the concern of antitrust law. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986); *Regional Multiple Listing Service of Minnesota, Inc. v. American Home Realty Network, Inc.*, 960 F. Supp. 2d 958, 985 (D. Minn. 2013)). To the extent that other alternative listing services (particularly ones that allow any licensed agent to join or subscribe) might plausibly be unable to stay afloat under the Policy, it would seem to be harming competition. All of that could conceivably be enough to plead a Sherman Act Section 1 claim. *But see ThePLS.com, LLC v. The National Association of Realtors*, 2021 WL 369545, at *8 (C.D. Cal. Feb. 3, 2021) (appeal pending) (finding that another private listing service had not alleged a plausible injury to consumers).

But even assuming for the purposes of this motion that the Policy constitutes an antitrust violation, TAN has failed to state antitrust injury because its alleged harm—the loss of agent members—does not flow from effects of the Policy that are harmful to competition. Moreover, taking the allegations in the complaint as true, TAN could never allege an antitrust injury from the Policy, because TAN's business model is itself anticompetitive in a way that the Policy would tend to remedy.

What TAN's complaint fails to reckon with is that listings are just information, and competitive marketplaces generally thrive on open information. Indeed, the point of the MLS is that such platforms are necessary for facilitating home sales. Sellers need to be able to list their homes in a manner that allows buyers to compare listings and identify potential matches. And keeping that platform running and operational requires setting rules that ensure fair play among members. *See Northwest Wholesale Stationers*, 472 U.S. at 296; *Freeman v. San Diego Association of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) (citing *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980)). The key procompetitive benefit of this system is that every NAR-affiliated MLS is open to any licensed real estate agent who is willing to pay the fees.

One could certainly imagine a competing listing service that was nevertheless equally open to all licensed agents. That NAR exercises control over the operating rules of the market for

home sales in most major markets across the country is not, in and of itself, good for competition. The presence and viability of other listings services that wanted to compete by offering different rules regarding showings or commissions would likely be valuable to consumers. It thus seems likely that any competitor seeking to operate a non-exclusive listing service (that is, a service that offers subscriptions to any agent willing to pay) would have standing to bring an antitrust claim if it plausibly alleged that the Policy was causing it to lose members. In that sense, it is the breadth of the Policy—sweeping in open-network competitors as well as exclusive ones—that raises an antitrust concern.

But to the extent the Policy prevents an exclusive network like TAN from operating the way it seeks to operate, it is not harmful to competition, even assuming the truth of the complaint's well-pled allegations. TAN describes itself as an exclusive listing service for elite real estate agents—a service that intentionally screens out everyone else. The only reasonable inference to be drawn from that description is that when a seller's agent lists a home on TAN without listing it on the local MLS, competition for that home is decreased. Only buyers who have enlisted the services of a TAN member agent are able to view the listing and bid for it. At the same time, the allegation that all TAN agents are also NAR members means that those agents and their clients are benefitting from open access to the listings on the MLS. Sellers' agents can gather information on how to position their homes competitively against comparable properties and buyers' agents can seek listings for their clients both in the open pool and on the exclusive network. But the vast majority of agents (those who are NAR members but not TAN members) have no way of knowing what listings the TAN agents are keeping secluded from the open market.

TAN seems unwilling to recognize the reality of how its "elite" members earned their status as "top agents" in the first place. If, as alleged, every single one of them has been and still is a NAR subscriber, then each has climbed their way to the top by dint of their access to an MLS. Now, these agents want to pull the ladder up behind them. TAN's platform would (absent the Policy) allow these agents to use the elite status they gained as a result of NAR's open-access

rules to diminish the opportunity of others who seek to achieve similar status through use of the MLS going forward. Instead of continuing to share listings with the open network of agents that supported their ascent, they would prefer to hoard choice listings among themselves. Antitrust law does not give them that right. *See Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1030-31 (9th Cir. 1988).

