LEWIS & LLEWELLYN LLP
Paul T. Llewellyn (Bar No. 216887)
pllewellyn@lewisllewellyn.com
Tobias Snyder (Bar No. 289095)
tsnyder@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590

Attorneys for Plaintiff
TOP AGENT NETWORK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOP AGENT NETWORK, INC. | CASE NO. 3:20-cv-03198-VC |
| Plaintiff, | **PLAINTIFF'S FOURTH AMENDED COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF SHERMAN ANTITRUST ACT SECTION 1** |
| NATIONAL ASSOCIATION OF REALTORS, | **(2) VIOLATION OF CARTWRIGHT ACT** |
| Defendant. | **(3) UNFAIR COMPETITION UNDER BUSINESS AND PROFESSIONS CODE SECTION 17200** |
| | **(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | **<u>DEMAND FOR JURY TRIAL</u>** |

## INTRODUCTION

1.      This action seeks to stop the National Association of Realtors ("NAR") and its affiliates from conspiring to shut down competition, disrupt the relationship between real estate agents and their clients, and take away a family's freedom to choose how to market their home for sale.

2.      The NAR is the largest trade association in the United States.  NAR's membership is composed of real estate professionals, primarily real estate agents and brokers. NAR's national organization charters thousands of local and state-level real estate associations throughout the country.  In almost all cases, the largest association of real estate professionals in a given market is an NAR affiliate.

3.      The primary benefit of membership in NAR and its affiliates is access to the local multiple-listing service, or MLS.  A market's MLSs are almost always controlled by a local real estate association.  With rare exception, every real estate market in the country is dominated by a single MLS or a consortium of cooperating MLSs.  Typically, the dominant MLS or MLSs in a given market will host listings for around 90% of homes sold in that market.  Typically, the dominant MLS or MLSs in a given market are owned and controlled by an NAR affiliate.

4.      Because such a high percentage of a local market's home sales are arranged through listings on the local MLS, a subscription to the local MLS is a practical necessity to meaningfully practice as a real estate agent.  In any given market, virtually all consumer-facing real estate agents will be members of the local dominant MLS.  This is true as well where an NAR affiliate controls the dominant local MLS, and in practice almost all active, consumer-facing real estate agents are NAR members.  Because these MLSs are generally controlled by associations of local brokers, the centrality of the MLS gives these brokers the ability to

manipulate the market in which they compete through the use of MLS membership or listing rules.

5.      While most home sellers prefer to market through the MLS—which generally puts a listing before the most eyeballs the fastest—at any given time a significant percentage of consumers prefer not to do so.  There are several reasons why sellers make the informed choice to avoid the MLS.  Many consumers wish to preserve their privacy and do not want to host viewings or have their property widely available for viewing on a listing website.  Other consumers engage in limited off-MLS marketing to "test the waters" to determine the appropriate price for their home listing on the local MLS—MLSs retain listing data and overpricing a home on the MLS and failing to achieve a quick sale can lead to a lasting drop in the property's value.  Sellers may also wish to avoid costs such as repairing and staging that are necessary to preserve the home's sale value on the MLS.  Others simply wish to avoid the hassle of the typical on-MLS sale.

6.      Most home sales are closed by a minority of agents—each year, around ten percent of agents are responsible for 90% of home sales.  Many more people believe they can succeed as a real estate agent than actually can—according to NAR, about 87% of new agents will leave the industry within the first five years.

7.      This means that NAR's membership is largely comprised of less-successful agents, many of whom are on the fringe of the industry or may soon to drop out.  However, as NAR has admitted in published reports, NAR's income depends upon its ability to maintain these low- and non-producing agents as dues-paying subscribers. In practice, this means that NAR has a strong incentive to keep these unproductive members in the industry and paying dues, rather than responding to the interests of either productive agents or consumers.

8.     Beginning in the early 2010s, NAR began raising concerns regarding the use of off-MLS listings to market homes, including through services such as Plaintiff Top Agent Network, Inc. ("TAN").  TAN functions as a private MLS, limiting its membership to the top ten percent of agents responsible for most residential real estate transactions by sales volume. Experienced and successful agents use TAN as part of their marketing for clients who do not wish to sell through the MLS, or for whom the optimal sales strategy includes some off-MLS marketing or networking.

9.     The less experienced and/or less skilled agents within NAR's membership dislike the competition they face from more successful agents who are able to use their skill and experience to market properties effectively through alternative means.  NAR is aware that, if these agents grow frustrated, they may leave the industry and cease paying membership dues.

10.     NAR thus promulgated a new mandatory policy, the Clear Cooperation Policy (the "Policy") that NAR affiliates must incorporate into the bylaws governing the MLSs under their control. The Policy requires that any property an agent markets in any way outside of his or her own brokerage off-MLS—either on TAN, similar platforms, or through informal marketing—must be listed on the local MLS within one business day thereafter.

11.     This Policy is intended to reduce competition in the market for broker services by preventing agents from using marketing strategies outside the standard MLS listing.  This reduction is accomplished by coercing agents and their selling clients away from the use of services like TAN's or engaging in other off-MLS marketing.  The primary reason agents use TAN and similar services is to represent sellers who do not wish to list their property on the MLS (or on behalf of buyers seeking to be counterparties to such sellers).  If anything listed on TAN must almost immediately be listed on the local MLS, consumers cannot use TAN and

similar services for this purpose. NAR officials have discussed openly that the Policy will eliminate TAN specifically as a competitor.

12. NAR claims that the Policy is pro-consumer because it will ensure homes are placed on the MLS where they will be exposed to more counterparties. However, this assertion is undercut by the fact that NAR created a carveout to the Policy that allows agents to market properties off-MLS as "office exclusives"—i.e., pocket listings held exclusively within a single brokerage—without having to subsequently list the property on the MLS. NAR has attempted no explanation—including in this litigation—for how the "broker exclusive" form of "pocket listing," protected by the Policy, is any less dangerous than the off-MLS listings the Policy is purportedly meant to reduce.

13. The reality is that NAR knows that off-MLS marketing and sales is an inherent part of the market that will never disappear, and that many sellers seeking to avoid the MLS will simply not sell their homes rather than be forced into an on-MLS sale. The "broker exclusive" carveout allows these sales to continue as pocket listings, with buyer and seller represented by the same brokerage. Note that such brokerages typically require their agents subscribe to NAR and the local MLS.

14. The Policy began being enforced on May 1, 2020. Far from leading to more exposure for home listings, the Policy's "office exclusive" exception has resulted in significantly *less* exposure and more fragmentation. While TAN's membership and listings have declined substantially as a result of the boycott, these listings have not gone to the MLS. Instead, there has been a large increase in the share of "broker exclusives." The large brokerages clearly recognize this as the windfall it is, and now loudly advertise their "exclusive" listings.

15.    Real estate agents who are not members of a large brokerage will be unable to properly serve customers seeking to market off-MLS, as they lack a sufficient number of colleagues to whom they can market the property.  This means, in turn, that a consumer wishing to market off-MLS will be forced to turn to an agent employed at a large brokerage, rather than the agent or brokerage of their choice.  (NAR's overwhelming membership among active agents means that in major real estate markets, it is virtually impossible to locate a skilled agent who is not subject to NAR's rules or the Policy.)  Similarly, a buyer seeking to purchase off-MLS properties will be forced to retain an agent at a large brokerage.  These will be the only agents to have access to a substantial number of off-MLS listings.  This guarantees that off-MLS listings will be siloed off into individual brokerages and cannot be marketed on parallel tracks.  At every level, consumers and agents will see their available choices reduced, both in the properties they are exposed to and the scope of available agents and clients.

16.    The removal of marketing alternatives has also lowered housing supply.  At any given time there exists a large number of home owners with no strong intention to sell their homes, but who might do so given the right combination of sale price and convenience.  Sales on the MLS are often described as a fast-moving circus, a situation many homeowners are happy to avoid.  Off-MLS marketing provides for alternative strategies, such as leaving a home on the market for extended periods of time, to see if a willing buyer at the right price happens to come along.  In this manner, off-MLS marketing can "loosen up" inventory by allowing tentative home sellers to enter the market at their own pace.  By restricting alternatives marketing the Policy works to tighten inventory, raising prices.

17.    Quality has also been reduced, as off-MLS sales become "office exclusives," which by definition involve self-interested brokerages representing both sides of the transaction.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

Consumers who do not wish to market on the MLS will have no choice but to hire an agent with an inherent conflict of interest.

18.    Finally, while the Policy has not encouraged greater use of the MLS, if that were to occur prices and other costs to the consumer would increase.  Homes sold on the MLS typically involve greater upfront investment by the seller (e.g., from maintenance and repairs), and concomitantly higher prices.  Because there are consumers on both sides of the transaction, higher prices confer no consumer benefit; instead, it increases the amount of money paid by consumers to the real estate professionals and other service providers handling the sale and transaction.

19.    The Policy, in other words, is anticompetitive and has no plausible pro-consumer benefits.  It therefore violates the Sherman Act and California state law and should be enjoined.

## THE PARTIES

20.    Plaintiff TAN is a California corporation with its principal place of business in San Francisco, California.

21.    Defendant NAR is a nongovernmental trade association organized under the laws of Illinois with its principal place of business in Chicago, Illinois.  The NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state.  It has approximately 200,000 members in California, derives revenue from California, and holds meetings in California.  For example, in November 2019, the annual NAR conference took place in California.  It also directs its California-based members to follow rules it promulgates.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.     This Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also proper in this District pursuant to 15 U.S.C. § 22 because all Defendants are found in this District and transact business herein.

25.     As described in more detail herein, the Court has personal jurisdiction over NAR both because of its substantial contacts with California, its specific contacts with the state give rise to this action, and pursuant to 15 U.S.C. § 22 because of its nationwide sufficient minimum contacts.

## INTERSTATE COMMERCE

26.     The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

## FACTUAL BACKGROUND

I.    **THE RESIDENTIAL REAL ESTATE MARKET, BROKER SERVICES, AND PROPERTY LISTING SERVICES.**

A.    **The Markets for Residential Real Estate and Broker Services.**

27.    There are 122 million households in the United States.  Approximately 65.8% of these households are owner-occupied, meaning the residents of the household own the property they reside in.[1]

28.    While a minority of homeowners acquire newly constructed properties, most residential properties are acquired directly from other owner-occupiers.  According to NAR, in 2019 there were approximately 5.34 million existing-home sales in the United States, alongside roughly 682,000 sales of newly constructed homes.  This means that not only demand, but also most supply of for-sale homes comes from consumers.

29.    For the vast majority of homeowners, the acquisition or sale of a primary residence will be one of the largest financial transactions of their lifetimes, and a process they will only repeat a handful of times at most.  For this reason, most consumers retain an agent to provide advice and representation throughout the home sale process.  According to NAR, roughly 90% of home buyers and sellers hire a professional real estate agent.

30.    Professional real estate agents provide a variety of services to buyers and sellers. While a small number of agents specialize in representing buyers or sellers, most residential real estate agents represent clients on either side of the transaction.  For sellers, an agent will

---

[1] In addition, according to surveys by the U.S. Department of Housing and Urban Development roughly 41% of rental properties are owned by individuals, who typically hold between one to four rental properties.  These small-scale landlords typically engage with the residential real estate market alongside owner-occupiers, rather than transacting with large commercial landlords.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

typically assist in, among other things, establishing an asking price; preparing the home for viewing and sale; assembling documentation and marketing materials; marketing the home to potential buyers or their agents; acquiring ancillary services such as photography and staging; engaging in negotiation on price and conditions; and completing the home sale transaction through the completed escrow process. For buyers, an agent will assist in tasks such as market research; locating available properties; negotiating prices and conditions; reviewing property information and disclosures; and completing the sale and escrow process.