Thus, the Policy has some pro-competitive applications, even if its breadth may render it problematic overall from an antitrust standpoint. Agents are free to be members of TAN (or other exclusive listing services) and to post listings on that platform, but they are not permitted to sequester listings away from the open MLS unless they are willing to forgo access to the MLS themselves. The most plausible inference is that the overall effect of the Policy, at least to the extent it applies to agents who wish to join exclusive listing services, is to increase competition. For homes listed by sellers' agents who are TAN members, the Policy ensures that buyers represented by both TAN and non-TAN agents are able to view their listings. And better information is available to the market, as agents are equally able to compare price and quality across all listings and use that information to create listings and negotiate sales.

The allegation that TAN is suffering a loss of membership due to the Policy comes as no surprise. But, in the language of the case law, TAN's injury flows from an aspect of the Policy that is not anti-competitive. *Pool Water Products*, 258 F.3d at 1034. The complaint itself confesses that TAN's members "generally advertise off-MLS for the purpose of avoiding the MLS," a tactic that is "render[ed] moot" by the Policy. And TAN recognizes that its members cannot simply give up their NAR memberships, because access to an MLS remains essential to being a successful player in the market for homes. In other words, TAN is losing members because agents recognize that the company's core value proposition is its offer of exclusivity. Thus, in contrast to an open-network service, TAN's injury is flowing from the aspect of the Policy that keeps listings available to a much larger audience of agents and their clients. In that context, the relatively small competitive harm represented by the loss of consumers' ability to choose TAN rather than the MLS pales in comparison to the procompetitive benefits of open

information.

Indeed, the competitive harms alleged by TAN would largely be alleviated if the Policy merely applied to exclusive listing services. TAN complains that people wishing to sell their homes off-MLS are forced to use large brokerage firms, but that harm would be alleviated if a competing non-exclusive listing service could offer a matchmaking function akin to TAN's. TAN complains that some people wishing to sell their homes want a degree of privacy the MLS can't give them, but again, a non-exclusive listing service offering a matchmaking function would give them that. TAN complains that other rules governing the operation of and participation in the MLS are unattractive to home buyers and sellers, but a competing listing service open to all subscribers would alleviate that harm. A narrower policy would thus alleviate the competitive harms that TAN complains about, while still preventing exclusive services like TAN from harming competition in a different way.

Ultimately, when the allegations in the complaint show that the plaintiff's desired business model is harmful to competition, injury resulting from the aspect of a competitor's practice that interferes with that business model cannot be antitrust injury. TAN is not the first plaintiff to attempt to allege an antitrust injury by stating that a competitor's practice is preventing it from reaping the benefits of anticompetitive activity. *See Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 438-39 (2d Cir. 2005) ("In short, [plaintiffs'] theory of injury is not simply that ABEM-certified doctors command super-competitive remuneration; their injury is the inability to do likewise.").[2] But one of the virtues of the antitrust standing analysis is that it prevents such a plaintiff from deploying antitrust law as a shield for its own anticompetitive activities. Accordingly, TAN's Sherman Act claim must be dismissed with

---

[2] When asked to identify cases supporting its theory of antitrust standing, TAN flagged Judge Katzmann's partial dissent in *Daniel*. But even accepting Judge Katzmann's view of that case, it does not change the analysis here. In *Daniel*, allowing more doctors to join the contested certification program would have incrementally benefited competition insofar as it would have increased the supply of certified doctors available to consumers. *Id*. at 446. But in this case, there is no marginal benefit to competition in allowing TAN to operate, because it has designed its platform to exclude the vast majority of competing agents.

prejudice.

<h2 style="text-align:center">C</h2>

Because TAN lacks antitrust injury, its three claims under California state laws also fail. A plaintiff bringing claims under the Cartwright Act must meet the same antitrust injury requirement as under the Sherman Act. *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723-24 (1982). And TAN has not stated a claim for intentional interference with contractual relations under California common law, because TAN does not allege that NAR induced TAN's members to breach their existing contracts—only that they chose not to renew their memberships. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142 (2020). Finally, because TAN has not stated a claim for violation of any other law, its subsidiary claim for unlawful acts under the Unfair Competition Law also fails.

<h2 style="text-align:center">III</h2>

The motion to dismiss is granted, and the complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: August 16, 2021

VINCE CHHABRIA
United States District Judge