31.    In exchange for providing these broker services, real estate agents—on both the buyer and seller side—are almost always compensated by receiving a commission from any home sales negotiated successfully to close, calculated as a fixed percentage of the ultimate sale price. Under the industry standard process, the title company engaged by the seller will take 5%-6% of the sale amount held in escrow, split it evenly, and provide this amount to the brokerages to which the buyer's and seller's agents belong. The brokerages then pay the agreed portion of these commissions to the agents involved in the sale.

32.    Because real estate agents earn their income through commissions, the overriding financial incentive for real estate agents is to generate high sales volume. An agent representing a seller is financially incentivized to earn that seller the highest price possible, as quickly as possible. An agent representing a buyer will also seek to consummate a sale as quickly as possible. The buyer's agent is also financially incentivized to obtain a higher commission from the transaction.

33.    Both the residential home sale market and the market for broker services are fundamentally local in nature, though industry standards and practices are similar nationwide. As NAR has put it, "the U.S. real estate industry is a collection of many local real estate

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

markets." Real estate, of course, is fixed to a particular location and immobile. Buyers of residential real estate almost always first choose the geographic area in which they want to live—based on criteria such as proximity to a job or personal ties—and then narrow their search to properties within these areas. Residential real estate agents also generally represent buyers and sellers within a specific geographic region. Many regional real estate markets are anchored around a major metropolitan area.

34.     Real estate agents generally must be licensed by the state, which provides a rough starting point for calculating the number of real estate agents operating in each state and nationwide. However, as a practical matter the number of active and productive real estate agents working in a given area is far less than the total number of licensed agents. Roughly 10% of licensed agents are responsible for 90% of home sales. These individuals comprise the group that most consumers think of as true "real estate agents"—i.e., the consumer-facing professionals that an individual homebuyer or seller might encounter during a search for representation in a residential home transaction.

35.     As for the remaining licensed agents, roughly 50% do not sell a single home in a given year. Some of these agents are new to the industry, and will eventually become producing agents, but most are individuals who obtained their license but were unsuccessful and rarely if ever actively practice. Like many commission-dependent sales jobs, relatively few people are able to generate sufficient sales to sustain a career—according to a 2014 NAR study, 87% of real estate agents quit the business by the fifth year. The half of licensed agents who generate no sales includes unskilled and retired agents who obtained their license with the hope of making some sales but have not been successful. This group also includes agents who do not actively practice real estate professionally—for instance, to gain access to MLS data for research and

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

analysis purposes.  The remaining 40% of agents are those who engage in the practice of real

estate but are generally not as well-known or experienced, involved in at most a handful of

transactions each year.  Such individuals might, for instance, work on behalf of a single large

institutional client such as a family office or property developer, or use their license sporadically

to help personal acquaintances with property transactions.

36.     Most real estate agents operate in small brokerages.  According to NAR, as of

2019 roughly 78% of real estate firms had a single office, typically with two full-time licensees.

According to NAR, the typical brokerage receives 55% of its business from prior clients or

referrals from prior clients.

### B.    Multiple Listing Services.

37.     The precursors to the modern multiple listing service arose in the 1800s, when

members of local real estate broker associations began scheduling meetings to exchange

information regarding properties they wished to sell.  Over time, these local associations

formalized the exchange of available property information and incorporated new

communications technologies as they arose.  These exchanges evolved into the modern MLS:

subscription-based databases of properties listed for sale in a particular geographical region, by

one or more local real estate associations.

38.     These regional MLSs have consolidated over time.  In almost all markets, home

sales are currently dominated by either a single MLS, or a group of MLSs that have entered into

mutual information-sharing agreements allowing access to listings across platforms.  Atlanta,

Georgia is the only major metropolitan area in the United States in which there are independent,

competing MLSs of significant size.  In all other major markets in the United States, a single

dominant MLS or cross-sharing MLS network hosts virtually all property listings in the area.

39.     According to NAR, in a typical year roughly 90% of homes sales are on-MLS sales listed on the local MLS.  On information and belief, and consistent with the general understanding in the industry, a similar share of home sales originate on the local MLS in each of the regional markets in which TAN operates, though precise data is not readily available.[2]

40.     MLSs earn their primary income through subscription fees paid by real estate agents to access the service.  MLSs earn additional revenue by syndicating property listings, including to heavily trafficked, consumer-facing websites such as Zillow, Trulia, and Redfin.

41.     Because such a high percentage of a market's home sales originate through the MLS, access to the local MLS is an absolute necessity for any consumer-facing real estate agent. It is well understood within the real estate industry that an agent must join the local MLS to meaningfully practice the profession.  An agent that lacks access to the dominant local MLS will be unable to review the area's available housing inventory on behalf of buyers[3] and will be limited in his or her ability to market properties effectively on behalf of sellers.  As the California Supreme Court commented in a 1976 decision, "one does not need an advanced degree in economics to predict whose services a buyer or seller of a home is likely to engage," if choosing between an agent with access to the dominant local MLS and one without.[4]  More recently, a 2007 joint report by the United States Department of Justice and Federal Trade

---

[2] The precise percentage of for-sale homes in each regional market that are listed on a particular MLS is not available prior to discovery.  While NAR publishes periodic reports containing nationwide statistics, there is little public data on listing volume for specific MLSs. Further, real estate markets generally span across county and occasionally state boundaries, meaning the total number of homes sold in each market is not easily available and must be compiled from local property records from multiple jurisdictions.

[3] The information that MLSs syndicate to consumer-facing websites is less complete than the information available to MLS subscribers.

[4] *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 936, 549 P.2d 833, 842 (1976).

Commission regarding competition in the real estate industry (the "Report") commented that "MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[5]

42.    Indeed, the universal experience of professional real estate agents is that *every* active, producing agent is a member of the local MLS.  One hundred percent of TAN's members are also members of their local MLS—without exception—and on information and belief every agent who is likely to be interested in TAN's services is a member of his or her local MLS. Further, it is rare for any real estate agent to earn a living *exclusively* or even primarily from off-MLS sales—TAN is not aware of any agent subscribed to its network who does so—and on information belief all agents within TAN earn the bulk of their income by representing clients for whom they market or list properties on the local MLS.

43.    Because membership in the dominant local MLS is a professional necessity for practicing real estate agents, each MLS is capable of exerting substantial influence over the practice of real estate in the surrounding market, for instance by imposing conduct requirements for membership or discriminating between listings.  As the FTC Report cited above noted, because MLSs are controlled by the local real estate associations "brokers usually set the rules for each others' participation in the MLS by agreement," and thus "it is possible for one dominant group of brokers to establish MLS rules that favor them and disfavor other brokers who compete in a manner that they dislike."  For example, in 2006 the FTC charged multiple MLSs that had disadvantaged MLS listings based on the terms of the listings agent's contract

---

[5] "Competition in the Real Estate Industry: A Report by the Federal Trade Commission and U.S.," April 2007.

with his or her client, in order to discourage the spread of lower-fee agreements that were considered less desirable by the brokers in control of the MLS.[6]

### C.    NAR and its affiliates.

44.    Founded in 1908, the National Association of Realtors is a North American trade association for professionals in the residential and commercial real estate industries.  NAR has grown to control the primary real estate association in every state and virtually every significant market in the United States, as well as nationwide.  NAR is currently America's largest trade association, representing approximately 1.4 million members.

45.    NAR has a nested, hierarchical structure.  In addition to its own realtor membership, NAR acts as an umbrella organization for a chartered network of competing realtor associations, including 54 at the state level, and over 1200 local associations.  For instance, NAR is represented in this District by defendant San Francisco Association of REALTORS® ("SFAR") and the California Association of REALTORS®.[7]  On information and belief, NAR has approximately 200,000 members in California and, through its membership dues and fees described below, collects substantial revenues and fees from its members located in this District.  Over 4,000 real estate agents are members of the SFAR.

46.    NAR's charter agreements with affiliates obligate the affiliate groups to follow mandatory directives and guidelines promulgated by the national umbrella organization.  Failure

---

[6] Austin Bd. of Realtors, FTC Dkt. No. C-4167; Information and Real Estate Services, LLC, FTC File No. 061-0087; Northern New England Real Estate Network, Inc., FTC File No. 051-0065; Williamsburg Area Ass'n of Realtors, Inc., FTC File No. 061-0268; Realtors Ass'n of Northeast Wisconsin, Inc., FTC File No. 061-0267; Monmouth County Ass'n of Realtors, Inc., FTC File No. 051-0217.

[7] The term "realtors," styled REALTORS® by NAR, is a licensed trademark owned by the association for use by its professional membership.  Typically, NAR's state and local affiliates incorporate the term "REALTORS" into their name.

to do so would lead to the affiliate losing NAR's indemnification protections and legal defense assistance. NAR's members are typically enrolled in NAR's national, state and local organizations in tandem. For example, a Bay Area real estate agent who seeks to join the SFAR, a local NAR affiliate, must also become a member of both the California Association of REALTORS® and the NAR, paying dues to, and agreeing to abide by the membership rules of, the local, state, and national organizations. Agents have no opt-out rights; if they wish to be a member of NAR or its affiliate groups and MLSs, they must pay dues and abide by the associations' rules.

47. While it is difficult to identify the exact share of active, consumer-facing real estate agents who are NAR members, the common understanding of professionals in the industry is that NAR's penetration among active, productive agents nears 100%. NAR estimates that there are roughly 2 million active real estate licenses in the United States, against 1.4 million NAR members. While not all NAR members are real estate agents, given the relatively low share of licensed agents who actively and productively practice, NAR's figures are consistent with the common industry experience that substantially all active and productive agents hold NAR membership.

48. NAR's member brokers compete with one another in local brokerage services markets to represent consumers in connection with real estate transactions. NAR's policies govern the conduct of its members in all fifty states, including all REALTORS® and all of NAR's local REALTOR® associations. Thus, the NAR and the state and local associations are vehicles for competing brokers to share their clients' listings and to cooperate in other ways, both at a local, statewide and national level. Indeed, as the NAR itself concedes on its website, its "local REALTOR® associations may now be viewed as competitors" and that "[b]y definition

associations consist of groups of competitors gathered together to promote their common business interests."

49.    NAR's ubiquity among American real estate agents is primarily the result of NAR's control of national MLSs.  As discussed above, with very rare exception each market's dominant MLS is owned and controlled by a local real estate association.[8]  In the vast majority of markets, and virtually all major markets, the association controlling the dominant MLS (or network of MLSs) is one or more chartered NAR affiliates.  In general, access to NAR-affiliated MLSs is restricted to NAR members, requiring agents to purchase NAR membership to access the MLS.[9]

50.    There is no agreed-upon figure for the total number of MLSs in the United States. In 2020, the Real Estate Standards Organization counted 597 MLSs in the country.  Showcase IDX, a firm providing web tools for syndicated MLS listings, counted 608 MLSs, noting that "the actual number is a moving target" owing to constant merging and renaming of MLSs—as of 2010, there were roughly 1,400 MLSs nationwide.  As Showcase IDX noted, "[e]ven NAR does not publish an authoritative list of MLSs in the United States."  NAR, meanwhile, states that

---

[8] One notable exception is MLSPIN, the dominant MLS in the Boston, Massachusetts market. MLSPIN is owned by individual stockholders rather than a local real estate association, but limits its ownership to MLSPIN subscribers.  MLSPIN is not an NAR-affiliated MLS, and despite being owned by real estate professionals it has not adopted the Policy or imposed any similar rules.

[9] The sole exceptions are those MLSs located in California, Alabama, Florida and Georgia, a result of judicial decisions in California and the Eleventh Circuit finding that the practice violated state and federal antitrust laws.  Even in these jurisdictions, however, before gaining access to the NAR-affiliated MLSs, non-member participants must first agree to follow and be bound by the NAR-affiliated rules, and any such additional rules the NAR-affiliated association promulgated, and also pay the required fees.  In sum, an agent cannot access an NAR-affiliated MLS without first paying a fee and agreeing to be bound by NAR's rules.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

there are "over 800" MLSs in the U.S., though it rarely makes clear whether this figure (and other MLS data) represents total MLSs, or only MLSs controlled by NAR affiliates.

51.     It is not clear exactly how many national MLSs are controlled by NAR.  The common understanding among real estate professionals is that all but a handful of these MLSs are owned by NAR affiliates.  Industry professionals, including NAR's own marketing materials, often conflate NAR and the nationwide MLS system.  The joint DOJ and FTC Report cited above noted that MLSs are "typically operated by a local group of brokers affiliated with NAR."

52.     TAN's experience in major real estate markets is consistent with the fact that NAR controls the overwhelming share of all nationwide MLSs.  As outlined more fully below, in all but a few of the markets where TAN operates, the dominant local MLS is controlled by an NAR affiliate.  As mentioned above, all of TAN's members (and likely potential members) are subscribed to their local MLS, and thus the vast majority of TAN's members are subscribed to an NAR-affiliated MLS in their market (and all members in markets dominated by NAR affiliates).

53.     While NAR's regional affiliates are ostensibly in charge of their own MLSs, in practice the operation of these MLSs is heavily directed by the national organization.  Among the many mandatory publications issued each year by NAR is the Handbook on Multiple Listing Policies (the "Handbook"), which includes model provisions for MLS bylaws and other rules and regulations established by the NAR for the operation of NAR-affiliated MLSs.

54.     Each policy in the Handbook is classified as either "Informational," "Optional," "Recommended," or "Mandatory."  NAR affiliates are required by their charters and bylaws to follow "Mandatory" policies or risk losing their NAR charters coverage under the National Association's master professional liability insurance policy.  As Walter T. Baczkowski, Jr., Chief Executive Officer of SFAR, declared in this action, "SFAR is following NAR's Clear

Cooperation Policy ("Policy") because it is a mandatory policy. SFAR, however, has no discretion to decide whether or not to follow mandatory NAR policies, and it has no power to change NAR's Policy."

55.     NAR's ability to dictate mandatory rules to nationwide MLSs allows it to directly impact the nationwide broker services market and related industries. As alleged earlier, access to the dominant regional MLS is a professional necessity for active real estate agents. These regional MLSs are owned by local broker associations. Brokers in control of a local broker association can use the association's ownership of the local MLS to influence the behavior of brokers they compete against, and there are multiple past examples in which brokers have used MLSs in this way, including for example the FTC cases cited above. Through the NAR, competing brokers can coordinate on a nationwide level, simultaneously impacting broker services markets throughout the country by disseminating mandatory rules to NAR's MLSs, which are critical necessities to the practice of real estate in almost all significant real estate markets.

56.     In 2019, the NAR charged members an annual fee of $150 and a $35 "Consumer Advertising Campaign Special Assessment." These dues accounted for roughly three quarters of NAR's revenue, which totals around $200 million per year. In California alone, based on these figures, NAR makes over $35 million in fees. And given NAR's large membership in its associations in the Bay Area, a substantial portion of this amount is derived from agents and associations in this Judicial District.

57.     Dues payments are typically routed through NAR's local affiliates, where NAR members have concurrent memberships. The MLSs controlled by NAR's local affiliates also generally charge NAR members a monthly fee for access, typically around $25 to $60 per

month, and also charge non-members who want to participate in the relevant MLS a separate fee, which can be higher than the membership dues.

### D.    On-MLS Sales, Off-MLS Sales and TAN.

58.    As mentioned above, 90% of homes sold are listed on their local MLS. Sales of homes listed on the MLS are commonly referred to as "on-market" or "on-MLS" sales, while the remainder are referred to as "off-market" or "off-MLS" sales.[10]

59.    Because real estate agents work on commission, the agent's overriding financial incentive is to help close deals on behalf of his or her clients as quickly as possible, and on the seller's side to do so at the highest price possible.  (A buyer's agent must balance financial reward against the client's potential dissatisfaction at overpaying.)  Most home sellers also prefer to maximize speed and final price, and for the vast majority of a real estate agent's clients the ideal marketing strategy will involve listing the home on the local MLS, where it is likely to be seen by the most potential buyers.

60.    Over time, the on-MLS sales process has become increasingly standardized and complex.  The typical home sale invites a swarming ecosystem of other service providers, such as appraisers and home staging professionals, each of which costs the seller money.  A home seller cannot reasonably forego these expenses because, as explained below, the failure to quickly sell an MLS-listed home causes a permanent reduction in the home's market value.

---

[10] Off-market sales are often confused with "pocket listings," which are a narrow category of off-market sales.  Pocket listings are exclusive listings that agents keep "in their pockets" rather than marketing them more broadly in the hope of identifying and representing the ultimate buyer as well, which would allow them to capture both the buyer and seller side commission.  These types of "double-ended" or "dual agency" listings are properly viewed unfavorably in the industry because they often involve agents and brokerages putting their interests ahead of the consumer. As discussed below, the "broker exclusives" exempted from the Policy are a form of pocket listing, and thus the Policy encourages the use of pocket listings in off-MLS transactions.

Thus, the seller is compelled to meet the presentation standard expected on the MLS if they do not want to suffer in the comparison, and risk their listing becoming "stale" and suffering a permanent drop in value.   For properties requiring substantial repair work, the costs of bringing the home to presentation standards can easily wipe away any gain in profit from increased exposure on the MLS.

61.    On-MLS sales typically place certain requirements on the buyer. For instance, most MLS listing rules require owners to make listed properties available for showings.  In addition, the seller must offer a buy-side MLS-market rate commission, typically 2.5% to 3%, to be taken seriously by the buyer's agent and to get that agent to speak favorably to their buyer client about the property.  The seller thus loses the practical ability to negotiate or alter the buyer-side commission associated with the sale, a further potential deduction from the purportedly higher sale price.

62.    Not all customers wish to sell on-MLS, for a variety of reasons discussed below. For many years, NAR's conduct rules have anticipated consumers' desire to market their properties off-market by requiring agents to obtain client consent, in writing, on a standardized "Exclude from MLS" form, before marketing a home off-MLS.  The customer was required to affirm that he or she understood that they were foregoing the opportunity to market the home to a broader population of potential buyers, and that this might result in a reduction in ultimate sale price.

63.    A 2019 report by Midwest Real Estate Data ("MRED"), an Illinois MLS owned by Chicago Association of REALTORS®, explains why consumers may choose to market a home off-MLS despite these warnings.  MRED "found five primary reasons why real estate

agents withhold listings from the MLS marketplace: [1] Seller privacy concerns; [2] Properties

that need repairs; [3] Pre-marketing strategies; [4] Bank-owned listings; [5] Price testing."

64.    **Seller privacy concerns.**  MRED found that some sellers "want to prevent

information about their house or the fact that they're selling from becoming public knowledge."

The report cited the example of a cancer patient who wished to sell her home without alerting

family, and so did not want the home placed on an MLS where the information would be quickly

available to thousands of viewers.  MLSs also syndicate to public-facing websites such as

Zillow, which increases exposure to a pool of potentially millions of people, though most MLSs

allow the listing agent to opt out of syndication to third parties.

65.    As a columnist phrased it in a recent article regarding the NAR rule change at

issue in this litigation, "[e]ven for the non-famous, selling your home can be a disruptive circus.

Listing off-MLS [i.e., off MLS] can reduce the number of lion tamers and jugglers, separate the

browsers from the buyers and perhaps remove some stress for sellers who, studies have shown,

are often already undergoing periods of life stress (divorce, relocation, death of a parent)."

66.    The information required to post a listing on an MLS is quite sensitive, as NAR

knows. MLSs require dozens of mandatory information fields to be completed before a listing is

posted.  A recent advisory notice from the California Association of REALTORS® warned

potential home sellers that "[e]ven after a sale is complete, the MLS distributes sales information

to the real estate community.  Brokers, agents, and MLSs may also share your personal

information with others who post the personal information on websites or elsewhere, or

otherwise use it.  Thus, there are various service providers and companies in a real estate

transaction who may be engaged in using or sharing your personal information."  Personal listing

information includes whether the sale is related to probate; whether the property is currently

occupied; the identity of the occupant, whether or not the occupant is the seller; and other sale conditions such as foreclosure.  Even when the sellers' name is not publicly listed, sufficient information is presented to allow the owner to easily be identified through online search tools. Indeed, on May 14, 2021, NAR passed a mandatory policy requiring all MLS listings to also provide the property's address.

67.    **Properties that need repairs.**  As MRED's report states, "[a] house needs work done (repairs, staging, a fresh coat of paint or new carpet, etc.) before it can be shown."  MLSs retain information regarding a property's listing history, and a residential property that fails to sell quickly after being listed can suffer a lasting drop in value.  A property sitting unsold on the MLS creates a permanent stigma that measurably reduces the home's market value—the assumption among those viewing the listing is that the home suffers from some defect that has stopped potential buyers from pulling the trigger, which reduces demand for that property and permanently lowers its market value.  Indeed, experienced agents know that listing too high a price on the MLS can, paradoxically, lead to a lower ultimate sale price—the long-term cost of a delayed sale overwhelms the higher anchoring point.  Using syndicated data licensed from MLSs, a study sponsored by Zillow found that homes suffered a severe penalty from long unsold listings, with a two-month delay associated with sale prices 5% below list price, and an 11-month delay associated with prices 12% below list.

68.    To avoid this pricing damage, sellers must raise their home to the presentation standards of other comparable properties prepared for listing on the MLS, which often involves cosmetic fixes, renovations, professional staging, or more costly structural repairs.  As MRED stated, "[m]any agents sign a listing agreement, but do not want the home to be viewable until key repairs, upgrades, and clean-up have been completed."  Other agents find their client's

interests best served by avoiding these costs altogether and selling the house as-is outside the MLS system.  Often buyers also benefit from this off-MLS marketing by being able to offer a "buy-it-now" price that allows the seller to avoid unwanted repairs while also allowing the buyer to spend less to purchase the home.

69.    **Phased marketing.**  As MRED recognized, some real estate agents attempt to "build hype and demand around a property by word of mouth before taking the listing to the market."  For instance, many agents produce professional marketing packages and other materials to be provided to potential buyers once a property is listed on an MLS; a consumer therefore may instruct her agent to get these materials ready before starting the clock on the MLS, but still seek to market the home informally to "build hype" and therefore increase the home value before the property is placed on the MLS.

70.    **No showings.**  As MRED stated, "many MLS rules require properties to be available for showings by all participating agents. Some sellers simply want to avoid opening up their home for showings and opt to hold them off-MLS."  They would prefer a more controlled selling process involving only experienced agents representing qualified buyers.  This concern only became more acute since early 2020, after the emergence of COVID-19, but even in the absence of the pandemic some consumers do not wish to be required to make their home available for entry by strangers.

71.    **Testing the Market.**  As recognized in the MRED report, "[a]gents often use off-MLS listings to test the market for pricing before ultimately putting a home in the MLS."  Sellers considering whether to sell their property may seek "some assurance of making a certain amount of money with the sale of their home."  Seeking out feedback through off-MLS sources "helps

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

prevent an overpriced listing from making it to the full market, where the price would need to be sped after sitting on the market for a period of time, becoming stale."

72.    Considering the above factors, MRED concluded that "[a]gents facing these common situations rightfully look to act in the best interest of their clients by marketing the property outside of many of today's existing MLS rules."  Once a home is listed on the MLS, the home seller is locked into a pricey, public, fast-paced process that they must navigate properly or risk lasting damage to their property's value.

73.    Many potential buyers would also rather purchase a home outside the MLS.  The typical home sold off-MLS is less "showroom ready" than homes listed on the MLS; agents are reluctant to list homes requiring substantial investment, cleanup or repair, as they sell less quickly.  Such homes can be attractive to buyers willing to trade condition for price.

74.     Naturally, real estate agents are happy to represent the minority of home sellers and buyers who prefer to market and transact off-MLS.  Few agents sustain their entire income on such sales, but they represent additional opportunities to earn commissions and to establish subject-matter expertise for future marketing.  To market homes off-MLS, agents rely on alternative channels such as soliciting other agents within his or her contact network or brokerage, contacting past clients, or advertising the property on their own web site.  Indeed, differing access to a broader professional network is one of the factors on which real estate agents compete with one another.

75.    Agents have also made use of services such as TAN and a small number of similar businesses.  Founded in 2010, TAN is a private, member-only community open to the top ten percent of agents by sales volume; on average, these agents account for roughly 90% of sold homes in their respective markets.  Thus the top ten percent of agents by sales represent,

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

generally, the corpus of agents successfully practicing the profession as consumer-facing, productive agents. That is, the restriction excludes the 90% of agents with very few if any sales or real clients each year.

76.     TAN has over 10,000 members in 31 chapters across the country, including in the San Francisco Bay Area. TAN's members are collectively involved in approximately $165 billion in home sales each year—or around 11% of all homes sold in the United States.

77.     Like an NAR-affiliated MLS, TAN provides the agents in its network with a platform to share market information and data. TAN members also use the service to share information about properties for which they are acting as sellers' agents, including properties the seller has not yet or does not intend to list on an MLS. As a practical matter, as NAR's counsel recognized in pre-litigation correspondence, the service TAN offers is effectively an alternative MLS providing a competing platform for home sellers and buyers looking for an alternative to the widely accessible NAR-affiliated MLS.

78.     Recently, TAN also introduced a new "match-making" service for its members. Now, beyond serving as a platform for exchanging information, TAN also facilitates one-on-one private conversations between a buyer's agent and seller's agent with symmetrical needs without any marketing of the property. For example, a TAN member can inform TAN that she represents a homeowner in San Francisco looking to sell in a general price range. TAN will then "match" that prospective seller's agent with an interested potential buyer's agent who communicated similar criteria to TAN. The prospective buyer and seller agents can then move off the TAN platform and begin communicating privately over email, phone or at a coffee shop regarding the specifics of their respective clients' goals. This matchmaking option allows prospective sellers and buyers to meaningfully test the market and/or find a counterparty, while

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

still protecting their privacy by avoiding a public posting. There are a small handful of alternative platforms like TAN, such as the PLS.com, that compete with the MLS.

79.    Like NAR and its affiliates, TAN derives its income primarily from membership dues. Agents may purchase monthly, quarterly, or annual memberships. Further, as with many associational organizations, TAN's value for its members derives in large part from network effects—the larger the share of top agents in TAN's membership, the greater the value of TAN membership to other top agents, as it allows for access to a greater volume of market intelligence and more opportunities to pursue off-MLS sales.

80.    Aside from a handful of small membership organizations such as TAN, there are presently no commercial alternatives to MLSs. Customer-facing websites such as Zillow or Trulia do not compete with TAN or MLSs, as they are consumers rather than suppliers of property listing services. The only reasonable equivalents are informal contacts between individual real estate agents, or internal information-sharing tools within a single brokerage.

## II.    NAR'S CLEAR COOPERATION POLICY.

### A.    NAR Relies on Subscription Fees from Unproductive Agents Who NAR Does Not Want Leaving the Industry.

81.    In 2015, NAR commissioned a report from the consulting firm Swanepoel called "The D.A.N.G.E.R. Report: Definitive Analysis of Negative Game Changers Emerging in Real Estate." NAR's Strategic Thinking Advisory Committee described the document as "a forward looking assessment of threats that could emerge from the perspective of agents, brokers, the National Association of REALTORS®, state and local associations and multiple listing services."

82.    The D.A.N.G.E.R. Report discusses a key dynamic in NAR's membership that affects the group's decision-making: the disconnect between the relatively low share of agents

interfacing with consumers and driving home sales, and the more numerous NAR membership that includes a large number of licensed but unproductive agents.  As the report states, "NAR is a membership-driven, dues-based organization. Therefore its revenue stream is primarily driven by size, which results in the majority of the decisions being based on the masses."  Similarly, "[m]any REALTOR ® Association structures are built around the principle of headcount, thereby forcing many key decisions to be based on quantity rather than quality."  Elsewhere, the NAR report comments that decisions at NAR "are often determined by trying to accommodate the lowest common denominator," and that "as a result of low barriers to entry [for REALTORS], the membership base represents an exceptionally eclectic selection of skills and knowledge."

83.     This idea was echoed in a 2020 NAR report quoting Zillow Group's Chief Industry Development Officer, who commented that "[t]he financial viability of many MLS organizations is tied to their membership count, and yet a meaningful number of those members may be low-producing or technically unsophisticated. This business model breaks down if the number of agents declines as a result of market changes that drive unproductive agents out of the market."

84.     In other words, NAR, its affiliates and the MLSs it controls each maximize their revenue by maintaining the largest possible subscriber list.  However, the majority of these agents are unproductive and unsuccessful at generating sales.  As organizations seeking revenue, NAR and its affiliates' interest is in maintaining these unproductive agents as paying subscribers rather than allowing them to wash out and leave the industry, and as a result the organization's decision-making is focused on placating these agents and avoiding their discouragement.

85.    These unproductive agents also have an incentive to use their majority power within NAR to promulgate rules that constrain competition in the market for broker services, in the hope that reducing the competitiveness of productive agents might increase other agents' chance of capturing clients and sales.  In addition, NAR members that are not real estate agents—such as those who provide photography, appraising and staging services—have a financial incentive to push home sales onto the MLS, where consumers typically make greater use of these ancillary services.[11]

86.    Indeed, many of the chief "dangers" identified by the 2015 NAR "D.A.N.G.E.R. Report" reflect pro-consumer innovations and industry trends that may potentially reduce the income paid to NAR's members.  For instance, the 2015 NAR report identifies as the largest "danger" to the MLS system the "Entry by a New Player."  The report states that "[i]n an industry that is based on information as its core, we continue to caution against selling or providing that information to 'third-parties.' . . . The fear is that data is flowing everywhere and if it isn't managed, brokers and agents will see their influence and power diminish in the future."[12]  Describing an initiative by large broker franchises to develop an in-house listing system, the report warned that "there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."  Discussing the possibility of a single nationwide MLS being established, the report warns that "[t]he threat arises out of who ends up

---

[11] The vast majority of NAR's members are real estate agents and brokers.  However, NAR's membership also includes a substantial minority of other real estate professionals such as property managers, appraisers and counselors.  These members would also have a financial incentive to force all sales onto the MLS, as on-MLS sellers tend to use these ancillary services more frequently.

[12] Elsewhere, the D.A.N.G.E.R. report notes that "[m]any [NAR affiliate] associations hold equity in and/or serve on the board of directors of an MLS organization," and that "the revenue derived from their MLS investment or the financial benefit associated with association membership have insulated them from severe membership or revenue loss."

with control [of the nationwide MLS] and how they will use it to further their business and fiscal agenda." (This also reflects an admission by NAR that control of MLSs allows a party to assert leverage over the real estate industry.)

87.    For another "danger," the report notes that while rising home prices have "facilitated the elevation of real estate earnings based on commissions," the increased cost has created "increased pressure on real estate agents to reduce their commission rates." Adjacent to a caricatured image of a pained man holding his head beside a falling line graph, the report raises concern that "[c]onsumers are . . . becoming more motivated to find an alternate solution, and a growing new generation of brokers and agents are exploring a legion of new business models and pricing models."

88.    In short, as of the mid-2010s NAR recognized that its membership was largely made up of unskilled, unproductive agents. Indeed, the single largest risk according to the D.A.N.G.E.R. Report was that "Masses of Marginal Agents Destroy Reputation." As the report explained, "[t]he real estate industry is saddled with a large number of part-time, untrained, unethical and/or incompetent agents," attracted by low barriers to entry and the perception of "easy money," whose lack of professionalism "threatens the credibility of the industry." According to NAR's report, "Professional, hardworking agents increasingly understand that the 'not so good' agents are bringing the entire industry down." Moreover, consumers often have little ability to distinguish these non-producing agents from producing ones, and may therefore find themselves locked up with an unknowledgeable (or worse) agent who does not have the experience or expertise to competently represent them.[13] However, the report also acknowledges

---

[13] A listing agreement generally includes a period of exclusivity, typically two to three months. This makes it difficult for consumers to switch from an unsuccessful agent to a more competitive one, a problem made worse by having more unskilled, unproductive agents remain in the market.

that NAR and its affiliates depend on membership fees from these agents, and as a result

organizational decision-making is overly responsive to their requests.  At the same time, NAR's

report recognizes that t the arrival of new competitors and innovative marketing strategies

threatens to reduce income paid to brokers and agents.

89.     It was within the above context that NAR began developing the Clear

Cooperation Policy that sparked this litigation.

**B.     NAR Adopts the Clear Cooperation Policy, Which Includes an Exception for "Office Exclusives."**

90.     Beginning in the mid-2010s, NAR increasingly discussed the threat posed by

alternative marketing services to NAR, its affiliates, and their owned MLSs.  Among NAR's

membership—primarily composed of lower-skilled, unproductive agents—there was a

perception that more successful agents were unfairly "hiding" listings from local MLSs, to the

detriment of other agents.  This perception was mistaken; in most cases, listing a property on the

MLS is the strategy most likely to bring a quick, high value sale, and for this reason agents have

a financial incentive to push listings to the local MLS.  Decisions to market homes off-MLS are

typically driven by consumers who choose to forego the MLS after being fully informed about

the potential risks of doing so.  In other cases, the agent in his or her expertise determines that

the best price is likely to be acquired off-MLS, particularly for dilapidated properties that may sit

on the MLS for some time, losing value from its failure to sell.  Agents who serve these clients

are not "hiding" listings from others, they are using their skill, experience, network and/or

tenacity to serve clients who demand that their agents be creative and deploy atypical marketing

strategies.

91.     Nevertheless, as discussed in the preceding section NAR and its affiliates depend

on continued membership from a large pool of unskilled, unproductive but dues-paying

members.  As a result, NAR's leadership is particularly responsive to the concerns of these less

productive members, lest they grow frustrated with their lack of success and leave the field

entirely.

92.     Thus, in mid-2019, NAR began taking affirmative steps to develop rules that

would prohibit productive agents from competing against their fellow agents using marketing

tactics outside the MLS system.  The promise to NAR's membership was that these rules would

push off-MLS home sales onto the MLS, reducing the delta between the marketing strategies

employed by successful agents and those familiar to NAR's overall membership, reducing the

competitiveness of successful agents and increasing the chance that unsuccessful agents might

secure sales and commissions.

93.     On September 20, 2019, the NAR's MLS Technology and Emergency Issues

Advisory Board issued an opinion recommending that the following mandatory policy be added

to NAR's MLS Handbook, which it referred to as "MLS Statement 8.0" or the "MLS

Cooperation Proposal":

> Within 24 hours of marketing a property to the public, the listing broker must
> submit the listing to the MLS for cooperation with other MLS participants. Public
> marketing includes, but is not limited to, flyers displayed in windows, yard signs,
> digital marketing on public facing websites, brokerage website displays (including
> IDX and VOW), digital communications marketing (email blasts), ***multi-brokerage
> listing sharing networks***, and applications available to the general public.

(Emphasis added).

94.     The NAR ultimately adopted the rule in November as the "MLS Clear

Cooperation Policy," (the "Policy") and it was incorporated into NAR's 2020 governing

"Handbook" as a mandatory policy.  It became effective on January 1, 2020, and each NAR-

affiliated MLS was required to implement the Policy by May 1, 2020.  MLS participants who do

not comply with the Policy face punishment, including monetary fines and expulsion from the MLS.

95.    Given NAR's unique structure, the Policy is simultaneously a national and local restriction.  The Policy was adopted by the approximately 800-member NAR board of directors, representing the nationwide cartel of real estate professionals comprising NAR's overall membership (with no input from consumers.)  But that decision works indirectly, by pushing mandatory bylaw language through NAR's charter agreements down to local MLSs.  In local markets where the dominant MLS is not controlled by NAR, the Policy's impact is minimal because agents had not needed to join these MLSs as a professional necessity.  In the majority of markets where NAR *does* control the dominant MLS, and where agents *do* need to join an NAR MLS to practice the profession, the Policy's implementation immediately bound substantially all consumer-facing real estate agents.

96.    As discussed above, NAR and its affiliate groups represent coordinated agreements among competing real estate agents and brokers, and the Policy constitutes an arrangement among agents and brokers to limit the means through which they can compete against each other in providing broker services to client home sellers.  The stated goal was to collapse all property marketing onto MLS listings, reducing the competitive advantage of skilled agents capable of executing alternative marketing strategies.

97.    This goal is accomplished in large part by eliminating the usefulness of services such as TAN that have arisen to assist agents in marketing off-MLS.  The point of these services is to allow the sharing of properties that the consumer does not want to have listed on the MLS; if sharing on TAN requires that the property be listed on an MLS anyway, a seller's agent will have to avoid listing on TAN if he or she seeks to follow the client's wishes.  The rule also

eliminates the effectiveness of other off-MLS marketing channels such as direct engagement with contacts, email lists, or the use of websites or signage to market properties, for the same reason.

98.    NAR intended for the Policy to coerce agents against using TAN.  Indeed, NAR's inclusion of "multi-brokerage listing sharing networks" in its definition of "public marketing" was deliberately aimed at TAN's business model, as one of the more well-known services used by brokers to serve off-MLS clients.  NAR officials have been explicit that an intended purpose of the Policy is to eliminate TAN as a competitor.  NAR has declared, in this litigation, that NAR believed that real estate agents' use of services like TAN reduced the value of NAR's product—i.e., might encourage non-productive agents to stop subscribing to NAR and its MLSs—and that this justified eliminating it.  In a November 26, 2019 email to another real estate organization that had expressed concern about the policy, counsel for NAR repeated that allowing off-MLS sales through outside fora would "devalue the MLS."  A so-called "study" published by the California Association of REALTORS® claimed that the Policy was "designed to . . . more or less take a sledgehammer" to MLS alternatives like TAN.  In March 2020, the president-elect of an NAR-affiliated MLS in Los Angeles questioned why TAN would continue working to improve its service, given that "soon the new NAR [Policy] will be official and TAN will no longer exist?"

99.    The adoption of the proposal was fiercely opposed by the active, consumer-facing real estate agents responsible for the overwhelming majority of residential home sales.  These agents viewed the Policy as a means for other, less successful agents and brokers to artificially suppress their competitiveness in the market for the benefit of less capable professionals and, as discussed below, siphon off-MLS sales to the minority of agents employed at large real estate

brokerages.  Real estate agents complained that the Policy removed a seller's choice in how they wanted to market their home, which should be a decision between the client and agent—not the client and NAR.

100.    While NAR's public relations campaign regarding the Policy focused on the dangers of "pocket listings" and the benefits of the MLS, in reality NAR is aware that some percentage of home-sellers and buyers will always avoid listing properties on the MLS, for the reasons including those stated in the 2019 MRED report.  Other NAR investigations have concluded the same, including a 2013 NAR working group which found that certain consumers value privacy over the broad marketing of their property.

101.    Thus, while it is generally more efficient and pro-competitive for a region's on-MLS listings to be consolidated in one place—the reason almost all local markets are dominated by a single MLS or consortium of MLSs with shared access—it will never be the case that 100% of properties are listed on-MLS.  A competitive market in natural equilibrium will always have a fraction of homes that sellers do not wish to place on the MLS, which a subset of buyers will actively seek.  Any attempt to move past this equilibrium point and artificially squeeze these consumers away from their choice and onto the MLS will *decrease* the efficiency and consumer welfare NAR claimed to be pursuing.

102.    NAR appears to have understood this in designing the Policy, because the rule included a gaping exception allowing off-MLS sales to continue, so long as they were marketed in a particular, exclusionary manner.  This carveout is known as the "office exclusive" exception.  An "office exclusive" is, essentially, an off-MLS "pocket listing" presented entirely to agents within one's own brokerage.  Such marketing might take the form of informal communications, internal listing platforms, or firm-wide email lists.

103.    Prior to the Policy's implementation, NAR made clear that "office exclusives" would not be covered by the Policy, and that marketing off-MLS within a brokerage would not trigger the one business day deadline to list on an MLS.  As one popular real estate commenter put it,

> Based purely on the language of the Policy and the FAQs, it appears that a large national brokerage like NRT, Compass, or eXp can take a listing, hold it off the MLS forever and communicate it to every agent in the company. . . . [T]he brokerages who can most effectively use Office Exclusives as a competitive lever are the big brokerages with lots of agents and lots of listings. The small independent is screwed. The boutique brokerage? Screwed. The small 3-person brokerages that makes up the vast majority of the Participants in any given MLS? Screwed. . . . How that is going to enhance cooperation or make it clearer is as yet unexplained.

104.    Despite many opportunities, including the issue being explicitly raised multiple times in this litigation over the past year, NAR has *never* attempted to explain why the "broker exclusive" pocket listings allowed through this exception are any better than off-MLS marketing conducted elsewhere.  NAR has never attempted to explain—to agents, consumers, or the Court—why the "fairness" and "consumer benefits" it purportedly seeks do not apply to pocket listings hoarded within a single brokerage.

105.    Instead, NAR has justified the "office exclusive" carveout simply by citing the general reasons some consumers avoid the MLS.  NAR's "FAQ" explaining the Policy states that "'Office exclusive' listings are an important option for sellers concerned about privacy and wide exposure of their property being for sale," a fact equally applicable to off-MLS marketing conducted on TAN.  In its October 2, 2020 motion to dismiss in this action, NAR asserted that the Policy is procompetitive because it "gives a seller complete control over how her home is marketed" and "she can forgo the benefits of a multiple listing and market her property to a limited group of potential buyers . . . through an office exclusive"—the exact thing NAR portrays as horrific and exclusionary when done through a service such as TAN.

106.    In any case, as discussed below this carveout has in practice provided a massive boost to large brokerages at the expense of consumers.  Indeed, the large brokerages themselves understood the proposed Policy to be a windfall opportunity.  As the CEO of Compass, one of America's largest brokerages, commented pre-implementation:

> "NAR's [Policy] will limit seller choice when it comes to using private home sale websites [*i.e*, TAN] to pre-market or market their home, but seller demand for privacy and flexibility isn't going anywhere.  Compass is the obvious choice for sellers who want to sell their homes or test the market, with the option to do so privately, while still getting the exposure to a community of 15,000+ top agents in major markets . . . ."

107.    The CEO's words would prove prescient once the Policy went live and began hurting consumers, the real estate market, the broker services market, and the market for property listings services.

108.    As noted above, TAN recently developed a new "matchmaking" service to supplement its traditional private MLS platform.  This matchmaking service simply connects a seller's agent and a buyer's agent who seemingly were a good fit for a potential real estate deal.  Once that connection is made, TAN's service ends; the prospective buyer and seller's respective agents move to private, one-on-one conversations regarding the property in question.  In other words, no "marketing" of any property—public or otherwise—occurred on a "multi-brokerage listing sharing network."  Based on the plain language of NAR's Policy, TAN understood this private one-on-one broker communication would under no circumstances qualify as "public marketing" and thus at least a portion of its business would be able to continue despite NAR's draconian Policy.  TAN also communicated its position on webinars that were widely available.

109.    Following TAN's webinars, some NAR-affiliates re-interpreted the Policy to prohibit one-on-one private communications among brokers unless they placed the property they discussed on the local MLS within one business day.  In numerous webinars and documents,

such affiliates have explicitly stated that no matter what TAN says or how it functions, if an agent uses TAN's services in connection with a property, the agent must place the property on the MLS within one business day. To be clear, if an agent has coffee with another agent and mentions a property for sale, these affiliates' (and potentially NAR's) position is that within one-business day the agent must list that property on the MLS.

110.    Other NAR-affiliates have initiated similar rules based on NAR's Policy. For example, "Bright MLS," the NAR-affiliate based in the Washington D.C. area, has also explicitly prohibited private one-on-one conversations among brokers unless the property at issue is placed on the MLS within one business day. Moreover, following TAN's webinars and SFAR's interpretation, two other Bay Area MLSs—Bridge MLS and MLS Listings—have now adopted the same prohibition on one-to-one agent communication. In fact, a Bridge MLS representative recently told a TAN member that Bridge MLS had been in contact with NAR regarding TAN's matchmaking service, and that the service is not in compliance with the Policy.

### C.    The Policy's Implementation Has Placed TAN Into a Death Spiral.

111.    As soon as the Policy took effect, TAN began to see a drop-off in property listings and subscriptions. Multiple subscribers have cited the Policy explicitly in explaining their decision to cancel their memberships. Agents generally advertise off-MLS for the purpose of avoiding the MLS, either to accede to their client's wishes or because it is the optimal strategy in that particular case. The Policy renders this moot, because any property listed on TAN will need to be quickly provided to the local NAR-affiliated MLS.

112.    As discussed above, this impact was the explicit purpose of the Policy, as the mechanism by which NAR sought to suppress competition among real estate agents was to prevent their meaningful use of off-MLS marketing tools.

113.    The drop-off in TAN membership has been notably higher in the markets dominated by NAR than in those that are not.  In 10 NAR-dominated markets, TAN's membership has dropped by an average of 21.4% and median of 28.7% over the last year, and continues to decline.  (Many of TAN's members are on annual memberships, delaying cancellation until time for renewal.)  Individual chapters within this group have declined by as much as 46%.  In three markets not dominated by NAR-affiliated MLSs and the Policy, membership has dropped an average of 11.27% and a median of 10.4%.[14]  The continuing loss of members cannot be sustained and will cause TAN to cease operating if it continues.

**D.**    **The Policy's Implementation Has Substantially Harmed Consumers, the Residential Real Estate Market, and Ancillary Markets.**

**a.**    **The Policy has failed to increase MLS use and has instead increased the use of "office exclusive" pocket listings, fracturing the market.**

114.    The Policy went into effect on May 1, 2020.  The subsequent year has confirmed the Policy's anticompetitive harm throughout the residential real estate industry and surrounding businesses.  What TAN predicted would occur prior to implementation has taken place: the Policy has not increased postings on the MLS but instead these properties are increasingly siloed within large brokerages, and consumers now face diminished quality, reduced inventory, and less innovation and choice.  Consumers who prefer to market and transact off-MLS are forced into undesirable dual-agency representation within a "broker exclusive" at a brokerage they may not otherwise have chosen to work with.

115.    Recently, Glenn Kelman, CEO of the real estate website Redfin, published an article examining the use of off-MLS marketing since implementation of the Policy.  Redfin found that despite NAR's rosy pre-implementation claims, since May 2020 the share of homes

---

[14] Real estate sales declined overall in 2020, likely an effect of the Covid-19 pandemic.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

sold without being marketed to the public increased 67%, from 2.4% of homes to 4.0%, with the rate rising every month in 2021. The total number of listings on MLSs has also decreased, though this figure is complicated by the Covid-19 pandemic's general reduction in housing sales in 2020.

116. The increase in off-MLS sales comes alongside a significant increase in the share of listings pocketed within "broker exclusives." Redfin found that in "markets where one brokerage has significant share, the largest brokerages are pocketing more than 10 percent of their listings."[15] This is to be expected. In markets dominated by an NAR-affiliated MLS— which is most major markets in the United States—a seller wishing to market off-MLS is unlikely to find any agents who are not members of the local MLS and bound by the NAR-promulgated rule. Accordingly, the only marketing strategy available to an off-MLS seller will be listing their property as a pocket listing within a brokerage—or not selling at all. According to real estate industry analyst Mike DelPrete, "nationally, about a quarter of Compass' listings are exclusive to Compass, and if you look at one of their biggest markets, San Francisco, about 45 percent of their listings are exclusive."

117. A sign pointing to the increased use of office exclusives is that large brokerages have begun to prominently advertise their access to exclusive listings. For instance, the first marketing content on the main splash webpage for Compass, America's largest non-franchised brokerage, advertises the company's exclusive listings.

---

[15] Note that it is difficult to determine the exact share of homes currently being pocketed within large brokerages, as these businesses generally do not release such figures.

## Compass Exclusives

Be the first to browse exclusive listings before they hit the market.

  

118.    The sequestering of listings into "broker exclusives" reduces the available inventory for buyers and their agents outside these brokerages.  NAR's arguments against TAN in this action have often been based on the idea that agents should not be allowed to "hoard" properties to market to a small audience on a service like TAN's.  Yet the Policy has only exacerbated this issue.  Unlike "office exclusives," agents do not market properties on TAN exclusively.  Indeed, even before the Policy the vast majority of properties initially marketed on TAN would end up being listed on an MLS—agents often use this pre-listing marketing to see if a quick sale is available at a reasonable price or to generate "buzz" amongst the producing agents in the market before the seller commits to the more taxing MLS listing process.  This pre-listing activity also allows the agent to "test the waters" and determine an appropriate listing price if the home is not sold. Agents also frequently market on TAN alongside other marketing channels, such as direct contacts, email lists, and web or print advertising.

119.    The available audience for office exclusives is much smaller, disseminated only to agents within a single brokerage.  While there are several large brokerages with tens of thousands of agents—in particular the large broker franchises—real estate is fundamentally local so most of these agents are irrelevant to any marketing effort, as they represent clients in other locations.  According to NAR data, out of 1.4 million REALTORS® only around 327,000 are

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

employed at the top 100 brokerages.  Even within these 100 brokerages, most have fewer than

2000 agents and only eight brokerages have more than 5,000 agents.

120.    Compass, the largest independent brokerage in the United States, with a large San

Francisco office, has approximately 1,500 agents employed in the San Francisco Bay Area.  This

compares to over 3,000 Bay Area agents within TAN's network.  Most local brokerage offices,

including for the major large realtors, have far fewer agents in each office.  By shifting all off-

MLS marketing into broker exclusives, NAR has ensured that off-MLS sales end up siloed in

small, mutually exclusive islands.

121.    Thus, sellers are harmed by seeing a reduced audience for their listings, and

buyers are harmed because they are locked out of viewing pocketed listings except for their own

agent's brokerage.  Buyers and sellers are also harmed because "office exclusive" sales are, by

nature, "dual agency" sales in which the same brokerage sits on both sides of the transaction.

This situation robs consumers of the independent advice they expect from an agent and creates

an inherent conflict of interest.  TAN, on the other hand, attracts agents from all brokerages and

virtually eliminates double-ended deals in transactions connected through the platform.

122.    By now, it has dawned on NAR's members that the "office exclusive" exception

undercuts the value of the Policy as it was sold to them by NAR.  In the Redfin article cited

above, the author CEO complained that NAR's "well-intentioned policy had the unintended

consequence of creating a monopoly on a monopolistic practice, favoring the big brokerages who

can still pocket listings within their own brokerage, in what are known as 'office exclusives.'"

At NAR's recent (virtual) Legislative Meeting & Trade Expo, a panel chaired by NAR general

counsel Katie Johnson acknowledged in response to complaints that the "office exclusive"

carveout was being abused, disadvantaged small brokers, and led to other "unintended consequences."

   **b.   The Policy has reduced inventory held by marginal sellers.**

123.   Another consequence of the Policy that harms buyers in particular is that it leads to a reduction in the available housing inventory.  Many less skilled and experienced agents are unfamiliar with marginal housing stock, as they have only encountered motivated clients.

124.   There is an adage in real estate, "Every home is for sale."  Unlike most products purchased by consumers, residential real estate is relatively unique in that most available housing inventory is sold by other owner-occupiers.  This means that the volume of available inventory is dependent on individual consumer choices—whether or not individuals are interested in selling their home.  "Every home is for sale," in the sense that there is always *some* price at which any given homeowner would sell their primary residence.  Some owners are actively motivated to sell their home, some would only sell for a price well above market and/or for a minimal sales hassle, and some sit on the margin.

125.   For example, one agent customer of TAN's had a client who had been interested in selling his home but changed his mind when the Covid-19 pandemic hit in 2020; he no longer wanted to list the property on the MLS and risk the showings and open houses that are a necessary part of on-MLS sales.  The client instructed the broker to locate "five good buyers" to make offers.  If the price was sufficient, the client would sell.  If not, he would hold onto the property for at least another year. The agent was at a small independent brokerage with few fellow agents to share the listing with.  The agent could not solicit offers on TAN or through direct contacts, as this would lead to the property's listing on the MLS.

126.   There is always a significant number of homeowners in a similar situation, who might consider selling their homes if the process is less intensive and rapid than required for an

effective on-MLS sale.  A hoarder embarrassed about her home, who wants someone to buy the place as-is and deal with the trash inside.  Busy homeowners who might consider a firm offer from a credible buyer, but have no interest in managing the tours, staging, repairs or painting that comes with MLS listings, and would just as soon stay put than deal with the hassle.

127.    Each of these above examples is a real client encountered by TAN's customer agents.  Off-MLS marketing allows these agents to use creative solutions to bring these homes into the market in a manner consistent with the client's wishes.  By cutting off these marketing channels, NAR discourages marginal sellers from entering the market, reducing housing supply and increasing home prices.  (Note that increased prices provide no net benefit to consumers, as consumers sit on both sides of the transaction—the higher income to sellers is offset by the higher cost to buyers.  However, because agents are paid out via commission, increased prices do increase the amount of money paid from consumers to real estate agents.)

### c.    The Policy Increases Costs to Consumers.

128.    The Policy's primary impact is to shift all off-MLS marketing into "broker exclusive" pocket listings.  However, shifting off-MLS sales to the MLS would also cause an overall increase in price to the consumer.

129.    As mentioned, a home listed on the MLS can suffer lasting harm to final sale price if it fails to sell reasonably quickly.  To be successful on the MLS, a home seller must incur costs such as staging, repairing, and/or renovating the property pre-sale.  These costs are in turn reflected in the home's sale price.  Increasing the share of homes sold on the MLS would thus increase the average home sale price, as a greater share of home sales incur these transaction costs.

130.    Because the residential real estate market involves consumers on both sides of the transaction, higher prices provide no consumer benefit, as the increased money received is

43

cancelled out by the increased money paid.  However, the amount of money diverted from consumers to agents increases, as the commission is calculated as a percentage of sale price. In addition, increased costs of transactions create barriers to closing by making the sales process more expensive for both buyers and sellers, which in turn decreases their ability to transact. Meanwhile, many consumers become locked out of the market.

> **d.    The Policy has reduced seller's ability to properly price a home, and to take advantage of available opportunities outside the MLS.**

131.    By reducing consumer choice in marketing properties off-MLS, the Policy further harms consumers by restricting the home seller's ability to appropriately price his or her home. An important aspect of residential real estate sales is placing the property on the market at an appropriate price point to attract potential buyers.  For this reason, sellers often wish to "test the waters," i.e., determine how buyers value the home, while also retaining the option to pull their home off the market without adverse consequences.  This testing of the waters is not possible if a property is listed on an MLS.  When a property listed on an MLS at too high a price point and remains unsold or is "delisted" and pulled from the MLS, this information is retained in the MLS and available to agents subscribing to the service.

132.    For similar reasons, as mentioned above, a skilled agent may strategically avoid listing certain homes on the MLS if it is not "ready for primetime."  The optimal strategy for a home with superficial deficiencies may be to market the home informally to buyers capable of recognizing the home's value, and avoid a protracted time on the MLS where the home presents as less attractive and may end up losing value after failing to sell.

> **e.    The Policy Removes the Consumer's Choice to Maintain Privacy and Avoid the MLS.**

133.    When consumers reject the office exclusive option that remains for off-MLS marketing, they are left with having to enter the MLS system.  Yet many sellers have privacy

concerns that are incompatible with listing the home on an MLS, or simply wish to avoid the home sale process that an MLS listing requires (both explicit MLS requirements and how the process works in practice). In this litigation, NAR's Director of Multiple Listing Services Engagement has declared under oath that "a seller may value privacy over broad marketing of the property," and thus prefer to avoid the MLS system. NAR's public statements regarding the Policy defended the "broker exclusive" carveout by asserting that off-MLS information sharing is "an important option for sellers concerned about privacy and wide exposure of their property being for sale."

134.    To list a property on an NAR-affiliated MLS, the agent must input dozens of required data fields; an MLS listing typically takes between 30 to 60 minutes to complete. In addition to basic information regarding the seller and property, the listing agent must provide information such as whether the sale is related to probate; whether the property is currently occupied; the identity of the occupant, whether or not it is the seller; and other sale conditions such as foreclosure. Even when the sellers' name is not publicly listed, sufficient information is presented to allow the owner to easily be identified. In addition, NAR-affiliated MLS agreements transfer ownership of the intellectual property relating to the listing to the MLS, including the seller's personal data and photographs of the property—which the NAR then sells for a profit. This information can then become available to vendors, marketers, creditors and potential employers, as well as any nefarious actors able to breach NAR's data. Any information provided to an NAR-affiliated MLS is almost immediately syndicated to numerous third-party sites accessible to millions of users.

135.    Furthermore, the seller may also want to avoid exposing herself to the potential adverse health effects of having large numbers of unknown potential buyers parade through her

home; the seller may prefer to sell to a known counterparty for reasons besides sale price; the seller may prefer to forego the typical expense of repairing and/or staging their home for potential buyers, and want to sell the home as-is; the seller might want to attract buyer-agents at less than standard commissions; or the seller may want the sale to move faster or slower than the standard closing process allows. Reducing consumers' free choice and forcing them to select undesired replacements reduces consumer welfare and in this case causes some consumers to leave the market entirely, reducing housing supply.

### f.    The Policy Reduces the Consumer's Choice in Agents.

136.    The Policy also reduces consumer choice in the selection of real estate agents to help market their home. As mentioned above, in any substantial market there are few active agents available to represent the seller who are not NAR members or otherwise subject to NAR's threat to remove access to the local MLS for violating the Policy. As a result, the marketing options for sellers are reduced to two: (1) listing the property on an MLS, and (2) forwarding the property to colleagues within the agent's own brokerage for a conflicted, self-dealing negotiation. Any home seller who does not wish to market on the MLS, and seeks to have their home marketed to a substantial number of buyers' agents, must engage with an agent at a large brokerage rather than the agent of their choice, and their property sale must proceed through a conflicted, self-dealing process rather than an arms-length negotiation.

137.    Consumer choice for home sellers has been reduced, and the shift from arms-length off-MLS negotiations to conflicted internal deals where one brokerage of record is on both sides of the transaction reduces quality as well. This is because instead of separate brokerages working in the best interest of the seller or buyer, with office exclusives the brokerage will make money from both sides of the transaction and therefore there is greater incentive for the intra-brokerage agents to push for a transaction to be consummated, and breach

46

client confidentiality, even when it may not be in the best interest of their respective clients. In addition, any home seller who fails to secure an agent employed at a large brokerage, or simply wants to avoid the potential for self-dealing, is either forced to market on the MLS—potentially against their wishes—or pursue "broker exclusive" marketing to a smaller number of potential counterparties than would be available if the agent could market to personal contacts or through services such as TAN's.

## III.    NAR'S ANTICOMPETITIVE ACTS HAVE CAUSED TAN INJURY IN VIOLATION OF THE ANTITRUST LAWS.

### A.    Relevant Market:  Professional Real Estate Listing Services.

138.    TAN and NAR, thought its control of local MLSs, are participants in the market for professional real estate listing services.  Participants in this market are real estate agents and brokerages on the one side, and centralized listing services on the other.  These participants exchange recurring membership fees for access to a platform allowing them to share and view for-sale property information.  Agents access real estate listing services in the course of providing broker services for consumers who wish to buy, sell, and obtain market research regarding residential real estate.  Individual consumers engage with the market for professional real estate listing and exchange services indirectly through real estate agents.

139.    Neither TAN nor MLSs market their listing services directly to consumers; rather, agents rely on listing services to locate potential counterparties for their clients and conduct market research.  Roughly 90% of home sellers and buyers use the services of a professional real estate agent, and roughly 90% of agent-led home transactions are arranged using information acquired through a professional real estate listing service.

140.    Agents, at the instruction of their clients, use real estate listing portals such as the MLSs and TAN to (1) obtain information regarding for-sale properties and the identity of the

associated listing agent, for the purpose of locating potential counterparties for clients seeking to purchase real estate, (2) to disseminate information regarding properties offered for sale by the agents' clients, for the purpose of attracting the notice of agents for potential counterparties, and (3) to conduct research regarding the real estate market, for the purpose of providing better advice to clients seeking to purchase or sell properties.

141.    The crucial competitive input for sellers in this market are (1) the membership of professional real estate agents and (2) the listing information that these agents provide.  The supply of agent memberships is necessary because an agent representing a home seller would have no reason to purchase the ability to list properties on a service that was not routinely accessed by agents representing home buyers.  Similarly, an agent representing a home buyer would have no reason to access a listing service that did not contain for-sale property information submitted by sellers' agents.  An agent looking to conduct market research would also find no value in a listing service that did not contain current property listings and information.  Therefore, no property listing service could survive without access to a "supply" of agent-members and the listing information they provide.

142.    The preceding paragraph describes what is known as a "network effect," referring to a common phenomenon in which the value of purchasing access to a network directly depends on the number of other individuals who have also purchased access to the same network. Network effects create a substantial, natural barrier to entry for associational products, because no matter how objectively better the new product might be, the actual market value of the product depends on the presence of existing users—something no amount of startup investment can guarantee.  The problem presents as a paradox: to gain users your product must be useful, but to be useful your product must have existing users. The difficulty of securing first-movers to

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

an associational product with no current user base is consistently the largest barrier to services based on individual networks.

143.    Property listings services are also subject to substantial artificial barriers to entry, in particular now that the Policy has been implemented.  New entrants such as TAN must compete with NAR's long-established brand value.  TAN must also contend with the Policy, which creates insurmountable switching costs for agents.  Using TAN as intended, to share properties that the client is not ready to put on the MLS, would require agents in NAR-dominated markets to forego membership in the local MLS, preventing them from making a living.

### B.    Geographic Areas.

144.    The market for professional real estate listing services is regulated nationwide under NAR's central influence, but in practice operates in distinct regional markets.  Residential real estate is, by nature, a localized product.  Each residential real estate market has its own immobile inventory of available real estate, and real estate professionals gain experience specific to the local markets in which they operate.  For this reason, both NAR and TAN primarily interface with their membership through local chapters or affiliates, allowing members to associate and share property information with professionals operating within the same geographic area.  Major population centers generally serve as an anchor for larger regional markets extending outward through the surrounding suburban and exurban communities.  Nearly all real estate agents focus their practice on the regional market in which they are located.

145.    TAN currently operates chapters in the following regions (some of which regions are subdivided into multiple chapters): Scottsdale, Arizona; Alameda County, California; Contra Costa County, California; Marin County, California; Monterey, California; San Fernando Valley, California; San Francisco, California; San Jose, California; San Mateo County, California; Santa

49

Barbara, California; Santa Clara, California; Sonoma and Napa Counties, California; Los

Angeles, California; Washington, D.C.; Oahu, Hawaii; Chicago, Illinois; Boston, Massachusetts;

Cape Cod, Massachusetts; Howard County, Maryland; Portland, Oregon; Austin, Texas; Fairfax

County, Virginia; and Loudoun County, Virginia.

146.    No government agency or regulatory body tracks or publishes comprehensive

statistics regarding the listing services used by real estate agents in local areas.  Similarly, there

is no set industry delineation of geographic markets for the purpose of residential home sales.

Thus, until discovery can be taken in this action, TAN lacks access to complete information

regarding the market share of each participant in each local market.

147.    The relevant geographic markets in which TAN operates are listed below.  In each

market, a single NAR-controlled MLS or consortium of NAR-controlled MLSs dominate the

property listing market.  While the exact share of each market controlled by NAR is not available

publicly, on information and belief close to 90% of each region's properties are sold through

listings on the identified NAR-affiliated MLSs, similar to national figures.  While NAR is a

national organization, its members are able to assert influence over local markets by

promulgating mandatory rules that filter down to the dominant MLS in each market.  On

information and belief, substantially all active, consumer-facing agents in each market are

subscribed to one or more of the identified NAR MLSs.

          a.    The Phoenix-Mesa-Chandler Metropolitan Statistical Area (the "Phoenix

Market").  TAN services this local market through a chapter based in the Phoenix suburb of

Scottsdale, Arizona.  The Arizona Regional Multiple Listing Service ("ARMLS") is the

dominant MLS in the Phoenix Market.  ARMLS is jointly owned by five local NAR affiliates

and operates primarily in Maricopa County and Pinal County, which contain the Phoenix

Market.  Two other major MLSs operate in the state, Multiple Listing Service of Southern

Arizona and the Western Arizona REALTOR® Data Exchange, both of which are controlled by

NAR.

b.      The San Francisco Peninsula and Monterey Bay areas (the "Central Coast

Market").  The Central Coast Market, which is centered around Silicon Valley, includes

Monterey, San Benito, San Mateo, Santa Clara and Santa Cruz Counties.  TAN services this

market through chapters based in San Mateo County, Monterey and San Jose, California.

MLSListings Inc. ("MLSListings"), is the market's dominant MLS.  On information and belief,

MLSListings is jointly controlled by seven local NAR affiliates operating within the Central

Coast Market.  On information and belief, two additional major MLSs have coverage areas that

overlap with portions of the Central Coast Market, SFARMLS and Bay East MLS, both of which

are indirectly controlled by NAR.

c.      The counties north of San Francisco, centered around Northern

California's wine country (the "North Bay Market").  The North Bay Market includes the

counties of Marin, Sonoma and Napa.  TAN services this local market through chapters based in

Marin County and Sonoma & Napa Counties.  This market has historically been dominated by

Bay Area Real Estate Information Services, Inc. ("BAREIS"), an independent MLS that has not

adopted the Policy.  However, BAREIS has entered into information sharing agreements with

several NAR-controlled MLSs and requires that its members' follow the rules of its partner

MLSs when accessing their information; moreover, BAREIS's bylaws grant several board seats

to local NAR affiliates.  In addition, California Regional MLS, the nation's largest MLS with a

service area that spans California, entered the North Bay Market in 2016.

d.      The city of San Francisco and the East San Francisco Bay Area (the "San Francisco Market") comprise a discrete local market for real estate property listing services.  The San Francisco Market includes the counties of San Francisco, Alameda and Contra Costa, and TAN services this market through chapters based in these three counties.   The San Francisco Association of REALTORS® MLS ("SFARMLS"), Bay East MLS and Bridge MLS, all of which are owned and controlled by local NAR affiliates, collectively serve as the dominant MLSs in the San Francisco Market.

e.      The county of Los Angeles (the "Los Angeles Market").  TAN services this market through chapters based in Los Angeles, California and the San Fernando Valley. This dominant MLSs in this market are the California Regional MLS, which is controlled by NAR, and Combined L.A./Westside MLS, Inc. ("CLAW"), d/b/a TheMLS, which is party to a state-wide information sharing agreement with multiple NAR-affiliated MLSs, alongside a number of more localized NAR-affiliated MLSs.

f.      The county of Santa Barbara (the "Santa Barbara Market") comprises a discrete local market for real estate property listing services.  TAN services this market through chapters based in Santa Barbara, California.  The dominant MLS in the market is operated by the Santa Barbara Association of REALTORS®, a local NAR affiliate.

g.      The State of Hawaii (the "Hawaii Market").  TAN services this local market through a chapter based in Oahu, Hawaii.  The dominant MLSs in this market are the Hawaii Central MLS ("HiCentralMLS") and the Hawaii Information Service (HIS). HiCentralMLS is owned and controlled by local NAR affiliate Honolulu Board of REALTORS®, while HIS is jointly controlled by the Kauai Board of REALTORS®, Hawaiian

Island REALTORS®, and West Hawaii Association of REALTORS®, all of which are indirectly controlled by NAR.

   h.  The Chicago Metropolitan Statistical Area (the "Chicagoland Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Chicago, Illinois.  The dominant MLS in this market is Midwest Real Estate Data, which services the greater Chicago metropolitan area.  MRED is owned by the Chicago Association of REALTORS® and is indirectly controlled by NAR.

   i.  The Boston–Cambridge–Nashua, MA–NH Metropolitan NECTA (the "Greater Boston Market") comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Boston, Massachusetts.  The dominant MLS in this market is MLS Property Info Network ("MLSPIN"), which services New England.  MLSPIN, is jointly owned by NAR members and is indirectly controlled by NAR.

   j.  Barnstable County, Massachusetts (the "Cape Cod Market"), comprises a discrete local market for real estate property listing services.  TAN services this local market through a chapter based in Cape Cod, Massachusetts.  The dominant MLSs in this market are MLSPIN and Cape Cod & Islands MLS ("CCIMLS"); CCIMLS boasts that it is "is the only locally based Multiple Listing Service in the region."  CCIMLS is owned and controlled by a local NAR affiliate, Cape Cod & Islands Association of REALTORS®.

   k.  The Portland–Vancouver–Hillsboro, OR–WA Metropolitan Statistical Area (the "Portland Market").  TAN services this local market through a chapter based in Portland, Oregon.  This dominant MLS in this market is Regional Multiple Listing Service ("RMLS"), which services Oregon and Southern Washington.  RMLS is jointly owned by the

Portland Metro Association of REALTORS®, East Metro Association of REALTORS®, and Clark County Association of REALTORS®, and is indirectly controlled by NAR.

l.      The Austin–Round Rock–San Marcos MSA (the "Austin Market").  TAN services this local market through a chapter based in Austin, Texas.  The dominant MLS in this market is Austin/Central Texas Realty Information Service ("ACTRIS"), which services the greater Austin area and central Texas.  ACRIS is owned by the Austin Board of REALTORS® and is indirectly controlled by NAR.

**FIRST CLAIM FOR RELIEF:**

**VIOLATION OF SHERMAN ANTITRUST ACT, 15 U.S.C. § 1**

**UNLAWFUL COMBINATION IN RESTRAINT OF TRADE**

148.    TAN realleges and incorporates the preceding paragraphs by reference.

149.    NAR's Policy constitutes a Group Boycott by NAR's associated members against TAN in the market for property listing services, and thus the NAR's actions are a per se antitrust violation.  The MLS Clear Cooperation Policy constitutes a Group Boycott because it cuts off TAN's access to the supply and customers in the relevant market needed to compete with NAR-affiliated MLSs—*i.e.,* information regarding properties being marketed and/or sold off-MLS, and the agents paying membership dues for this information—by undermining the entire purpose for TAN's services.

150.    As discussed above, the Policy constitutes a horizontal agreement among real estate agents not to compete against each other using off-MLS marketing, in order to suppress competition from more successful real estate agents for the benefit of NAR's broader membership, which is unable to compete effectively against high performers.  This restriction operates by leveraging MLS rules to require that agents place any property advertised publicly

54

**FOURTH AMENDED COMPLAINT**
**CASE NO. 3:20-CV-03198 VC**

on the local MLS.  Agents market properties off-MLS on behalf of clients who specifically wish to avoid the MLS, or because listing on the MLS will be detrimental to their client's interests. Thus, agents bound by the Policy will avoid off-MLS marketing to prevent triggering the requirement that the property be listed on the MLS.

151.    NAR is aware of and intended that this effect would coerce agents away from listing properties on services such as TAN's.  NAR intended that the Policy would starve TAN of property listings, causing agents to cancel the service.  Ultimately, NAR intended for this effect to eliminate TAN as a potential business rival, for the benefit of its non-producing agent members. TAN has already seen a significant drop in listings and subscriptions in NAR-dominated markets that is not matched in the few markets not dominated by NAR.

152.    As described above, NAR has a dominant market position.  NAR's dominance comes from its indirect control of the dominant MLS in virtually all of America's major markets; virtually all active, consumer-facing agents are subscribed to at least one of these MLS as a matter of professional necessity.  NAR's dominance, and the dominance of its local affiliates, is reflected in both its overwhelming market share and its ability to exert power over the behavior of real estate by leveraging control of MLSs, membership in which is necessary to practice as a real estate agent.

153.    The Policy is not justified by overall efficiency or competitive policy reasons.  As discussed above, the implementation of the Policy has harmed the real estate market and ancillary markets and has failed to accomplish its ostensible purpose.  Further, the existence of the "broker exclusive" carveout shows that NAR is not serious about reducing "pocket listings" in the market.

154.    Moreover, NAR's Policy is also invalid under a rule of reason antitrust analysis. First, NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this Policy among its membership, regional affiliates and NAR-related MLSs, constitutes a contract, combination, or conspiracy by and between NAR's members and its affiliate associations that unreasonably restrains competition within the market for professional affiliation for real estate agents throughout the United States, and within each regional market in which TAN operates, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As the NAR itself concedes, its individual members and affiliated associations are competitors in the market without a unity of economic interest.  The associations comprising the NAR are therefore legally capable of agreeing and conspiring to unlawfully restrain competition.

155.    Second, as described above, NAR added "multi-brokerage listing sharing networks" to its definition of "public marketing" in the Policy to target TAN and businesses similarly situated, competitors with NAR-affiliated MLSs, for the purposes of undermining TAN's business in the relevant market, thereby intending to harm or restrain trade.  The purpose of eliminating TAN and other off-MLS marketing channels from the market for property listing services is to suppress competition among real estate agents in the broker services market. Third, NAR's Policy has injured competition by already causing damage to alternative business models such as TAN and by reducing output and quality in the market, as described above.  TAN has also suffered untold reputational harm, with members openly questioning whether they can continue to use TAN's services or risk being fined.

156.    The aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects in the markets for residential real estate listing services, and the

related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, reducing output, and restricting consumer choice. The markets for broker services and residential real estate are also harmed.

157.    This contract, combination, or conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

158.    NAR's adoption of the MLS Clear Cooperation Policy, in combination with the charters and agreements allowing NAR to promulgate and enforce this proposal among its membership, regional affiliates and NAR-related MLSs, constitutes an unlawful exclusive dealing arrangement and/or Group Boycott.

159.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real estate listing services, by cutting TAN off from access to supply and customers.

160.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs. NAR's unlawful act has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

161.    TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues. As a target of NAR's Group Boycott, the injury suffered by TAN is directly connected to NAR's harms to competition.

**SECOND CLAIM FOR RELIEF:**

**VIOLATION OF THE CARTWRIGHT ACT, BUS. & PROF. CODE § 16700**

**EXCLUSIVE DEALING**

162.    TAN realleges and incorporates the preceding paragraphs by reference.

163.    NAR maintains monopoly power over the market for residential real estate listing services.

164.    NAR's unlawful act has substantially foreclosed TAN's access to the market for real estate listing services, by cutting TAN off from access to supply and customers.

165.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

166.    NAR's adoption of the MLS Clear Cooperation Policy has and will continue to prevent and/or discourage real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  NAR's unlawful act has had and will continue to have anticompetitive effects in the market for residential real estate listing services, and the related markets for residential real estate and broker services, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

167.    NAR's actions are not reasonably necessary to accomplish any procompetitive objective, or, alternatively, and its procompetitive justifications are pretextual.

168.    TAN has and will suffer actual injury as a result of the anticompetitive effects of NAR's actions, primarily through the loss of TAN members and membership dues.

## THIRD CLAIM FOR RELIEF:

## VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200

169.    TAN realleges and incorporates the preceding paragraphs by reference.

170.    Section 17200 of the California Business and Professions Code prohibits any unfair or unlawful business practice.

171.    Defendants have engaged in acts of unfair competition within the meaning of Section 17200 by engaging in unlawful and unfair conduct.

172.    Defendants engaged in unlawful conduct by committing the acts described herein in violation of Section 1 of the Sherman Act, and the Cartwright Act.

173.    Defendants have further engaged in unlawful conduct by requiring agents to disseminate their clients' private information on MLSs without client consent in violation of California's Consumer Privacy Act.  Defendants have further engaged in unlawful conduct by requiring real estate agents to violate their fiduciary duty to their clients by placing their homes on the NAR-affiliated MLS when it is not in the clients' best interest.

174.    Defendants have engaged in unfair conduct by adopting the MLS Clear Cooperation Policy, for the purpose of using their market power to prevent entities such as TAN from recruiting dues-paying members and from participating in the market for real estate listing services, thereby violating the policy and spirit underlying the federal and state antitrust laws. Defendants have also engaged in unfair conduct by acting to suppress competition in the broker services market.

175.    Defendants' unfair and unlawful acts have harmed competition in California by preventing and/or discouraging real estate agents from using residential real estate listing services that compete with NAR-affiliated MLSs.  Defendants' unlawful acts have had and will continue to have anticompetitive effects in the markets for real estate professional association and residential real estate listing services, and the related market for residential real estate, by reducing competition on price and quality, raising barriers to entry, and restricting consumer choice.

176.    TAN has and will suffer actual injury and economic loss as a result of the Defendants' unfair and unlawful actions, primarily through the loss of TAN members and membership dues.

## FOURTH CLAIM FOR RELIEF:

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

177.    TAN realleges and incorporates the preceding paragraphs by reference.

178.    Numerous membership contracts existed between TAN, on the one hand, and TAN's members on the other, through which TAN exchanged membership benefits in its network for membership dues.  Many of TAN's membership contracts were made with real estate agents who were also members of NAR.

179.    Defendants were aware that TAN had entered into membership contracts with real estate agents, including NAR members, and was aware that these members often shared off-MLS real estate listings through TAN for the purpose of engaging in off-MLS transactions.

180.    NAR's adoption of the MLS Clear Cooperation Policy made performance of these contracts more difficult by threatening agents with steep financial and professional penalties for using TAN, preventing or hindering their membership from sharing off-MLS real estate listings,

preventing TAN from serving as a forum for off-MLS sales and thereby reducing the value of the membership benefits TAN could offer to members.  This interference has caused and will continue to cause TAN members to terminate their membership.

181.    NAR deliberately adopted the MLS Clear Cooperation Policy for the admitted purpose of hindering NAR members from engaging in off-MLS transactions facilitated by TAN. NAR intended for adoption of the MLS Clear Cooperation Policy to denude the value of TAN membership.  NAR either intended to induce TAN members to cancel their TAN membership, or knew that such terminations were substantially likely (if not certain) to occur.

182.    TAN has and will suffer actual injury as a result of the NAR's interference, primarily through the loss of TAN members and membership dues.

## **PRAYER FOR RELIEF**

WHEREFORE, TAN prays for judgment against NAR as follows:

1.    For treble damages, including lost profits, according to proof, together with prejudgment and postjudgment interest thereon;

2.    For costs of this suit, including attorneys' fees and costs, pursuant to 15 U.S.C. § 26 and to the maximum extent permitted by law.

3.    For an award of punitive damages;

4.    For restitution;

5.    For an order directing termination of the anticompetitive conduct, including but not limited to rescission of the MLS Clear Cooperation Policy;

6.    For a permanent injunction barring enforcement of the MLS Clear Cooperation Policy; and

7.      For such other and further relief as the Court deems just and proper.


Dated:  October 1, 2024                    LEWIS & LLEWELLYN LLP


                                           By: */s/ Paul T. Llewellyn*_____
                                                Paul T. Llewellyn
                                                Attorneys for Plaintiff
                                                TOP AGENT NETWORK, INC.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial for all claims for relief so triable.


Dated:  October 1, 2024                    LEWIS & LLEWELLYN LLP


                                            By: */s/ Paul T. Llewellyn*
                                                Paul T. Llewellyn
                                                Attorneys for Plaintiff
                                                TOP AGENT NETWORK, INC.

FOURTH AMENDED COMPLAINT
CASE NO. 3:20-CV-03198 VC